# EXHIBIT 1

Ventura hospital to settle over gifts, loans to doctors : Ventura County Star     Page 1 of 2



Printer-friendly story
Read more at vcstar.com

# Ventura hospital to settle over gifts, loans to doctors

By Kathleen Wilson

Thursday, December 20, 2007

Community Memorial Hospital has agreed to pay the federal government $1.52 million to settle allegations of improper payments, gifts and loans to physicians over a period of nearly 10 years.

In an agreement released Wednesday by officials of the private Ventura hospital, the government alleges 17 examples of financial arrangements that conflict with federal law.

The 12-page settlement resolves allegations that Community Memorial made prohibited payments to doctors who referred Medicare patients to the hospital, federal officials said. Included were interest-free loans, rental arrangements at below-market rents, employment arrangements with physicians' family members and gifts, the U.S. Attorney's Office in Los Angeles said.

The government did not accuse the hospital of making false or inflated Medicare claims. At issue were violations of laws governing conflicts of interest in the medical arena.

Gary Wilde, president and CEO of Community Memorial, said the hospital voluntarily reported the financial transactions to the government after he arrived in 2004. Wilde said they all were initiated under the administration of former CEO Michael Bakst, who ran the hospital for nearly 25 years before he was terminated in 2003 after a legal battle with doctors.

Federal officials said the fact that the hospital came forward influenced the settlement.

### 'Transactions news' to board

Wilde said the hospital board of trustees was, with the exception of an interest-free home loan to a doctor, unaware of any of the transactions.

"The others were news to them," he said.

The board decided unanimously to report the transactions, Wilde said. The settlement frees the current administration and board members from criminal liability. Lawyers for the hospital negotiated the settlement with the U.S. Attorney's Office. Wilde said the government initially was seeking $11 million.

EXH: 1
Page #: 21

Ventura hospital to settle over gifts, loans to doctors : Ventura County Star                     Page 2 of 2

Michael Amir, Bakst's lawyer, denied that his client did anything wrong and said the transactions were approved by the board and subject to audits. The attorney said he talked to Bakst on Wednesday night after learning of the settlement.

"The bottom line is Mike just wants to move on with his life," he said. "He had a very successful 25 years with the hospital. He's disappointed that his reputation is being tarnished years after he left."

The settlement does not name the physicians who allegedly engaged in the financial relationships. The document cites interest-free loans of $645,000 given to doctors, a $1 million line of credit to a physician, and reimbursements Bakst received for numerous gifts to doctors and their family members, including a $15,000 Rolex watch, a Louis Vuitton handbag, airline tickets and a $4,000 digital camera.

Some of the allegations involved technical violations, such as arranging for work to be done by independent contractors without the proper paperwork, Wilde said.

### Inducements prohibited

With few exceptions, the federal Stark law prohibits hospitals from providing inducements to physicians, Assistant U.S. Attorney Wendy Weiss said. The law generally applies to physicians serving Medicare and Medicaid patients.

"The Medicare system operates under the belief that doctors should be free of financial entanglements when they are making referral decisions, so people are referred on the basis of their conditions and where they can get the best treatment, not on who is giving them some kind of incentive," Weiss said.

Amir said he was surprised that Bakst is being blamed.

"I just find it surprising that his name is being raised three or four years after he left the hospital," he said.

Dr. John Hill, who led the doctors' battle against Bakst's management, said the problems have been corrected under Wilde's tenure. But he regrets that the money for the settlement has to come from the hospital.

"This money that is being paid to the federal government doesn't punish the perpetrator," he said. "The money is being taken from the hospital. It's being taken from the community. That's the real concern I have. The ultimate penalty is misplaced."



© 2009 Scripps Newspaper Group — Online

EXHIBIT 2

08/10/2009  14:57  2136130550  BROWN WHITE NEWHOUSE  PAGE  02/49

1  BROWN, WHITE & NEWHOUSE LLP
   GEORGE B. NEWHOUSE, JR. (SBN 107036)
2  STEVEN A. HEATH (SBN 250867)
   CELIA OUELLETTE (SBN 292334)
3  333 South Hope Street, 40th Floor
   Los Angeles, California 90071-1406
4  Telephone:  213-613-0500
   Facsimile:  213-613-0550
5

6  Attorneys for Plaintiff
   COMMUNITY MEMORIAL HEALTH SYSTEM, INC.
7

                    VENTURA
                SUPERIOR COURT
                    FILED
                  AUG 1 0 2009
           MICHAEL D. PLANET
           Executive Officer and Clerk
       BY: _____ , Deputy
           DENISE M. LUGO

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

              FOR THE COUNTY OF VENTURA
10

11  COMMUNITY MEMORIAL HEALTH          Case No. 56-2008-00318654-CR-FR-VTA
    SYSTEM, INC., a California non-profit   [Hon. Kent Kellegrew]
12  public benefit corporation, formerly known
    as COMMUNITY MEMORIAL             SECOND AMENDED COMPLAINT
13  HOSPITAL OF SAN BUENAVENTURA,     FOR:
    INC., a California non-profit public benefit
14  corporation,                      (1) FRAUD: FRAUDULENT
                                          CONCEALMENT AND
15            Plaintiff,                   MISREPRESENTATIONS;
                                       (2) CONSPIRACY TO COMMIT
16        v.                              FRAUD AND TO BREACH A
                                          FIDUCIARY DUTY;
17  BARTLETT, PRINGLE & WOLF, LLP;    (3) BREACH OF FIDUCIARY DUTY
    RON CAMP, an individual; PETER A.     OF LOYALTY
18  GOLDENRING, an individual; and
    GOLDENRING & PROSSER, a California  JURY TRIAL DEMANDED
19  Professional Law Corporation,
20            Defendants.
21

22

23        At all times relevant to the allegations of this Complaint, Plaintiff Community

24  Memorial Health System, Inc. alleges as follows:

25

26

27

28

                                                   SECOND AMENDED COMPLAINT

174772.2

08/10/2009   14:57   2136130550          BROWN WHITE NEWHOUSE                PAGE  03/49

# I

## OVERVIEW

1.    Plaintiff Community Memorial Health System, Inc., a California non-profit public benefit corporation ("CMHS"), formerly known as Community Memorial Hospital of San Buenaventura ("CMH"),[1] brings this action against its former outside accounting firm, Bartlett, Pringle & Wolf LLP ("Bartlett Pringle") and its former General Counsel, Peter A. Goldenring ("Goldenring"), for **fraud**, consisting of active concealment of material facts and fraudulent misrepresentations (Count I); **conspiracy** to commit fraud and breach fiduciary duties of care and loyalty owed to CMH (Count II) and **breach of an** attorney's **fiduciary** duty of undivided loyalty (Count III).

2.    This lawsuit seeks to hold CMH's outside accounting firm, Bartlett Pringle, and its former General Counsel, Goldenring, accountable for their fraudulent misconduct as professionals: i.e., deliberate and active malfeasance consisting of collusion, conspiracy and fraud in concealing from the Board of Trustees of the Hospital (the "Board") material evidence, well known to them, that CMH's then Executive Director Michael D. Bakst ("Bakst") was, and had been, actively engaged in various types of financial misconduct, self-dealing and fraud involving illegal and fraudulent abuse of CMH funds. These derelictions by Bakst, as CMH's Executive Director, damaged CMH in excess of several million dollars.

3.    In 2002, the Board learned of serious allegations that CMH's then Executive Director Bakst was potentially defrauding the Hospital by, *inter alia*: (1) submitting bogus claims for reimbursement of personal expenses purportedly for the Hospital's benefit over a multiple-year period;  (2) receiving reimbursement for hundreds of thousands of dollars of insufficiently documented expense claims between January 1, 2001 and October 2002, expenses which were largely, if not entirely, for Bakst's personal benefit and/or not for ordinary or reasonable business expenses;  and (3) using Hospital funds to make

---

[1]    Plaintiff CMHS shall alternatively be referred to herein as "CMH" or "Hospital."

SECOND AMENDED COMPLAINT

174772.2

1   inappropriate payments for the benefit of various members of the Hospital's medical staff,

2   resulting in CMH accruing substantial liabilities under federal Medicare regulations

3   rendering such payments unlawful.

4        4.    To investigate these suspicions so the Board of Directors might be fully

5   informed, and thereby to take appropriate action, CMH engaged its outside accounting

6   firm, Bartlett Pringle, to conduct an objective review of CMH's books and records, a

7   special procedures review known as the Agreed Upon Procedures review ("AUP review").

8   This AUP review included conducting interviews of appropriate hospital personnel in

9   order to determine whether such fraudulent conduct was actually occurring. The Board of

10   Trustees specifically instructed Bartlett Pringle to report its findings and recommendations

11   back to the Board after conducting the AUP review. By accepting the AUP review,

12   Bartlett Pringle engendered certain fiduciary duties of loyalty, objectivity and professional

13   competence and care, which it owed strictly to its client, CMH.

14        5.    Had the defendants Bartlett Pringle and Goldenring appropriately discharged

15   their respective duties of care and professional responsibility to the Hospital following the

16   AUP review, certain revelations regarding Bakst's repeated instances of misconduct and

17   gross misfeasance that occurred over a multiple-year period would have been revealed to

18   the Board. Namely, had the Board known of Bakst's various acts of misconduct and gross

19   misfeasance, Bakst would have been immediately terminated with cause from his

20   employment at the Hospital, and the Hospital would have likely recovered from Bakst

21   monetary damages with respect to monies he fraudulently received from the Hospital, as

22   well as the material damages that the Hospital incurred by virtue of Bakst's violations of

23   federal Medicare laws known as the "Stark Law" (see ¶¶ 22-27, *infra*).

24        6.    The Hospital engaged Bartlett Pringle to perform the AUP review "in

25   accordance" with professional "standards established by the American Institute of

26   Certified Public Accountants" ("AICPA"). Bartlett Pringle promised that at the conclusion

27   of such AUP review, it would "submit a report in letter form outlining the procedures

28   performed and [its] findings, observations and recommendations resulting from the

-3-

174772.2

1  procedures performed" to the Board.  However, Bartlett Pringle broke its promise to

2  faithfully and objectively report to the Board its "findings, observations and

3  recommendations" resulting from the AUP review, which had revealed unmistakable

4  evidence of fraud, self-dealing and financial skullduggery committed by Bakst over a

5  multiple-year period, misconduct involving hundreds of thousands of dollars of CMH

6  funds, and the misuse of CMH assets for Bakst's personal benefit and separate instances of

7  self aggrandizement.

8        7.   Rather than disclose these findings to the Board, as it faithfully promised to

9  do, Bartlett Pringle, at the request of CMH's then General Counsel Goldenring, agreed to

10 conceal and withhold such factual findings and observations from the Board.  Not only did

11 Bartlett Pringle and Goldenring conceal key disclosures, Bartlett Pringle and Goldenring

12 made materially false misrepresentations to the Board.  Had the truth been disclosed to the

13 Board (instead of being concealed pursuant to a conspiratorial agreement), the Board

14 would have been alerted to Bakst's fraudulent misconduct and could thereby have

15 implemented appropriate remedial action.

16       8.   On information and belief, Bartlett Pringle knew that Goldenring had an

17 actual conflict of interest by acting as Bakst's personal attorney while also purporting to

18 act as the General Counsel to the Board.  Despite this knowledge, Bartlett Pringle allowed

19 Goldenring to review a prior draft of Bartlett Pringle's report to the Board and to redact or

20 excise factual findings that Goldenring believed would be damaging or embarrassing to

21 Bakst.  In so doing, Bartlett Pringle essentially allowed Bakst (through attorney

22 Goldenring) to re-write their report to the Board of Trustees obscuring their findings

23 regarding Bakst's various financial misdealings.

24       9.   By conspiring to withhold and conceal this material information from CMH,

25 both Bartlett Pringle and Goldenring knowingly, deliberately and willfully violated their

26 respective professional and fiduciary duties of loyalty and disclosure to their true client,

27 CMH, and damaged CMH in a number of ways:

28

-4-

SECOND AMENDED COMPLAINT

174772.2

a.  Because Bartlett Pringle's report had been sanitized of any findings relating
to or revealing Bakst's financial misconduct, CMH did not realize the full
extent and scope of Bakst's misconduct, self-dealing and his violations of
federal regulations. Thus, when CMH decided to terminate Bakst's
employment in 2003, it provided him with a more favorable settlement that
included, among other things, a multi-million dollar severance payment and
a full release of claims, both known and unknown, which CMH would not
have provided had it known the actual facts involving Bakst's misconduct.

b.  Years later, when CMH ultimately discovered that Bakst had engaged in a
pattern of financially improper transactions with members of the medical
staff, and that some of these transactions violated the "Stark Law" and IRS
regulations against providing certain types of financial benefits to medical
staff capable of making Medicare referrals to the Hospital, the Hospital was
forced to investigate and self-report such acts of misconduct to the United
States Department of Justice ("DOJ") and to the Department of Health and
Human Services, Office of Inspector General ("OIG"), resulting in a
negotiated fine of approximately $1.5 million.

10.  Bartlett Pringle, and CMH's former attorney, Goldenring, should be held
responsible for their respective misconduct, inexcusable omissions, false
misrepresentations, cover-up, active concealment and grave derelictions of their
professional responsibilities and fiduciary duties of care and loyalty to their client, CMH.
CMH herein seeks to be made whole as a result of the damages caused by Bartlett
Pringle's and Goldenring's professional misconduct and fraud, including but not limited to
the payment of a civil fine to the DOJ and the OIG to resolve Bakst's Stark Law violations,
and other damages caused the fact that CMH unknowingly released Bakst from liability,
because of Bartlett Pringle's false assurances that Bakst had not and was not engaged in
any known financial misconduct.

-5-

174772.2

## II

## PARTIES AND VENUE

11.     Plaintiff, CMH, is a California non-profit public benefit corporation, located in Ventura, California.  CMH owns and operates various hospitals and health clinics in the County of Ventura, California, including an acute care hospital in Ventura known as Community Memorial Hospital (the "Hospital" or "CMH").

12.     CMH is a 240-bed general acute care hospital located at 147 North Brent Street, Ventura, California 93003.  During 2004, CMH provided care to 22,315 Medi-Cal inpatients and outpatients, and provided approximately $3,100,000 in charity care.  CMH is the sole health care provider in the city of Ventura of cardiac catheterization laboratory services, open heart surgery, and peripheral/interventional vascular and angiography procedures.

13.     Defendant Bartlett Pringle is a California limited liability partnership and a certified public accounting firm which has served the Santa Barbara and Ventura Counties for over 50 years.  Bartlett Pringle's principal place of business is at 1123 Chapala Street, Santa Barbara, California.  Beginning in or about the 1980's and concluding in 2005, Bartlett Pringle acted as the outside certified public accounting firm for CMH (references herein to "Bartlett Pringle" throughout include Defendant Ronald E. Camp.)

14.     Bartlett Pringle holds itself out as "a financial services firm" whose "partnership with [its] clients is based on [the accounting firm's] ability to provide an integrated, comprehensive range of services."  One of the categories of services that Bartlett Pringle provides, according to its website (www.Bartlett Pringle.com/services.htm), is "audit services" by which Bartlett Pringle promises that "your organizations' financial practices and procedures" will be reviewed to assure "accurate and objective financial statements."  Bartlett Pringle's range of services within "audit services" include "audits, reviews and compilations *to meet almost any need*." (Emphasis added).  Bartlett Pringle expressly holds itself out as a "member of AICPA Division of Firms," thereby implicitly representing to its clients that it fully complies with

-6-

174772.2

08/10/2009  14:57   2136130550                 BROWN WHITE NEWHOUSE                    PAGE  08/49

1   the ethics standards and professional guidelines set forth by the American Institute of

2   Certified Public Accountants ("AICPA").

3       15.   Defendant Ronald E. Camp ("Camp") was a partner of Bartlett Pringle, and

4   one of the principals at Bartlett Pringle responsible for performing legal and accounting

5   services for CMH.

6       16.   Defendant Peter A. Goldenring ("Goldenring") is an attorney licensed to

7   practice law in California.  Goldenring is a principal of Goldenring & Prosser, a law firm

8   with offices at 6050 Seahawk Street, Ventura, CA 90003.

9       17.   Defendant Goldenring & Prosser, PLC ("Goldenring  & Prosser"), is a

10  professional law corporation in the State of California, which maintains its principal

11  offices at 6050 Seahawk Street, Ventura, CA 90003.  (References herein to Goldenring &

12  Prosper throughout include Defendant Peter A. Goldenring.)

13      18.   On information and belief, Bakst caused CMH to hire his former personal

14  attorney, Goldenring to serve as General Counsel to the Board of Trustees of CMH.

15      19.   On information and belief, Goldenring had previously represented Bakst in

16  personal, family-law matters prior to becoming counsel to CMH.  Goldenring continued to

17  represent Bakst's personal interests while concomitantly serving as outside counsel to the

18  Hospital, a dual capacity representation that resulted in a persistent, on-going conflict of

19  interest under the California Rules of Professional Conduct, Rule 3-310.  Therefore, there

20  existed at all relevant times an actual and unwaived conflict of interest between

21  Goldenring's representation of the Hospital and his prior and ongoing representation of

22  Bakst in his personal capacity.

23      20.   On information and belief, at no time did Goldenring obtain the informed

24  written consent of both Bakst and CMH to "accept or continue representation of more than

25  one client in a matter in which the interests of the clients" either "actually" or "potentially"

26  conflicted, in violation of California Rule of Professional Conduct, Rule 3-310(C)(2)&(3).

27      21.   Venue is proper in Ventura County under Code of Civil Procedure section

28  395.5 for the following reasons:  (a) the audit engagement contract between Bartlett

-7-

SECOND AMENDED COMPLAINT

174772.2

1   Pringle and CMH was made and entered into in Ventura County;  (b) Ventura County is

2   the principal place of business of both the Plaintiff CMH and defendants Goldenring &

3   Prosser, PLC, and Peter A. Goldenring, and (c) the respective defendants' breaches of their

4   professional commitments to CMH  and their breaches of fiduciary duty and professional

5   malpractice described in this Complaint occurred in that county.

6

7                                                    III

8                              **FACTUAL & LEGAL BACKGROUND**

9          A.     Stark Law Physician Anti-Referral Law and Alleged Violations
                  Thereof

10

11          22.    As described herein, Michael D. Bakst caused CMH to enter into a number

12   of financial relationships or transactions with certain physicians on CMH's medical staff

13   (hereafter, the "Transactions"), which the DOJ has claimed constituted violations of the

14   federal physician anti-referral law and regulations promulgated there under, commonly

15   referred to as the "Stark Law."

16          23.    The Stark Law provides that, subject to certain exceptions, a physician may

17   not refer patients for Medicare-covered designated health services to an entity, such as

18   CMH, with which the physician (or an immediate family member of the physician) has a

19   financial relationship, and the entity may not bill for any services provided as a result of a

20   prohibited referral.  (42 U.S.C. § 1395nn.)  Designated health services ("DHS") include,

21   among other things, all hospital services.  "Financial relationship" is defined broadly by

22   the Stark Law to include any type of ownership interest or compensation arrangement.

23          24.    Under the Stark Law, CMH constitutes an "entity" subject to its prohibitions

24   with respect to transactions or financial arrangements with the physicians on its medical

25   staff (i.e., the "Physicians").  As fully described below, Bakst, acting in his capacity as

26   Executive Director of CMH, knew, or should have known, that when he caused certain

27   Physicians to enter into the Transactions described below, he was committing the Hospital

28

                                                -8-

174772.2

1  to a course of conduct that the DOJ and the OIG have since alleged constituted violations
2  of the Stark Law.

3      25.    Penalties for Stark Law violations include, without limitation, non-payment
4  for services resulting from a prohibited referral, civil penalties up to $15,000 for each such
5  service, and exclusion from participation in governmental health care programs (including
6  Medicare and Medicaid).  Civil penalties of up to $100,000 apply for schemes, such as
7  cross-referral arrangements, intended to circumvent the rules.

8      26.    Stark penalties also include the refund of all payments a hospital (or other
9  entity) receives for DHS provided pursuant to a prohibited referral.  (42 U.S.C. §
10  1395nn(g)(2); 42 C.F.R. §411.353(d); 42 C.F.R. § 1003.101.)

11      27.    Moreover, Title 42, United States Code, § 1320a-7b(a)(3) makes it a felony
12  for a person or entity who learns of the occurrence of any event affecting his or her initial
13  or continued right to a Medicare payment to conceal or fail to disclose that event, with the
14  intent to fraudulently secure a payment that is not due, or a higher amount of payment than
15  is due.  On information and belief, the OIG, which enforces the integrity of the federal
16  Medicare program, has indicated that this statute requires a healthcare provider to disclose
17  the receipt of and refund any Medicare (and other governmental) reimbursement that the
18  provider later learns was improper or constituted a violation of the Stark Law, even though
19  the provider had no fraudulent intent at the time it filed a claim for such reimbursement.

20      28.    In light of the above statutory provisions, and after learning, following
21  Bakst's termination as Executive Director of CMH, that Bakst had engaged in a number of
22  illegal transactions that  likely violated the Stark Law, CMH voluntarily self-disclosed the
23  existence of these suspect financial relationships to the DOJ and to the OIG.  As described
24  below, those violations were ultimately settled by and between CMH and the DOJ/OIG,
25  with CMH agreeing to pay a fine of approximately $1,500,000 for negligent and reckless
26  conduct committed solely by Bakst while in his capacity as Executive Director of CMH.

27
28

174772.2                                                    SECOND AMENDED COMPLAINT

EXH: 2
Page #: 31

**B.    Bakst's Financial Misconduct Involved Personal Expenditures, Gifts and Impermissible Benefits to the CMH Medicare Staff Subject to the Stark Law Prohibitions and Impermissible Gifts to Hospital Employees**

29.    Beginning in or about 1998 and, on information and belief, during earlier periods and continuing until his termination from CMH in 2003, Bakst used his personal credit card to engage in numerous unlawful transactions involving the purchase of personal items for which Bakst sought and obtained reimbursement from CMH by submitting expense vouchers.  Most of these transactions, if not all, were not "ordinary and reasonable" expenditures of the Hospital, *i.e.*, such purchases were not necessary or appropriate business expenditures of a non-profit 501(c)(3) organization.  Rather, Bakst's illicit transactions consisted of: (1) personal expenditures for which Bakst unlawfully and fraudulently asked the Hospital to pay;  (2) impermissible "gifts" and other forms of largess that Bakst unilaterally conferred on certain members of the medical staff that may have constituted Stark Law violations; and (3) impermissible and inappropriate "gifts" of Hospital funds to CMH employees that essentially provided them with additional compensation, which CMH failed to properly record as additions to their taxable income or to issue 1099's to such employees, as it was required to do under the federal tax laws.

30.    On information and belief, Bakst knew that he could easily defraud the Hospital in this fashion because as Executive Director, he was responsible for CMH's insufficient accounting controls and personal expense reimbursement procedures for himself.  Essentially, Bakst would regularly make substantial purchases of computers, personal handheld devices, cameras, watches, electronic equipment, jewelry and other personal items that were in no way connected to or justified by CMH's business of providing high quality health care to the citizens of Ventura County.  Bakst would make such expenditures on one or more of his personal credit cards and then submit the credit card bills, containing thousands of dollars of essentially personal expenditures, to the Hospital's accounting department for payment on a monthly basis.  Bakst would not submit supporting documentation prior to payment.  The Hospital would then pay the

-10-

174772.2

1    credit card bill in its entirety and such improper expenses would be booked to the general

2    ledger.

3          31.    Sometime later, Bakst would fill out an Expense Reimbursement Form and,

4    as Bartlett Pringle's Workpapers recited: "After the form [was] complete[d], Dr. Bakst

5    [would] . . . determine which expenses [were] for the hospital and how much he owe[d]

6    CMH for the excess portion of the bill that was paid for his own personal expenses. He

7    then [would] indicate on the expense report the amount [Bakst] owe[d] CMH." Bakst

8    knew that CMH did not track these figures and was unable to verify them. On information

9    and belief, Bakst also knew fully well that the majority of his sundry purchases of

10   expensive personal computers, watches, electronic equipment, cameras and like gifts were

11   not properly reimbursable by CMH and could not, consistent with sound business practices

12   and federal tax laws, be charged to or paid by CMH. On information and belief, Bakst

13   knew that although such expense receipts were subject to "review" and approval by

14   CMH's Director of the Finance Committee, such review and approval was largely pro

15   forma, and that Bakst's entire list of expenditures would be, and routinely was, approved

16   without any audit, follow-up or questions asked. As Bartlett Pringle noted in its

17   Workpapers: "[We] noted that all of the expense reports were approved after the check

18   was cut. In a number of cases, approval was months later."

19         32.    A partial list of personal items that Bakst purchased for his personal benefit,

20   and which he fraudulently charged the Hospital for, included approximately $57,500 in

21   personal charges, to wit:

22         a.    Between April 2001 and August 2003, Bakst charged his American Express

23               card and his Platinum Plus card for $7,560.88 in repairs to his personal

24               automobile: charges to Silver Star Mercedes and Motor Cars West.

25         b.    Between May 17, 2000 and September 20, 2003, Bakst purchased in excess

26               of $12,000 worth of camera equipment for his personal use: i.e., several

27               digital cameras and computer cameras. Several of the expense notations

28

-11-

174772.2

EXH: 2
Page #: 34

08/10/2009  14:57   2136130550          BROWN WHITE NEWHOUSE          PAGE 13/49

read: "Camera for MDB [Michael D. Bakst] to replace one given to employees."

   c. Between March 26, 2000 and May 25, 2003, Bakst purchased in excess of $30,000 in computer equipment, on information and belief, for his personal use, including an Apple iBook, a Sony computer and a "computer for MDB and [CMH employee] Nick Pappas."

   d. Between January 25, 2002 and June 29, 2002, Bakst purchased in excess of $1,500 in gifts, described as follows:

     i. HF Wichman & Co., "Estes Park Conference": $686.41

     ii. CompUSA – "Keats Smiley Gift" – palm handheld: $427.98

     iii. Coach Leatherwear – "Gift Pat Holden": $478.46.

   e. Between February 22, 1999 and September 21, 2003, Bakst purchased in excess of $6,300 in various personal electronic items such as palm handheld devices, cell phones, and Apple computer players.

   f. On or about April 8, 2001, Bakst purchased a Tourneau watch for $424.63 that he characterized as "gift for MB."

33. A partial list of impermissible "gifts" and other forms of largess that Bakst improperly conferred on certain members of the medical staff, CMH Physicians, and their family members between September 15, 2000 and October 3, 2003 that constituted potential Stark Law violations of approximately $50,000, included without limitation the following charges to his personal credit cards:

   a. An airline ticket for Dr. B on June 24, 2002 and a $15,000 diamond studded Rolex watch on January 24, 2003, totaling approximately $20,000 in improper benefits.

   b. Handspring computer (April 15, 2001), iPod, plus other computer products (January 10, 2002) for two other CMH Physicians, worth approximately $890.

-12-

c.  Airline tickets purchased for Dr. C on or about June 20, 2002 for approximately $6,500.

d.  A Sony digital camera and another camera (purchased from Circuit City), worth approximately $4,000, purchased for Dr. H on March 24, 2002 and September 1, 2002, respectively.

e.  An Apple Computer – Palm 500, worth approximately $1,000, purchased for Dr. L on or about May 28, 2002.

f.  A digital video camera, worth approximately $2,150, purchased as a "baby gift" for Dr. M on or about August 18, 2001.

g.  Various gifts, a camera system (Circuit City), miscellaneous gifts from Europe, a camera, and a fitness center subscription, worth in the aggregate approximately $3,750 for Dr. R from December 29, 2000 to May 2002.

h.  Best Buy computer supplies purchased for Dr. S on January 17, 1999 for approximately $420.

i.  Various computers, a computer system, monitors, a base station, supplies and accessories, iPod and cameras, worth in the aggregate approximately $8,000, purchased for Dr. W1 from September 15, 2000 to October 3, 2003.

j.  "Birthday gifts," worth approximately $1,175, purchased from The Good Guys and Circuit City for Dr. W2 on September 14, 2001 & September 16, 2003.

k.  A Louis Vuitton gift for a family member of a physician, purchased for $660 on or about January 25, 2001.

34.  A partial list of impermissible "gifts" and other forms of largess that Bakst improperly conferred on CMH employees that constituted potential "excess benefit" transactions under federal tax laws and which totaled approximately $47,000 between March 2000, and June 2003, included without limitation the following charges to his personal credit cards:

-13-

124777 2

a.   Gifts for CMH employee "CM," from November 21, 1998 through August 6, 2002 (scanner, camera and car rental expenses) for $2,150.

b.   Gift for CMH employee "DP" from The Good Guys on September 16, 2003 for $500.

c.   Gifts for CMH employee "DG" from August 10, 2000 to January 19, 2003 (pocket computer and camera) for $1,000.

d.   Gift for CMH employee "CG" on October 20, 2000 (Verizon cell phone) for $550.

e.   Gifts for CMH employees "R&J" on March 5, 2000 (computer supplies and "gifts") for $800.

f.   Gifts for CMH employee "AL" in December 2001 (digital camera and computer system) for $2,750.

g.   Gifts for CMH employee in HR department from August 3, 2001 to December 13, 2001 (iBook and digital camera) for $2,350.

h.   Gifts for CMH employee in IT department from April 8, 2000 to May 10, 2003 (supplies and laptop computers, Apple computers, and iPod) for approximately $16,700.

i.   Gifts for CMH employee "Rick" on April 15, 2002, "Westlake Village – appreciation" for $700.

j.   Gift for CMH employees "R&C" on October 24, 2001 (video camera) for $1,200.

k.   Gifts for CMH employee "KS" from May 21, 2003 to June 2, 2003 (mail order phone and Carnival Cruise line expense) for $1,500.

l.   Gifts for CMH employee "BT" from September 22, 2000 to on October 24, 2001 (Louis Vuitton bag, airfares, "Van Gundy & Sons jewelers – Employee Gift") for $8,500.

m.   Gift for CMH employee "TW" on June 4, 2000 (computer) for $2,200.

n.   Gift for CMH board member on September 28, 2000 (palm pilot) for $400.

-14-

SECOND AMENDED COMPLAINT

174772.2

1      o.  Sundry gifts for medical staff and engineering department from June 11,

2      2002 to June 1, 2003 (3 CLIE units, PDA and "gifts for engineering staff).

3     C.  <u>Bakst's Financial Misfeasance Involving Loans and Other Financial</u>
<u>Arrangements with Members of the CMH Medicare Staff Subject to</u>

4      <u>the Stark Law and Which Led to CMH's Multi-Million Dollar</u>

5      <u>Settlement with the DOJ and the OIG.</u>

6     35.  From 2001 to 2004, Bakst paid a family member of a surgeon $160,000 for

7  marketing services rendered to the Hospital during that time frame.  Although the contract

8  was a reasonable fair market exchange of services for value, the agreement arguably

9  violated the Stark Law because it was not pursuant to a signed contract between CMH and

10  the person performing such marketing services.

11     36.  On or about May 31, 2002, Bakst made Physician "J" an unsecured, interest-

12  free loan of $40,000 pursuant to a May 31, 2002 letter agreement.  Because the loan was

13  not pursuant to commercially reasonable terms and customary market rates and conditions,

14  the loan arguably violated the Stark Law.

15     37.  On or about February 2003, Bakst made Physician "C" an unsecured interest-

16  free loan of $155,245.  Because the loan was not pursuant to commercially reasonable

17  terms and customary market rates and conditions, the loan arguably violated the Stark

18  Law.

19     38.  From August 2002 to January 2004, Bakst provided a medical practice group

20  with a $16,667 monthly cash flow guarantee pursuant to a January 11, 2002 letter in

21  connection with the recruitment of a skilled surgeon.

22     39.  Pursuant to a November 17, 1997 loan agreement, Bakst provided Dr. "P"

23  with $111,240 to assist Dr. P in acquiring the medical practice of another physician.

24     40.  From June 2000 to 2004, Bakst paid the brother of a surgeon at CMH twice

25  the hourly rate set forth in his employment records to write and edit CMH's publications.

26  Because the rate of reimbursement was in excess of what would otherwise be ordinary and

27  reasonable compensation to a physician on staff, this financial arrangement arguably

28  violated the Stark Law.

-15-

174772.2

1     41.    Pursuant to an April 23, 2003 agreement, Bakst engaged and paid a surgeon

2 for being the medical coordinator of a charity project in conjunction with a charitable

3 foundation from October 2002 to August 2005.

4     42.    Pursuant to an October 9, 2002 letter agreement, Bakst paid a surgeon

5 $30,000 per year for endovascular laboratory "coordinator" services at CMH.

6     43.    Pursuant to a promissory note dated January 1, 1998, Bakst loaned another

7 medical group $125,000 to enable it to acquire certain intangible assets from another

8 medical practice.

9     44.    Pursuant to a letter agreement dated August 3, 1999, Bakst provided Dr. J

10 $50,000 in relocation fees and an income guarantee.  Pursuant to an agreement dated

11 September 1, 1999, Bakst leased office equipment and office space to Dr. J, and pursuant

12 to a letter agreement dated March 6, 2001, Bakst provided Dr. J with a medical director

13 stipend in the amount of $8,000/month.

14     45.    Pursuant to an August 14, 2002 letter agreement, Bakst provided an interest-

15 free loan of $450,000 to Dr. "H" to assist him in purchasing a home; and Bakst engaged

16 and compensated Dr. H $125,000 from February 4, 2003 to February 3, 2005 to coordinate

17 a quality assurance program for newborn care and pediatric services at CMH.

18     46.    Pursuant to a contract effective May 1, 2002, Bakst provided Dr. "B" with

19 $100,000 to provide exclusive medical and administrative services to CMH and an income

20 guarantee of $285,000 per year for three years; and provided office space, equipment and

21 administrative services to Dr. B and managed his practice pursuant to a management

22 agreement dated June 3, 2002.

23     47.    In addition to the financial arrangements noted above, Bakst gave Dr. B the

24 following four items: (1) a digital camera worth approximately $650 (in or about October

25 2001); (2) a stereo system worth approximately $1,300 (in or about May 2002); (3) airline

26 tickets worth approximately $4,300 (in or about June 2002); and (4) a diamond studded

27 Rolex watch worth approximately $15,000 (in or about January 2003).

28

-16-

174772.2

1      48.    Bakst provided another Physician, Dr. "R", with the following items: (1) a

2 $1,601.77 video camera (in or about December 2000); and (2) a $727.56 digital camera (in

3 or about October 2001).

4      49.    Bakst provided another Physician, Dr. "W", with the following items: a

5 $4,000 digital camera (in or about July 2002); and a $3,800 computer with accoutrements

6 (between September 2000 and June 2001).

7      50.    Bakst provided another Physician, Dr. W, with a "Circuit City gift" in the

8 amount of $320 (in or about September 2001).

9      51.    Bakst provided another family member of a Physician a $661.45 Louis

10 Vuitton handbag (in or about January 2001).

11          D.    <u>CMH Asks Its Outside Auditors To Perform An Agreed Upon</u>

                       <u>Procedures Review After Receiving Information that Bakst Was</u>

12                        <u>Engaged in Financial Misconduct in His Capacity of Executive</u>

                       <u>Director, Leading to a Conspiracy By and Between Bartlett Pringle</u>

13                        <u>and Goldenring to Conceal the Foregoing Misconduct from CMH's</u>

14                        <u>Board of Trustees.</u>

15      52.    On information and belief, at some point in 2002, members of the Board of

16 Trustees of CMH heard hearsay rumors and unsubstantiated allegations that CMH's then

17 Executive Director, Bakst, was potentially defrauding the Hospital by, *inter alia*: (1)

18 awarding non-competitive bids for construction contracts worth over $150,000; (2)

19 allowing professional service vendors and construction contractors to bill CMH for

20 services rendered, not for the benefit of CMH, but for the benefit of individual members of

21 CMH management, including Bakst as the Executive Director; (3) submitting fraudulent

22 claims for reimbursement of personal expenses supposedly for the Hospital's benefit, but

23 which were, in fact, wholly unrelated to CMH's legitimate business expenditures; (4)

24 receiving reimbursement for hundreds of thousands of dollars of expense claims between

25 January 1, 2001 and October 2002, supported by little to no documentation furnished to the

26 Hospital and which expenses were not ordinary or reasonable business expenses of the

27 Hospital; (5) causing personal service work by CMH employees, i.e. Rick Arth and Nick

28 Pappas, as well as outside contractors to be performed for the benefit of Bakst; and (6)

-17-

1   making significant payments (again of Hospital funds) to or for the benefit of various

2   members of the Hospital's medical staff resulting in CMH accruing substantial liabilities

3   under federal Medicare regulations rendering such payments unlawful.

4        53.     To investigate each serious allegation of misconduct and misdealing, and to

5   take appropriate remedial action, CMH engaged its then outside accounting firm, Bartlett

6   Pringle, to conduct an objective AUP review of CMH's books and records, including

7   interviews of appropriate Hospital personnel. The Board of Trustees asked Bartlett Pringle

8   to report faithfully to the Board after conducting the AUP review.

9        54.     On or about November 22, 2002, the Hospital, by and through its general

10  counsel, Goldenring, acting in his capacity as General Counsel to the Board and to CMH,

11  entered into a written agreement with Bartlett Pringle by which Bartlett Pringle agreed to

12  perform a specific AUP review for CMH ("Agreement").  A copy of the Agreement is

13  attached as Exhibit A.

14       83.     The Agreement, like all contracts, called upon each of the parties to perform

15  certain specific tasks.  Each of the terms, covenants and conditions required by CMH to be

16  performed under the Agreement were duly performed and satisfied.

17       84.     With respect to Bartlett Pringle's duties, the Agreement required Bartlett

18  Pringle to perform an investigation into the financial dealings of CMH's then Executive

19  Director, Michael D. Bakst, including, among other things, the following:

20   •   Review the expense reports of the CMH Executive Director to determine
         whether or not the expenses were properly documented and for the benefit of
21       CMH rather than for Bakst's personal benefit.

22   •   Interview at least two CMH employees (Rick Arth and Nick Pappas) to
         determine whether or not those employees were performing personal
23       services for the CMH Executive Director while being paid by CMH.

24   •   Review documentation for equipment purchases to determine whether not
         the purchases were for the benefit of CMH and not for the benefit of any
25       individual member of CMH management.

26   •   The Agreement required Bartlett Pringle, following the completion of the
         accounting work, to "submit a report in a letter form outlining the procedures
27       performed and our findings, observations and recommendations resulting
         from the procedures performed."

28

-18-

174772.2

55.    Bartlett Pringle was then, and had been, engaged for many years as the Hospital's independent outside accountant, with responsibilities for performing year-end audits in accordance with generally accepted accounting standards.  As the Hospital's independent outside auditor, Bartlett Pringle owed additional fiduciary duties of care and disclosure to CMH and to its Board of Trustees, not to the Executive Director (or any management official) Michael D. Bakst.  These strict fiduciary duties superseded the more limited disclosure obligations otherwise imposed on Bartlett Pringle by virtue of its AUP review, and entailed an obligation to disclose to the Board financial discrepancies and problems learned by staff accountants during limited reviews.

56.    On information and belief, Ron Camp ("Camp"), the partner in charge of the CMH account, was aware that prior to Goldenring's becoming CMH's General Counsel, Goldenring had acted as Bakst's personal attorney and had a close personal relationship with Bakst.

57.    One important "purpose" of the AUP review (as set forth in the Agreement) was to "assist [the Board of Directors] in determining whether or not any assets have been misappropriated from CMH by its Executive Director during the period from January 1, 2001 through October 31, 2002."

58.    The professional standards applicable to Bartlett Pringle's AUP review were set forth in the AICPA's Code of Professional Conduct (hereafter cited as "ET") (see ET §91.01).  Generally, an agreed-upon procedures engagement requires the auditors to carry out specific procedures of an audit nature to which the auditors and the entity have agreed and to report back to the client on factual findings.  As the auditor simply provides a report of the factual findings of agreed-upon procedures, no further assurance is necessarily expressed.

59.    In undertaking the AUP review, Bartlett Pringle owed a strict fiduciary duty of care and loyalty solely to the Board of Trustees and derivatively to CMH as an institution.  Bartlett Pringle, on the other hand, owed no duty of care or loyalty to the subject of the audit, Michael D. Bakst.  Indeed, as noted, the primary objective of the AUP

-19-

174772.2

1 | review was to determine whether Bakst had engaged in illegal or unethical misconduct,
2 | and to report back to the Board with respect to its objective findings so that appropriate
3 | remedial action could be taken if "problems" were found.  As the Agreement specified
4 | (consistent with the Professional Standards): "At the conclusion of our engagement, we
5 | [Bartlett Pringle] will submit a report in letter form outlining the procedures performed and
6 | [setting forth based on those procedures] our findings, observations and recommendations
7 | resulting from the [investigation and inquiry arising from] procedures performed."
8 | (Exhibit A, p. 2.)
9 |     60.    Although the applicable professional standards did not require the auditor
10 | conducting the AUP review to qualify as an "independent" auditor, the professional
11 | standards governing Bartlett Pringle's work, Section 201 of AICPA's Attestation Standard
12 | (hereinafter cited as "AT") on Agreed-Upon Procedures Engagements  required that "if
13 | matters come to the practitioner's attention by other means that significantly contradict the
14 | subject matter (or written assertion related thereto) referred to in the practitioner's report,
15 | the practitioner should include this matter in his or her report." (See AT §201.40.)  In
16 | short, by agreeing to undertake an AUP review, Bartlett Pringle agreed to thoroughly
17 | investigate the Board's questions, plan and carry out an effective review, and report
18 | faithfully back to the Board regarding its "findings and recommendations" in a
19 | professional and objective fashion.  If additional evidence of wrongdoing came to Bartlett
20 | Pringle's attention by virtue of the AUP review, it was required to duly report on these
21 | findings or concerns to the Board.
22 |     61.    Instead of complying with the foregoing professional responsibilities,
23 | Bartlett Pringle agreed, as charged in detail below, to conceal and obscure its findings of
24 | Bakst's financial misconduct and other improprieties, which it duly discovered during the
25 | audit.  By agreeing with Goldenring to conceal and cover-up evidence of Bakst's financial
26 | chicanery, Bartlett Pringle committed gross and inexcusable professional malpractice and
27 | misconduct, which damaged the Hospital as will be detailed below.
28 |

-20-

SECOND AMENDED COMPLAINT

174772.2

08/10/2009  14:57    2136130550          BROWN WHITE NEWHOUSE          PAGE  22/49

62.   By the same token, attorney Goldenring owed a strict fiduciary duty of loyalty to his client CMH because he was purporting to act as General Counsel to the Board in connection with the AUP review.  In acting on behalf of the Hospital in connection with Bartlett Pringle's AUP review, Goldenring, on information and belief, committed not only acts of misfeasance, but indeed gross dereliction of his professional duties.  In addition, by failing to solely represent the interests of his client, CMH, attorney Goldenring created an actual conflict of interest under the California Rules of Professional Conduct, Rule 3-310(C)(2), which provides that an attorney admitted to practice law in California cannot, "without the informed written consent of each client: . . . accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict."  CMH was never advised that Goldenring was acting, in part, to protect Bakst's legal interests, and CMH did not provide informed written consent to the actual conflict of interest that existed between its interests and the interests of Bakst. Therefore, Goldenring acted unethically and unprofessionally in a manner forbidden by the California Rules of Professional Conduct.

63.   Goldenring also violated his duty of care and loyalty to CMH when he negotiated the terms of the Agreement between the Hospital and Bartlett Pringle.  In the written Agreement setting forth the terms and conditions of the AUP review, Bartlett Pringle attempted to artificially shorten the otherwise applicable statute of limitations for CMH to bring a lawsuit, such as this one, alleging breach of contract or fraud.  The Agreement provided for an unreasonable narrowing of the otherwise four-year statute of limitations (that would otherwise apply to a written contract for services):

> It is agreed by CMH and Bartlett, Pringle & Wolf, LLP or any successor in interest that no claim arising out of services tendered pursuant to this agreement by or on behalf of CMH shall be asserted more *than two years* after the date of our report on this engagement.

(Exhibit A at p. 3.)

64.   This purported statue of limitations provision thus attempted to limit to *two years* an action under the contract for which the normal statute of limitations would either

SECOND AMENDED COMPLAINT

1747722

1   be four years (for written contract) or three years (for fraud).  See CCP §337 (four years to

2   bring "an action upon any contract"); CCP § 338 (three years to bring action "on the

3   ground of fraud or mistake").  Notably, in agreeing to this limitation, Goldenring failed to

4   protect the interests of his client, CMH, because although the longer statutory period

5   obviously favored his nominal "client," CMH, the shorter period arguably furthered the

6   interests of his actual client, Bakst—again highlighting Goldenring's persistent and

7   unwaived conflict of interest.  Bartlett Pringle and Goldenring conspired to attempt to limit

8   the statutory period of limitations in order to conceal the "facts" relating to Bakst's

9   misconduct from CMH, while also limiting their own liability to the Board in the event

10  their active concealment was ultimately detected, this provision is unconscionable and

11  unenforceable as a matter of law and policy.

12      65.   Shortly after the Agreement was signed on November 22, 2002, Bartlett

13  Pringle commenced its AUP review and in doing so committed deliberate fraud and

14  malpractice with respect to its client.  In conducting its AUP review, Bartlett Pringle had

15  complete and full access to CMH's books and accounting records in conducting its AUP

16  review, including the records of Bakst's expense reimbursements for his personal credit

17  card and other relevant records.  The Agreement placed no time or material limitations on

18  the scope of Bartlett Pringle's review.  By the same token, Bartlett Pringle had access to

19  any Hospital employee they wished to interview in determining the basis for the

20  allegations against Bakst as specified in the Agreement.  In short, Bartlett Pringle had full

21  access to the "facts" showing Bakst to be violating various laws, regulations, and sound

22  business practices.

23      E.   <u>Bartlett Pringle Failed to Adequately or Competently Discharge Its
         Professional Responsibilities in Conducting the Agreed Upon</u>

24         <u>Procedures Review by Failing to Notify Their Client as to Their</u>

25         <u>Findings of Fraud</u>

26      66.   In the course of its AUP review, Bartlett Pringle discovered multiple

27  instances of dishonest, unethical and unlawful financial dealings that Bakst had performed

28  through the exercise of his duties and responsibilities as the Hospital's Executive Director.

-22-

SECOND AMENDED COMPLAINT

174772.2

1  Many of these facts squarely and unmistakably related to the specific questions the Board
2  had asked Bartlett Pringle to inquire into and report back on its findings.  Moreover, the
3  AUP review was performed in a deliberately deceptive fashion, and Bartlett Pringle also
4  interestingly failed to discharge its contractual and professional obligation to notify the
5  Board about the nature, degree and extent of Bakst's financial misconduct, fraud, self-
6  dealing and illegal actions.

7        67.    For example, in certain Workpapers dated December 9, 2002 (Headed "CMH
8  Expense Reimbursements for Michael Bakst, January 1, 2001 through October 31, 2002")
9  a Bartlett Pringle staff auditor (with the initials "Ska") observed as follows with regard to
10  the expense reimbursement "process:"

11        Currently the total credit card bill is submitted for
       payment by Dr. Bakst.  A piece of paper showing the amount
12     to be paid and to whom is attached.  There is no supporting
       documentation.  A check is then cut [payable to Bakst] and
13     the entire process is booked to [the] general ledger.
14
          Later the actual expense reimbursement form is filled out
15     in detail.  After the form is complete, Dr. Bakst [sic] can
       determine [sic] which expenses are for the hospital and how
16     much he owes CMH for the excess portion of the bill that was
       paid for his own personal expenses. . . . We noted repayments
17     [by Bakst] to CMH.  However, the Hospital does not track
       these figures.  It is Dr. Bakst' [sic] responsibility to see that
18     payments are made correctly.  There are also some instances
       where he has taken additional funds and indicated that they
19     should be included in his payable to CMH account.
20         *  *  *
21
          [With regard to approval of Bakst's expense report:]  It
22     was noted that all of the expense reports were approved after
       the check was cut.  In a number of cases, approval was
23     months later.
24

25

26  (See Exhibit B1; Workpapers D-0.)

27        68.    On information and belief, Bartlett Pringle intentionally performed
28  professionally deficient work; that is they actively collaborated with Goldenring in failing

-23-

174772.2

EXH: 2
Page #: 4

1    to disclose areas of fraudulent conduct identified in their Workpapers, and indeed made

2    knowingly false statements to CMH to "lull" the Board of Directors into believing that

3    Bakst was <u>not</u> committing significant acts of financial skullduggery.  Bartlett Pringle also

4    failed to appropriately follow-up on items they did identify, and concealed their findings of

5    fraud and other "red flags" of misconduct from their client in a conspiracy to protect the

6    subject of the review, Executive Director Bakst.

7          69.   For Instance, Bartlett Pringle's "findings" as they appear in the sanitized

8    version of their Management Letter to CMH conflict to a significant degree with the

9    findings, statements and other evidence appearing throughout their Workpapers, which

10   manifest frequent observations of business practices that fall far outside the norms of

11   acceptable, ordinary or reasonable practices, particularly for a charitable 501(c)(3)

12   organization, i.e.:

13            a.   The Workpapers observe numerous instances where CMH made payments in

14                full of Bakst's personal credit card knowing that the personal expenses had

15                only been self-identified by Bakst without any apparent back up or

16                verification.  (See Exhibit B1; Workpaper D-0.)

17            b.   The Workpapers document payments by CMH to Bakst of hundreds of

18                thousands of dollars of expense claims (indeed a staggering sum of nearly

19                $400,000 from January 1, 2001 through October 31, 2002) with little or no

20                supporting documentation or receipts.  A person reviewing the expense

21                reports could not have sufficiently identified the charge and the ostensible

22                business purpose in order to verify the appropriateness of the charge.  In fact,

23                any objective review of the description of the expense items would have, and

24                did in fact, raise significant concerns about the propriety of such charges and

25                whether they were related in any estimable way to the lawful business of the

26                Hospital, a charitable, not-for-profit organization. (Id.)

27            c.   The Workpapers confirm routine usage of CMH funds to pay for Bakst's

28                personal expenses, as noted.

-24-

174772.2

SECOND AMENDED COMPLAINT

d.  The Workpapers reflect various manifestly inappropriate purchases by Bakst and subsequent reimbursement of him by CMH, for approximately $100,000 worth of computers, cameras and other electronic equipment which Bartlett Pringle acknowledged were given out as "gifts." (See Exhibit B5 and B12; Workpaper D-4.)  Moreover, the Workpapers clearly reveal thousands of dollars of gifts to physicians on staff, such as Dr. R ("camera", $1,601.17), Dr. B ("Handspring Computer" $467.58), Dr. W ("Dr. W's birthday -- video camera" $320.98), and other Physicians ("Northridge Apple -- Computer System" $7,467.09) -- gifts that should have raised concerns about compliance with various federal laws prohibiting kickbacks and/or providing benefits to physicians under applicable Medicare regulations (i.e., the so-called "Stark Law").

e.  The Workpapers determined that approximately $28,000 of additional "advances" were made directly to Bakst (by virtue of CMH directly paying his personal credit card debts), and were not properly recorded on CMH's books and records.  (See Exhibit B3; Workpaper D-0.1.)

f.  The Workpapers observed that the expense reimbursement procedures were poor, resulting in inadequate supporting documentation, improper approval processes and numerous errors -- findings that raised significant and material "red flags" about the possibility of fraudulent conduct.  Indeed, the Workpapers suggested, if not confirmed, that Bartlett Pringle documented Bakst's personal use of his credit card and his reimbursement of hundreds of thousands of dollars of blatantly improper and illegal expenses during the course of their AUP review.  (See Exhibit B4; Workpaper D-0.2.)

g.  The Workpapers found use of purportedly unpaid or unused vacation, sick leave and holidays as offsets to CMH's payment of Bakst's personal expense items.  Bartlett Pringle reviewed Bakst's bank account statements, which reflected some deposits (i.e. payments by CMH) into Bakst's account for

-25-

SECOND AMENDED COMPLAINT

174772.2

1    unused vacation and sick leave, in amounts that were highly questionable.

2    (See Exhibit B14-B16; Workpapers F-I, F-4, and F-5.)

3    h. Bartlett Pringle conducted two interviews of CMH employees, and those

4    interviews did not reflect that a thorough or professionally capable

5    investigation was made or appropriate follow-up initiated.  The interviews

6    with Nick Pappas (IT Chief) and Rick Arth were to ascertain whether they

7    were performing personal services for Bakst while being paid by CMH.

8    Such interviews were superficial at best.  Both employees acknowledged

9    performing services for Bakst and Rick Arth stated that the services were

10   performed during work hours, during which time he was being paid by

11   CMH.  The Workpapers also revealed that Nick Pappas received numerous

12   computers from Bakst (paid for by CMH), but there is no indication that he

13   was asked about any other gifts.  (See Exhibit B13.)

14   70.  Finally, in the Independent Accountants' Report dated December 16, 2002

15   (but not in the follow-up report), Bartlett Pringle inexplicably reached conclusions that

16   were clearly contradicted by the findings appearing at multiple locations in their

17   Workpapers (i.e. problems identified in the preceding paragraph).  For example, in the

18   report dated December 16, 2002, Bartlett Pringle falsely reported:

19   (1) The Executive Director's expense reports were properly
     documented and "the expenditures charged to CMH on the reports were for the
20   benefit of CMH, not the Executive Director," a demonstrably false statement.

21   "(2) All personal expenses included in the expense reports were clearly
22   indicated as such, and are being treated as loans or advances to
     the Executive Director," another false statement belied by the expense reports;
23

24   "(3) All payments by CMH to the Executive Director appear appropriate and in
     accordance with his employment agreement," a misleading statement; and
25

26   "(4) That interviews with CMH employees indicated " ...no improper
     activities were taking place," again a conclusion inconsistent with Bartlett Pringle's
27   own Workpapers.

28

-26-

174772.2

71.   There was no factual or rational basis for these statements, which, on

information and belief, were knowingly false and/or misleading and made as the natural

outgrowth of a conspiratorial agreement between Bartlett Pringle and Goldenring to lie to

CMH, by concealing the "true" facts that would have exposed Bakst' wrongdoing.  In fact,

these conclusions were squarely contradicted by Bartlett Pringle's own Workpapers and

the findings, statements and conclusions set forth therein.   The report's only indication of

Bakst's gross violations and acts of financial impropriety and misconduct as noted above is

the following statement: "During the conduct of this engagement, we noted certain

deficiencies in the CMH accounting system, which do not affect this report, which are

discussed in a separate letter to you, along with recommendations for improvement." This

last statement was highly misleading, if not another outright falsity.  The recommendations

that Bartlett Pringle initially provided to the Board in the so-called "Management Letter"

were heavily edited by Bakst and Bakst's personal attorney, Goldenring, and a sanitized

version was ultimately produced.  The draft letter clearly revealed indications of fraudulent

behavior on the part of Bakst, and clearly "affected" the false conclusions and statements

in the Independent Accounts Report of December 16, 2007.

      F.   <u>Bartlett Pringle Deliberately Failed to Alert the Board of Trustees
and/or the Audit Committee of Possible Illegal and Unethical Acts by
the Hospital's Executive Director As They Were Required To Do by
the Relevant Professional Standards</u>

72.   Based on their objective review of the available documentation, Bartlett

Pringle was obviously well aware of Bakst's numerous financial improprieties, if not

blatantly illegal acts. Section 54 of the AICPA's Auditing Standards (hereinafter cited as

"AU") on Illegal Acts by Clients required Bartlett Pringle to "detect and report

misstatements resulting from illegal acts having a direct and material effect on the

determination of financial statements." (AU §317.05).  Section 54 of AICPA's Auditing

Standards also required Bartlett Pringle to perform appropriate follow up when "the

auditor becomes aware of information concerning a possible illegal act . . . [by obtaining]

an understanding of the nature of the act, the circumstances in which it occurred and

-27-

SECOND AMENDED COMPLAINT

174772.2

1  sufficient other information to evaluate the effect on the financial statements." (AU

2  §317.10). When those acts constitute illegal acts, as here, "the auditor should assure

3  himself those charged with governance are adequately informed with respect to illegal acts

4  that come to the auditor's attention." (AU §317.17). Bartlett Pringle failed to advise, alert

5  or notify either the Board of Trustees or the Audit Committee of the following "red flags,"

6  which indicated the presence, if not possibility, of fraud based on their work during the

7  AUP review:

8        a.  Outright theft and/or misuse of CMH funds by Bakst for personal use;

9        b.  Possible IRS issues relating to the artificial splitting of wages between a for-
10           profit entity and the not-for-profit entity;

11        c.  Possible IRS issues known as "excess benefit transactions" arising from
12           Bakst rewarding himself and other non-exempt employees with lavish gifts
         and financial benefits outside the scope of normal compensation;
13

14        d.  The manipulation of the approved and reported wages paid to Bakst;
15

      e.  The taking of non-cash items in lieu of compensation; and
16

      f.  Providing thousands of dollars in gifts to doctors possibly in violation of
17           Medicare regulations, i.e. "Stark Law" violations

18        G.  <u>The Cover-Up:  Instead of Notifying the Board of Trustees About
19           Their Findings of Possible Fraud and/or Financial Irregularity, as
         Required by Law, the Professional Standards, and the Agreement,
20           Bartlett Pringle Engaged in a Conspiracy to Conceal Such Facts from
         the Board By Inappropriately Deleting and/or Redacting its Findings</u>

21

22      73.  The original Independent Accountants' Report (which remained unchanged)

23  was issued on or about December 16, 2002 and was sent directly to Goldenring as General

24  Counsel for the Board. (Attached as Exhibit C.) As noted, this whitewashed report, which

25  itself contained several outright false and misleading statements, did not identify any of the

26  substantial problems or issues that the auditors had observed during their AUP review.

27  This report also provided no indication to the Board about the true state of affairs at CMH,

28  except for the disclaimer that some unrelated accounting "deficiencies in the CMH

-28-

174772.2

1  accounting system" had been observed and "would be reported to you, along with related

2  recommendations for improvement," in a separate "Management Letter" which the Board

3  presumably would not see, and in fact was never provided.

4       74.    The following day, December 17, 2000, a draft of that Management Letter

5  was faxed to attorney Goldenring for his review and comments at approximately 11:53

6  a.m.  As noted, even sending a draft of the Management Letter to Bakst's attorney

7  essentially allowed the subject of the investigation to preview, edit and hence cover-up the

8  findings of his own misconduct.

9       75.    Although the original draft of the Management Letter failed to properly

10  account for the full scope of Bakst's financial self-dealing and misconduct with CMH

11  funds, it did identify specific problematic transactions that highlighted the possibility, if

12  not probability, of fraud on the part of Bakst.

13       76.    Attorney Goldenring, working out his conflict of interest by favoring his *de*

14  *facto* personal client, Bakst, over his nominal corporate client, CMH, sanitized the

15  proposed draft by making significant and material changes.  On or about January 7, 2003,

16  Goldenring sent Bartlett Pringle a marked-up version of the original draft of the

17  Management Letter.  (Attached as Exhibit D.)  In this version, Goldenring, acting on

18  information and belief, in collusion with Bakst, demanded that the following revisions

19  (mostly deletions) be made, including, inter alia, the following (Deleted language shown in

20  strikeout; additions in **bold**):

21          A significant amount **Some** of CMH related expenditures are paid
           for via the Executive Director's personal credit card and
22          document by expense reports.  We understand that there is no
           Hospital credit card available.  During the period covered [by the
23          Review] such expenditures averaged about $17,500 per month
           and included expenditures for some computers and other capital
24          equipment, CMH related travel costs for Trustees and various
           CMH employees, and expenditures for employee social functions.
25                   *  *  *
26
27          However this practice [of reviewing the expense reports after first
           paying Bakst for the charges] requires complicated accounting
28          allocations and increases the likelihood that errors will occur in

                                          -29-

EXH: 2
Page #: 5?

1   account for the personal expenses.  ~~During the period examined,~~
2   ~~we found approximately $28,800 of the transactions in which~~
3   ~~personal expenses were paid and not accounted for properly; that~~
4   ~~is, they were treated as CMH expenses not reimbursable by the~~
    ~~Executive Director.~~
        *  *  *

5   
6   Gifts to employees and others are not being reported as taxable
7   income to individuals by CMH.  ~~A significant amount of gifts~~
    ~~such as computers, cameras and similar items totally~~
8   ~~approximately $110,000 were made during the period reviewed~~
    ~~and such gifts are clearly subject to income tax.~~

9   (See Exhibit D.)

10       77.    The Bartlett Pringle partner in charge of the review, Ron Camp, initially

11   resisted Goldenring's suggestion that the accounting firm disregard its duty of full

12   disclosure to CMH at least with respect to the Management Letter.  However, by no means

13   did Camp intend to make a complete and thorough disclosure of all of the "red flags" made

14   known to him during the AUP review.  Nonetheless, Camp sent a fax to attorney

15   Goldenring dated January 20, 2003 stating: "I made a few minor changes based on your

16   comments, but did not delete the findings, since they are an integral part of the report."

17   (Attached as Exhibit E.)  Camp suggested, "If you prefer, maybe a meeting with (CMH's

18   Chairman Phil Drescher of the Board) and (Chairman Gary Wolfe of the Audit

19   Committee) would be more appropriate."  (See Exhibit E.)

20       78.    Goldenring responded to Bartlett Pringle in a letter dated February 3, 2003.

21   (Attached as Exhibit F.)  In it, Goldenring was adamant that Bartlett Pringle agree to

22   participate, in effect, in a cover-up to conceal the badges of fraud pointing directly to his

23   personal client, Bakst.  In that letter, Goldenring insisted that additional modifications

24   and/or deletions be made: "the difficulty I have [with the current draft of the Management

25   Letter] is the specifics that are contained in the letter which can only cause confusion," by

26   which of course, Goldenring meant embarrassment and potential exposure of his client

27   Bakst's fraudulent and illegal conduct.  (Emphasis added.)  Disregarding his ethical

28   obligations to his corporate client, CMH, Goldenring also swung into full advocacy mode,

                                                      -30-

174772.2

1 | falsely asserting that: "Fundamentally what has occurred is that nothing has improperly

2 | happened involving Dr. Bakst." Goldenring further demanded that:

3 |        We would like the Management Letter not to contain
        statements about what has happened, but rather what you want
4 |        to have happen.

5 |

6 | (See Exhibit F.)

7 |        79.    Ron Camp ultimately capitulated and agreed to delete all of the embarrassing

8 | "revelations," *i.e.*, those disclosures that detailed and gave ample measure of Bakst's

9 | misconduct, and which provided, moreover, substantial hints about the full scope of the

10 | fraud. Rather than discharge their independent fiduciary duty to CMH and make full

11 | disclosure of the facts and red flags made known to them during the course of the AUP

12 | review, Bartlett Pringle agreed to go along with the conspiracy to conceal, cover-up and lie

13 | to the Board by not disclosing the items struck out above (in addition to other items which

14 | should properly have been disclosed). A memo to the Workpaper file by Bartlett Pringle

15 | states that the "shortened report" (hereafter, the "Sanitized Report") was provided to

16 | Goldenring on February 8, 2003. (Attached as Exhibit G.) The Sanitized Report was

17 | backdated to December 17, 2002 in order to create the false appearance that its issuance

18 | was followed by the Independent Accountant's Report as required by the Agreement. The

19 | Bartlett Pringle memo to the file also falsely indicated that the original findings were

20 | discussed orally with Mr. Gary Wolfe, Chair of the Audit Committee, and that Mr. Wolfe

21 | had confirmed that CMH did not want a detailed report. Mr. Wolfe, in fact, did no such

22 | thing. That statement was false, and indeed was a deliberate and integral part of the

23 | cover-up and concealment; in fact, not one member of the Board of Trustees ever

24 | authorized either an "oral" report or even a copy of the Sanitized Report. Rather the Board

25 | of Trustees asked for, yet never received, a full report on the questions they had put to their

26 | "independent" auditors. The failure on the part of Bartlett Pringle to deliver a

27 | Management Letter to the Board of Directors was part of the conspiratorial agreement they

28 | made with Goldenring to conceal the actual facts from the Board.

-31-

174772.2

SECOND AMENDED COMPLAINT

EXH: 2
Page #: 5

80.     The Sanitized Report was not disseminated, provided or discussed orally or otherwise, as promised, to the Board of Trustees or for that matter with any officer, director, agent, representative or employee of CMH.   On information and belief, the Sanitized Report was <u>not</u> provided to Philip Drescher, Chairman of the Board of Trustees; it was <u>not</u> provided to Gary Wolfe, Vice Chairman of the Board of Trustees, nor was it provide to or discussed with Harry Maynard, Board member and Chairman of the Finance Committee. The Sanitized Report was <u>not</u> provided to the CFO, who knew little about the Agreed Upon Procedures review, other than the fact that one was performed.  None of these individuals was provided with the Sanitized Report, and no one on the Board of Trustees or in the administration of the Hospital, including the CFO, were informed about the nature of Bartlett Pringle's true findings regarding the extent and degree of Bakst misconduct (as it was fully known to Bartlett Pringle).

81.     The reason that this information was concealed from the Board – indeed from all relevant persons at CMH, with the exception of Bakst, Goldenring and Camp – was that Bartlett Pringle and Goldenring intended to, and did in fact, conceal from the Board the actual facts concerning Bakst' various acts of financial misconduct and self-dealing, the same disturbing facts which the Board had specifically asked Bartlett Pringle to investigate and report back to the Board on.  Instead of receiving a copy of any so-called "Management Letter" from Bartlett Pringle, members of the Board of Directors were simply informed, in substance, that the AUP review had essentially "cleared" Bakst of any accusations of misconduct.  Bakst used this deliberately false report, on information and belief, hence, to solidify his position of power at CMH, and to continue his campaign of stealing and fraudulent misuse of CMH funds through the remainder of 2003, until Bakst was terminated by the Hospital for unrelated reasons in October of 2003.

H.     <u>Violation of Bartlett Pringle's Duty to Disclose Wrongdoing Arising from Its Role as Outside Accountants to CMH</u>

82.     The information uncovered by Bartlett Pringle regarding Bakst's numerous financial discrepancies and possible fraud, if not outright illegal conduct (*i.e.*, information

-32-

SECOND AMENDED COMPLAINT

174772.2

EXH: 2
Page #: 56

1  constituting "red flags") during the course of their AUP review should have been disclosed

2  to the full Board and to the Hospital during their next financial statement audit, if not at the

3  conclusion of the AUP review.  Despite their duty to disclose such information to the

4  CMH Board, Bartlett Pringle's concealed such information and, in doing so, violated their

5  professional responsibilities to CMH.

6      83.    In conclusion: by the foregoing conduct, Bartlett Pringle violated the

7  following professional standards:

8          a.  Failure to report potentially illegal acts to the Board of Trustees or to the

9              Audit Committee (reporting to the General Counsel of the Audit Committee

10             is not a sufficient exercise of due professional care);

11         b.  Failure to accurately report findings to the Board of Trustees as required by

12             the Agreement and the Standards of Professional Conduct of an agreed upon

13             procedures review;

14         c.  Failure to report and/or disclose such financial issues and/or problems during

15             the next financial statement audit;

16         d.  Issuance of misleading and/or false statements in their report of findings

17             amounting to active concealment; and

18         e.  Inadequate investigation and follow up in connection with the AUP review

19             pursuant to their Agreement with CMH.

20  As a result of this misconduct and sundry breaches of fiduciary and professional duties by

21  both Bartlett Pringle and Goldenring, CMH has sustained millions of dollars in damages,

22  in an amount to be determined.

23      I.    CMH Discovered the True Extent of Bakst's Financial Misconduct
            and That Bartlett Pringle Breached Its Fiduciary and Contractual
24          Duties to CMH By Actively Concealing the Facts Underlying Bakst's
            Fraudulent and Improper Financial Dealings
25

26      85.    Bartlett Pringle "issued" its Sanitized Report in January 2003, although as

27  noted it deliberately did not actually provide the Board of Directors with a copy, and, on

28  information and belief, it did not provide or otherwise summarize the findings contained

                                   -33-
                                            SECOND AMENDED COMPLAINT

174772.2

therein to any member of the CMH Board of Directors, <u>except for Bakst</u>, and Goldenring, as Bakst' counsel. Therefore, Bartlett Pringle, essentially cleared Bakst of any financial irregularities or misconduct, and actively concealed the facts that it had been engaged to discover and report to the Board. As a direct result of such active malfeasance, Bakst continued to work for CMH as its Executive Director until October 2003, when his employment was terminated for other reasons. Shortly thereafter, CMH's Chief Financial Officer sent a letter dated February 26, 2004 to Goldenring, raising questions about the propriety of certain Transactions involving CMH's Medical Staff. The CFO's letter described ten separate loan arrangements between CMH and the physicians on staff that the CFO had viewed as being problematic. ("February 26, 2004 Letter").

86.    When the CFO wrote the February 26, 2004 Letter questioning the propriety of the Transactions to outside counsel, the CFO did <u>not</u> know whether Bartlett Pringle had considered or reviewed these Transactions in connection with the AUP review, which occurred during late 2002 to early 2003. In fact, as noted, the CFO had never received or read any audit findings or written reports concerning the AUP review, including the two "reports" dated December 16, 2002 or December 17, 2002 (aka, the "Sanitized Report"). The CFO does recall that Bartlett Pringle verbally recommended that the Executive Director obtain and use a corporate credit card rather than his personal credit card for purchases related to hospital business. The CFO, as a result, had no reason to believe that Bakst, in fact, had committed any discrepant or fraudulent practices in the past within the scope of the findings set forth below (See paragraphs 72(a)--(f).) Indeed, the CFO believed, with good reason, that Bartlett Pringle had essentially cleared Bakst with respect to any allegations of financial misconduct in its report to the CMH Board of Trustees (a report, which was never, in fact, delivered to any Board member or other officer or director of CMH, except for Bakst). The CFO raised issues related to the Physician Transactions after Bakst's separation from the Hospital because he believed that these issues did not fall within the scope of the AUP review, and, therefore, had <u>not</u> been considered by Bartlett Pringle during the AUP review.

-34-

SECOND AMENDED COMPLAINT

174772.2

87.      In or about May 2004, the Board engaged an outside law firm, Foley &
Lardner LLP ("Foley"), to fully investigate and undertake a compliance review of its
current financial arrangements with the physicians.  Foley undertook an investigation
consisting of the following steps: (i) reviewing copies of all available written contracts and
relevant correspondence between CMH and the involved Physicians; (ii)  reviewing
minutes of general and Executive Committee meetings of the Boards of both CMH and a
related medical management company; (iii) reviewing minutes of the CMH Board's
Finance and Operations Committees for approximately the past five years; and
(iv) conducting in-person interviews with CMH's management personnel, its former
Executive Director, as well as with most of the Physicians.  Foley's findings were that a
number of Transactions involving the Physicians were problematic under the Stark Act,
and the Hospital elected to make full disclosure of these findings to the U.S. government.

88.      In or about August 2005, following its investigation, Foley made a written
disclosure to an Assistant U.S. Attorney with the United States Attorney's Office
("USAO") in Los Angeles regarding its findings with respect to the Physician
arrangements and whether or not they constituted violations of the federal Stark Law.  At
that juncture, specifically by August 2005, neither CMH nor any of its employees,
directors, officers or representatives (nor for that matter its outside counsel, Foley) knew or
had any reason to know about the full extent of Bakst's financial misconduct, although
attorneys at Foley had heard some reports about Bakst's discrepant practices of making
inappropriate gifts to physicians and hospital employees.  As a result of CMH's disclosure
to the government of Bakst's misconduct relating to the Physician arrangements, the
government promptly launched an investigation.

89.      In or about January 2006, Foley, as part of its continuing investigation and
in response to the government's investigation, requested Bartlett Pringle, through their
counsel, make Bartlett Pringle's file, including all correspondence and Workpapers arising
from the AUP review, available so that Foley could continue its due diligence review of
the allegations concerning Bakst's financial self-dealing and other improprieties, including

-35-

1  violations of the Stark Law and federal tax laws and reporting obligations. <u>Through their</u>

2  <u>counsel, Bartlett Pringle only produced a copy of the Sanitized Report on or about January</u>

3  <u>20, 2006</u>. Bartlett Pringle's counsel informed Foley that Goldenring had also "represented

4  Bakst" with regard to the AUP review and that privilege issues prevented them from

5  producing its files to CMH. Later, Goldenring sent Foley a letter claiming that he

6  represented no one.

7          90.     At no point before September 2006 did Bartlett Pringle provide either CMH

8  or its counsel with the earlier drafts of the Management Letter, which disclosed their

9  malpractice, fraud, and conspiracy to conceal Bakst's misconduct from CMH. As a result

10  of Bartlett Pringle and Goldenring & Prosser PLC's deliberate measures to conceal their

11  collusion and deception from CMH which continued in full force through September 2006,

12  at no point before September 2006 at the earliest, did anyone at CMH know about, or have

13  any reason to suspect, Bartlett Pringle's fraudulent and deceptive failure to inform CMH

14  about the full extent and magnitude of Bakst's financial misconduct or self-dealing.

15          91.     Throughout 2006, as part of the continuing conspiracy and cover-up to keep

16  their fraud, misconduct and manifest breaches of fiduciary duties from their former client

17  (CMH), Bartlett Pringle refused to produce its complete files to CMH, giving CMH's

18  counsel (the attorneys at Foley), on information and belief, an entirely bogus explanation

19  that Bakst was asserting an attorney-client privilege over the files and Workpapers

20  generated during the AUP review. Bartlett Pringle knew full well that Bakst had no

21  attorney client privilege to assert with regard to the UAP – which was supposed to be an

22  investigation of Bakst.  Consequently, Foley was unable to review Bartlett Pringle's

23  Workpapers or files, and thus throughout all of 2006, Foley was unable to determine the

24  full extent of Bartlett Pringle's and Goldenring's cover-up and concealment of Bakst's

25  financial misconduct.

26          92.     For example, on September 13, 2006, an attorney at Foley sent an email to

27  Bartlett Pringle's counsel stating that CMH had heard that an earlier draft of the

28  Management Letter existed, possibly containing comments by Bakst or Goldenring that did

-36-

174772.2

SECOND AMENDED COMPLAINT

1  not appear in the final Sanitized Report.  Foley again strongly requested that Bartlett

2  Pringle furnish all versions of the Sanitized Report and its entire file.  Shortly thereafter,

3  Bartlett Pringle produced the *original draft of the Management Letter* to Foley but still

4  refused to produce its Workpapers, thus continuing to withhold evidence of its active

5  concealment and fraud.   Not until February 1, 2007 did Bartlett Pringle finally produce its

6  complete file, which was then promptly analyzed by CMH's forensic accountants at

7  Hemming Morse.  Therefore, CMH was not aware of the various causes of action it

8  possessed against both Bartlett Pringle and Goldenring until February 2007 at the earliest.

9  Bartlett Pringle's complete file revealed for the first time the full extent of Bartlett

10  Pringle's fraud and its conspiratorial agreement with Goldenring to cover-up, conceal and

11  withhold material facts concerning Bakst's financial misconduct with Hospital funds, in

12  order to keep CMH from discovering the causes of action asserted in this action against

13  Bartlett Pringle and Goldenring.

14      93.    In or about November 2007, CMHS, the parent company of the Hospital,

15  and the DOJ and the OIG entered into a binding settlement agreement that resolved the

16  government's potential claim based on Bakst's suspect Physician arrangements described

17  in ¶¶ 33-49, with an imposition of a civil fine of $1,500,000 on CMHS.

18
19
20
21
22
23
24
25
26
27
28

-37-

SECOND AMENDED COMPLAINT

174772.2

EXH: 2
Page #: 61

## FIRST CAUSE OF ACTION

### (Against Bartlett Pringle, Ron Camp & Goldenring & Prosser, and Peter A. Goldenring: Fraud Consisting of Fraudulent Concealment and Intentional Misrepresentation)

94.     Plaintiff incorporates paragraphs 1 through 93 of this Complaint as though fully alleged herein.

95.     In acting and failing to act as described herein, Bartlett Pringle, pursuant to a conspiracy with Goldenring, made material misrepresentations of fact and concealed and suppressed material facts from Plaintiff CMH.  Bartlett Pringle's and Goldenring's false representations and concealments were intentional, indeed the product of a conspiratorial agreement between the two defendants, each of whom owed a fiduciary duty to Plaintiff to disclose and reveal the full extent and scope of Bakst's financial misconduct.  Such concealments were calculated to induce in Plaintiff the false belief that: (a) there were no underlying material issues surrounding Bakst's fraudulent business and financial performance of his duties as Executive Director, *i.e.*, the numerous suspect accounting, legal or business practices with regard to Bakst's financial practices, including his expenditures that were purportedly on behalf of the Hospital; (b) that Bakst was not engaged in manifestly illegal, fraudulent or unethical conduct; and (c) that Bakst was not by virtue of his business practices engendering legal liability to the Hospital under any provision of Medicare or federal tax law, and that there was no fraud or self dealing going on (collectively, "Suspect Practices").

96.     Defendant Bartlett Pringle's report to the Board following the completion of the AUP review was false, affirmatively misleading, and omitted necessary and material facts and disclosures.  As noted, CMH specifically asked for a report addressing its concerns that Bakst had committed any one of a number of specific acts of self-dealing, fraud and financial misconduct.  In addressing these questions, Bartlett Pringle, at the instructions of and in collusion with attorney Goldenring, made a number of demonstrably false and misleading statements.

-38-

174772.2

97.     For example, in its Independent Accountants' Report dated December 16, 2002, Bartlett Pringle falsely reported as follows:

(1) The Executive Director's expense reports were properly documented and "that the expenditures charged to CMH on the reports were for the benefit of CMH, not the Executive Director;"

(2) All personal expenses included in the expense reports were clearly indicated as such, and are being treated as loans or advances to the Executive Director;

(3) All payments by CMH to the Executive Director appear appropriate and in accordance with his employment agreement; and

(4) That interviews with CMH employees indicated " ...no improper activities were taking place."

98.     Each of the statements made by Bartlett Pringle in the preceding paragraph was false, and constituted knowingly false and misleading statements and omissions of fact.  Not only did such conclusions lack a factual basis, the statements were squarely contradicted by Bartlett Pringle's own Workpapers and the findings, statements and conclusions set forth in the Workpapers.  Moreover, the report was clearly misleading by omission: in failing to disclose the substantial instances of financial misconduct, self-dealing and other fraudulent activity on behalf of Bakst, the report misled CMH into believing that Bakst was not engaging in the Suspect Practices.  The only indication of Bartlett Pringle's awareness of Bakst's gross violations and acts of financial impropriety and misconduct as noted above is the following statement:  "During the conduct of this engagement, we noted certain deficiencies in the CMH accounting system, which do not affect this report, which are discussed in a separate letter to you, along with recommendations for improvement."  This last statement was highly misleading, if not an outright falsity, as it implied that the only instances of "deficiencies in CMH's accounting system" were minor and sporadic, when in fact, as defendants well knew, such was far from the case.

SECOND AMENDED COMPLAINT

174772.2

08/10/2009  14:57    2136130550         BROWN WHITE NEWHOUSE              PAGE  41/49

99.    Bartlett Pringle and CMH's attorney Goldenring each owed a professional, ethical, and contractual duty to CMH to affirmatively and fully disclose the evidence of such Suspect Practices -- the fraud, self-dealing and suspect business and accounting practices discovered during Bartlett Pringle's AUP review—directly to the full Board.

100.    By willfully misrepresenting Bartlett Pringle's true findings and by failing to disclose, reveal or inform the full Board with respect to the Suspect Practices detailed herein, Bartlett Pringle's and Goldenring's conduct, borne of a conspiratorial agreement, was intentional, fraudulent, despicable, malicious and undertaken with willful disregard for their fiduciary duties owed to Plaintiff and disregard for the Plaintiff's rights and economic well being.

101.    CMH and its Board of Trustees reasonably relied on Bartlett Pringle's contractual promise to conduct a thorough and honest investigation of Bakst' Suspect Practices and derelict financial transactions.  The Board was wholly unaware of Bakst's Suspect Practices and fraud, and had it been aware of the actual facts by and through appropriate disclosures by Bartlett Pringle and/or Goldenring, the Board would have reacted differently with respect to such revelations.  Specifically, CMH would have moved to take immediate action against Bakst, including without limitation: (a) immediately terminating Bakst's employment as the Executive Director; (b) continuing an intensive audit and investigation of Bakst's discrepant business and financial practices; (c) implementing new accounting controls to reduce Bakst's ability to commit such fraud; and (d) terminating and rescinding any financial relationships with physicians that were arguably a violation of the Stark Law; among other prophylactic actions.

102.    Bartlett Pringle and Goldenring's deliberate, knowing false statements and their concealment of Bakst's fraud and self-dealing, and financial misconduct and misuse of CMH funds and monies to provide gifts to employees, board members and members of the medical staff caused substantial and direct damages to CMH, to wit: Plaintiffs were directly damaged by the defendants' failure to perform because CMH, as a direct and proximate cause of defendants' breach, did not learn about Bakst's egregious and wrongful

-40-

174772.2

1   misconduct, malfeasance, fraud, self-dealing and numerous Stark Law violations.  As a

2   result, when Bakst's employment with the Hospital was terminated in October 2003, the

3   Hospital agreed to a settlement on substantially more generous terms than it would have

4   agreed to if CMH known the full extent of Bakst's misconduct.  In particular, CMH would

5   have terminated Bakst without agreeing to pay Bakst any additional benefits or payments,

6   and it would not have agreed to issue a full (i.e., Civ. Code Section 1542) release of any

7   and all claims, both known and *unknown*, the Hospital might have against Bakst.  Had the

8   Hospital known the actual facts underlying Bakst's self-dealing and financial

9   skullduggery, it would have pursued Bakst to recover a civil judgment against him, and it

10   would have ensured that Bakst remain available to indemnify and reimburse CMH for any

11   civil fine suffered by the Hospital on account of his misconduct.

### SECOND CAUSE OF ACTION

12

13   **(Against Bartlett Pringle, Ron Camp & Goldenring & Prosser, and Peter A.**
     **Goldenring: Conspiracy to Commit Fraud**

14   **and To Breach a Fiduciary Duty)**

15

16        103.   Plaintiff incorporates paragraphs 1 through 93 of this Complaint as though

     fully alleged herein.
17

18        104.   Bartlett Pringle, as CMH's outside accountant and pursuant to their

19   contractual undertaking to faithfully engage in an AUP review of Bakst and his financial

20   dealings, owed CMH a fiduciary duty of loyalty and care.  Similarly, attorney Goldenring,

21   as General Counsel to the Board of Trustees and to CMH, owed a strict fiduciary duty of

22   loyalty and care to his client, CMH.  Those fiduciary duties included affirmative duties (a)

23   of full disclosure with respect to all matters bearing on the affairs, business, regulatory

24   compliance and finances of CMH, (b) to protect and safeguard the legal and business

25   interests of CMH with respect to the potential misfeasance, fraud or misconduct of any

26   CMH officer, director, agent or employee and (c) to advise CMH with respect to

27   conformity with sound corporate, accounting and legal practices on matters of Hospital

28   business.  Bartlett Pringle, in addition, was charged by Section 54 of AICPA's Auditing

     Standards with a fiduciary duty "to detect and report misstatements resulting from illegal

-41-

SECOND AMENDED COMPLAINT

174772.2

1   acts having a direct and material effect on the determination of financial statements

2   [which] is the same as that for misstatement caused by error or fraud." (AU §317.05).

3   This fiduciary duty required Bartlett Pringle to affirmatively report to the responsible

4   official or corporate committee at CMH evidence that came to their attention regarding

5   illegal and unlawful business practices by CMH's Executive Director.

6        105.   Bartlett Pringle and Goldenring each knew about Bakst's financial self-

7   dealing, financial misconduct and fraudulent behavior as regards to his gift-giving

8   practices and various other acts that violated tax laws and the Stark Law's anti-referral

9   regulations.  Rather than comply with their fiduciary duties to CMH by reporting such

10  fraud, misconduct and unlawful behavior to the Board of Trustees or to the Finance or

11  Audit Committees, Bartlett Pringle and Goldenring conspired with each other to commit

12  fraud on CMH by concealing Bartlett Pringle's true findings and whitewashing its

13  recommendations so thoroughly that the CMH Board was left entirely in the dark as to the

14  true nature of Bakst' alleged misconduct.

15       106.   If Bartlett Pringle and Goldenring had not conspired to conceal Bakst's

16  various forms of financial misconduct and self-dealing from the Board of Trustees, the

17  Suspect Practices would have been disclosed to the Board following the AUP review

18  pursuant to Bartlett Pringle's Independent Accountants' Report, allowing the Board to

19  institute appropriate corrective and remedial actions, including the termination of Bakst for

20  cause from his position as Executive Director of CMH.  Plaintiff CMH was thus directly

21  damaged by Bartlett Pringle's conspiracy to breach its fiduciary duty of full disclosure

22  regarding its findings of fraud, self dealing and misconduct on the part of Bakst as set forth

23  more fully in paragraph 103 *supra*.

24       107.   Bartlett Pringle's and Goldenring's conduct in conspiring to defraud CMH

25  and to breach, aid and abet the other in breaching their respective fiduciary duties of care,

26  loyalty and full disclosure to the client, CMH, was intentional, fraudulent, despicable,

27  malicious and undertaken in willful and conscious disregard for the rights of Plaintiff.

28

-42-

174772.2

### THIRD CAUSE OF ACTION

### (Against Goldenring & Prosser & Peter A. Goldenring: Breach of Fiduciary Duty of Undivided Loyalty)

108.   Plaintiff incorporates paragraphs 1 through 93 of this Complaint as though fully alleged herein.

109.   During the relevant time frame covered by this Complaint, Goldenring, an attorney duly admitted to practice law in the State of California, and Goldenring & Prosser purported to act as the legal advisor and attorney for CMH even though, prior to and concurrent with such engagement, Goldenring had an on-going, attorney-client relationship with the target of the AUP review, Michael D. Bakst. As CMH's General Counsel, Goldenring had an absolute duty of loyalty to CMH to advance CMH's legal interest at all times at "every peril to himself," and without consideration being given to any other client, such as Bakst, whose interests in connection with the AUP review necessarily and irreconcilably conflicted with the interests of CMH.  Goldenring's absolute duty of fiduciary loyalty to CMH could not be squared or reconciled with Goldenring's duty of loyalty and care to his other "client" Michael D. Bakst in connection with the AUP review, unless Goldenring fully disclosed the conflict to each client, and under California law, obtained a signed wavier of any potential or actual conflict.

110.   On information and belief, Goldenring and Goldenring & Prosser had previously represented CMH's then Executive Director Bakst in various personal matters, and in fact, Goldenring represented Bakst in connection with ongoing matters, including the AUP review, even while he was concurrently serving as counsel for CMH.  In so acting, Goldenring had an actual conflict of interest pursuant to Rule of Professional Conduct 3-310, and such conflict (an actual conflict) could only be waived in writing by each client, after full disclosure of all relevant facts. Accordingly, CMH did not know that Goldenring was secretly representing Bakst, who was the subject of the AUP review, whilst Goldenring pretended to represent the Hospital or the Board.  Goldenring, on information and belief, did not want the Hospital to know about his secret role as Bakst'

174172.2

1  counsel in respect to the UAP, and for that reason did not disclose his dual representation

2  to CMH.

3      111.  Had CMH known that Bakst was secretly representing the target of the

4  special audit or investigation commissioned by the Board of Trustees, the Hospital would

5  have discharged Goldenring and selected conflict-free counsel.

6      112.  Due to the <u>actual, unwaived conflict of interest</u> inherent in Goldenring's

7  attempting to simultaneously represent <u>both</u> the target of the special audit and the auditors

8  conducing the review, Goldenring was unable to deliver the legal services that CMH had

9  contracted him to engage, and as a matter of law failed to render any compensable services

10  for which he or Goldenring & Prosser were entitled to be receive compensation.  In order

11  to represent two clients with an actual conflict of interest, Goldenring was required to

12  make full disclosure to each client with regard to his actual pending conflict, and obtain a

13  knowing signed conflict waiver from each client, which he did not do.

14      113.  Because Goldenring failed to obtain a signed waiver with respect to the

15  undisclosed actual conflict of interest (discussed in the preceding paragraphs), Goldenring

16  was not entitled to charge or collect legal fees from CMH as he was legally unable to

17  perform competent, ethically appropriate services to his client, CMH.  Nonetheless,

18  Goldenring and Prosser PLC and Goldenring charged CMH for "legal services" rendered

19  to the hospital in connection with the AUP review, and collected substantial monies from

20  CHM.  According, and all such fees should be ordered forfeited and returned to CMH.

21      <u>EFFECT OF TOLLING AGREEMENT ON STATUTE OF LIMITATIONS</u>

22      114.  By November 2007, CMH, having learned for the first time in January 2007

23  about the conspiratorial agreement between Bartlett Pringle and Goldenring & Prosser to

24  conceal the facts arising from the AUP review, had an opportunity to fully investigate the

25  facts surrounding the conspiracy, breach of fiduciary duty, malpractice and contractual

26  causes of action set forth in this complaint.  To protect its rights against the defendants,

27  CMH instructed counsel to draft a complaint, which it was prepared to file forthwith,

28  initiating this civil action.  Because, however, the engagement agreement with Bartlett

-44-

174772.2

08/10/2009  14:57   2136130550                    BROWN WHITE NEWHOUSE                    PAGE  46/49

1   Pringle required that before any civil action was filed to enforce rights set forth in or

2   protected by the agreement, the parties must agree to non-binding mediation, CMH sent a

3   draft of the complaint to counsel for Bartlett Pringle and to Goldenring & Prosser, PLC,

4   with a request for mediation.  In order to provide time for the parties to schedule, prepare

5   for and hold the required mediation, the parties entered into a Statute of Limitations

6   Tolling Agreement, effective November 30, 2007.  (A true and correct copy of that

7   agreement is attached hereto as Exhibit H;  hereafter "Tolling Agreement").  As a result of

8   the fact that Defendant knowingly and willfully entered into the Tolling Agreement, the

9   relevant statutes of limitation was "tolled," or stopped running from November 30, 2007

10  on.

11      115.   The Tolling Agreement further provided that "[a]ny party to this Agreement

12  may terminate the tolling provisions of this Agreement by delivering written notice in

13  accordance with the notice provisions set forth in Paragraph 4 of this Agreement, in which

14  case the tolling provisions shall cease and be legally ineffective two weeks after such

15  notice is received."

16      116.   On April 28, 2007, counsel for Goldenring & Prosser PLC, provided a letter

17  to counsel for CMH that it was providing "notice terminating the Tolling Agreement dated

18  November 28, 2007."  Under the terms of the Tolling Agreement, the tolling period

19  became inoperative two weeks after the letter from Goldenring & Prosser's counsel was

20  received; that is on May 12, 2007, the statute of limitations commenced running again,

21  having been effectively tolled from November 30, 2007.

22      117.   The Complaint in this matter was filed on May 14, 2007.  Five additional

23  days ran with respect to the Statute of Limitations after December 1, 2008.  For purposes

24  of the statute of limitations, hence, the Complaint was effectively filed on or about

25  December 2, 2007.

26

27

28

SECOND AMENDED COMPLAINT

174772.2

EXH:2
Page #: 66

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Community Memorial Health System, Inc. prays for judgment as follows:

### ON ALL CAUSES OF ACTION:

1.    For damages in an amount to be proven at trial together with interest thereon at the legal rate;

2.    For punitive damages in an amount to be proven at trial;

3.    With respect to Count III, for a refund of all attorney's fees and other professional fees paid to Goldenring during the pendency of his unwaived and undisclosed breach of his loyalty to the Hospital as CMH's counsel.

4.    For its reasonable attorneys' fees and expenses;

5.    For costs of suit herein incurred; and

6.    For such other and further relief as the Court may deem just and proper.

DATED:  August 10, 2009

BROWN WHITE & NEWHOUSE LLP

By _____

GEORGE B. NEWHOUSE, JR.
STEVEN A. HEATH
CELIA OUELLETTE
Attorneys for Plaintiff
COMMUNITY MEMORIAL HEALTH
SYSTEM, INC.

-46-

SECOND AMENDED COMPLAINT

174772.2

EXH:2
Page #: 6

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
*Community Memorial Health System, Inc. v. Bartlett, Pringle & Wolf LLP*
Case No. 56-2008-00318654-CR-FR-VTA

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action. My business address is 333 South Hope Street, 40th Floor, Los Angeles, California 90071.

On August 10, 2009, I served the following document(s) described as: **Plaintiff's Second Amended Complaint for: (1) Fraud; Fraudulent Concealment and Misrepresentations; (2) Conspiracy to Commit Fraud and to Breach a Fiduciary Duty; (3) Breach of Fiduciary Duty of Loyalty; Jury Trial Demanded** in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

### SEE ATTACHED SERVICE LIST

☒ **BY MAIL:** I deposited such envelope in the mail at 333 South Hope Street, 40th Floor, Los Angeles, California 90071. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.

☐ **BY FACSIMILE:** I served said document(s) to be transmitted by facsimile pursuant to Rule 2008 of the California Rules of Court. The telephone number of the sending facsimile machine was 213/620-1398.

☐ **BY OVERNIGHT DELIVERY:** I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier.

☐ **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☐ **BY ELECTRONIC MAIL:** On the above-mentioned date, from Los Angeles, California, I caused each such document to be transmitted electronically to the party(ies) at the e-mail address(es) indicated below. To the best of my knowledge, the transmission was reported as complete, and no error was reported that the electronic transmission was not completed.

☒ (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on August 10, 2009, at Los Angeles, California.

Erin K. Gallagher

175736.1

08/10/2009  14:57   2136130550                    BROWN WHITE NEWHOUSE                PAGE  49/49

SERVICE LIST

*Community Memorial Health System, Inc. v. Bartlett, Pringle & Wolf LLP*
Case No. 56-2008-00318654-CR-FR-VTA

Desmond J. Hinds, Esq.
Filomena Meyer, Esq.
Hinshaw & Culbertson, LLP
11601 Wilshire Blvd., Suite 800
Los Angeles, CA 90025-1744
310-909-8000 Fax: 310-909-8001
dhinds@hinshawlaw.com

Randall J. Dean, Esq.
Chapman, Glucksman & Dean
11900 West Olympic Blvd., Eighth Flr
Los Angeles, CA 90064
310-207-7722 Fax: 310-207-6550
rdean@cgdlaw.com

175736.1

EXH: 2
Page #: 71

EXHIBIT 3



Printer-friendly story
Read more at vcstar.com

# Lawsuit reflects broken trust

## Colleagues worked for Ventura hospital

By Tom Kisken , Kathleen Wilson

Sunday, May 25, 2008

The players in the sweeping fraud lawsuit filed by Community Memorial Hospital once presented a united front: the longtime volunteer trustees, the former administrator they considered their personal friend, the accounting firm that had reviewed the books for close to 25 years, the law firm that advised the hospital during a bruising battle with physicians.

Now that unity has been shattered, as officials of the nonprofit Ventura hospital are claiming an elaborate coverup by trusted advisers and alleging fraud by former CEO Michael Bakst. The board contracted the accounting firm to investigate Bakst but is now alleging that the firm concealed its findings under pressure from the hospital's attorney. The hospital didn't learn until years later about the litany of financial problems that could cost $5 million, including $1.52 million paid in federal fines, officials say.

Now a battle is erupting over who did what when.

**Defendants deny allegations**

Records in the lawsuit, filed earlier this month, indicate accountant Ronald Camp eliminated some negative findings from the final report and never cited hundreds of thousands of dollars in questionable spending shown in supplementary work documents. Officials say then-hospital attorney Peter Goldenring pressured the accountant to leave out the final report's negative findings. The lawyer also represented Bakst in long divorce proceedings, fueling allegations and denials about a conflict of interest.

All of the defendants deny all allegations. Goldenring's Ventura law firm provided documents showing the full findings from the financial report were shared with Gary Wolfe, then vice chairman of the hospital board. An accountant's personal memo says Wolfe told him the board didn't want the findings included in the written report.

James Prosser, Goldenring's law partner, said the document and a second letter on findings that was faxed to Wolfe shows the board knew everything.

"How can you say the person you're told to communicate with doesn't suffice as notice to the board?" Prosser asked.

Wolfe said he doesn't remember receiving the faxed letter and was never told the full details of Bakst's spending. He never agreed the findings should be communicated only orally, he said.

**Alleged financial misconduct**

Although the former CEO who ran the nonprofit hospital for nearly 25 years is not named as a defendant in the lawsuit, the war of legal documents revolves around his alleged financial misconduct.

Bakst was dismissed in October 2003 after a power struggle with physicians and not because of the financial improprieties alleged in the lawsuit. Board members say they only discovered the depth of the problems after Bakst left.

"He was spending money that didn't belong to him and using it for his own personal purposes and for personal political gain," hospital attorney George Newhouse said, adding Bakst was currying favor with the board, employees and physicians.

"A hospital is a charity that exists to serve the community and the residents of Ventura County. That money should be used to buy imaging machines, operating rooms and serve the people of Ventura," he said. "When you are head of a corporation and spending corporate assets for your own use, that's not just misuse, that's fraud, particularly when records are asserting that personal expenditure is for public purpose."

Lawyer Michael Amir said Bakst won't be interviewed. He denied his client committed fraud, saying all his purchases were made on behalf of the hospital and were reviewed and approved by the board.

"I'm disappointed that Community Memorial Hospital continues to disparage Mike Bakst's name and reputation through its lawsuit and now its attorneys," he said.

The hospital paid the federal government $1.52 million late last year to settle allegations that it violated laws governing preferential treatment for doctors, including interest-free loans and gifts. The alleged violations over nearly 10 years were committed under Bakst's tenure, but his settlement agreement precludes a lawsuit against him, hospital CEO Gary Wilde said.

Wilde estimates that cleaning up the entire problem could cost the hospital $5 million in fines, accounting investigations and legal fees.

Amir won't say whether Bakst has been contacted by federal authorities.

**'It's not to be vindictive'**

Wolfe said the board decided to sue to protect the assets of the hospital.

"It's to recoup the money," he said. "It's not to be vindictive."

At issue in the lawsuit is the information deleted from a review the hospital commissioned from its longtime accounting firm.

Six years ago, the board asked Bartlett, Pringle & Wolf of Santa Barbara to investigate rumors that Bakst was engaged in offshore gambling and skimming hospital contracts, Wolfe said. No evidence of that was found, he said.

Bakst was indignant and welcomed the investigation, which was authorized in an agreement in November 2002. Accountants sent Goldenring, who was representing the hospital, their independent report on Dec. 16, based on a review of records from Jan. 1, 2001, to Oct. 31, 2002.

The accountant reported no inappropriate conduct by Bakst but told Goldenring he would send another letter detailing accounting deficiencies and recommendations. That letter, dated the next day, cited "$28,800 of transactions in which personal expenses were paid and not accounted for properly," and "a significant amount of gifts such as computers, cameras and similar items totaling approximately $110,000 were made during the period reviewed and such gifts are clearly subject to income tax."

Three weeks later, Goldenring wrote to Camp asking him to delete those statements from a letter recommending changes in the hospital's accounting procedures. Camp resisted, saying the findings were "an integral part of the report." He suggested a possible meeting with Wolfe and then-board Chairman Phil Drescher.

Goldenring repeated his objections Feb. 3, and five days later Camp issued a follow-up letter that the hospital calls a "sanitized report."

Hospital officials say they never saw all the findings and did not know about the problems. Had they known, they would have fired Bakst immediately and cleaned up the issues then, the lawsuit says.

**'They're simply not true'**

Prosser said the findings were deleted only because they didn't fit the context of a report designed to correct accounting processes. He said the omitted findings were presented by the accountant as staff errors and not as misconduct by Bakst.

Hospital officials say accounting records referred to in the lawsuit as working papers show much bigger problems than made it into any of the reports. "The work papers document payments from CMH to Bakst of hundreds of thousands of dollars of expense claims with little or no supporting documentation or receipts," the lawsuit says. The records also reflected thousands of dollars in gifts to physicians and employees, such as a $1,600 camera and a computer system for $7,470.

The gifts should have ignited concerns about Medicare-related laws against kickbacks to physicians, the lawsuit says.

Prosser said Goldenring never saw the working papers. The full findings from the original letter were shared with board leaders, Prosser said.

"Wolfe and Drescher were fully informed," he said.

Camp, who is now retired, not only sent drafts of his findings to Goldenring but also discussed them with the attorney and Wolfe more than once, according to a personal memo dated February 2003.

In a follow-up phone call, Wolfe told him he did not want a more detailed report with specific findings, Camp wrote.

Prosser said the memo came from Camp's accounting firm. Lawyer Randall Dean, who represents Camp and the accounting firm, wouldn't discuss the memo except to say that it could be a focus of court proceedings. He denied all allegations that his clients withheld anything from the board or conspired in a coverup.

"They're simply not true," Dean said, refusing to address any specifics.

### 'This is very infuriating'

Wolfe angrily denied that he wanted to keep the findings out of the report. He acknowledged being told some of the findings by phone, but said the memo bore little relationship to the call. He complained the law firm never should have made it public.

"This is very infuriating they would try to piecemeal it in the press, rather than court, where it can all come out properly," he said.

Wolfe said Camp should have contacted Phil Drescher, then-chairman of the board, or Harry Maynard, the longtime finance chairman.

But in the memo, Camp says Wolfe told him he was going to talk to Drescher. The former chairman did not return telephone calls Friday.

Prosser said it was not the first time Wolfe had been warned. He provided a letter outlining the deletions being suggested and a cover sheet showing it was faxed to Wolfe. The trustee did not recall receiving it.

Wolfe said the accountants didn't pursue questionable financial activity that would have uncovered some of the loans to physicians. The loans surfaced when Chief Financial Officer David Glyer raised concerns in 2004, according to the lawsuit.

Hospital officials say they did not know the full findings of the investigation until 2007, when the accountants turned over their complete files, including the working papers.

Dean said all the allegations in the lawsuit are untrue. Prosser said Goldenring's role in financial matters was limited to the 2002 review. When Glyer voiced his concerns about the loans, Goldenring sent a letter to legal specialists asking them to explore troubling aspects of the financing.

Prosser contended the hospital is using some facts and carefully hiding others.

"There's the whole rest of the story they're not telling," he said.

The hospital lawsuit details the alleged conflict of interest surrounding Goldenring's representation of both Bakst and the hospital board. A state rule says lawyers shall not represent clients whose interests conflict except with their informed written consent. The lawsuit says the hospital did not know that Goldenring was representing Bakst. That representation did not end until May 2006, according to court records.

Prosser said the divorce was completed the year before the investigation was launched though follow-up work continued.

"It was known by board members," he said. "It was openly talked about by Dr. Bakst. It wasn't anything that anyone expressed any concern about."

He acknowledged, however, there was no written disclosure.

Legal ethicist Diane Karpman said Prosser can also argue the divorce work and representation of the hospital board are totally unrelated.

"You could argue that it's apples and oranges," she said.

Although he was unfamiliar with the hospital case, University of Southern California legal ethics Professor Greg Keating said representing clients with conflicting interests is a dangerous practice that can jeopardize attorney-client confidentiality. He said such conflicts rarely emerge at large corporations.

"It appears to emerge in circumstances when the CEO sort of dominates the company and has so much power that no one says no," he said.

**A certain level of trust**

Such relationships were not uncommon at Community Memorial Hospital. Wolfe, now chair of the hospital board, did personal accounting work for Bakst. Prosser said another board member testified as an expert witness in Bakst's divorce case.

"Everybody on the board considered him a personal friend," Wolfe said. "He was a very likeable guy."

Wolfe says his years-long preparation of Bakst's income tax returns was not a conflict of interest with his position on the board. He does not believe the relationship affected his view of Bakst's management.

"I've been over and over that," he said. "You get a level of trust when you have worked with somebody for a long time. I do feel a sense of betrayal. It hurts. A board has to have a certain level of trust with a CEO."

The lawsuit lists expenses for which Bakst was allegedly reimbursed, such as $7,500 in automobile repairs, plus gifts to physicians and employees such as cameras, computer, liquor and jewelry.

Physicians said they thought the gifts were from Bakst personally and not from hospital funds.

"I worked for Dr. Bakst for 10 years," said Dr. Richard Reisman, medical director of the hospital's network of outpatient clinics. "Over that time, we became friends, and on occasion he gave me a birthday present."

There are some in the medical community who welcome the lawsuit as a way to push misconduct onto a stage where it will receive public scrutiny. Others want the drama to end.

"I see it as an obstacle to a healing process that I thought would have been completed," said John Keats, a doctor on staff at the hospital. "I think it's time for the medical community to move beyond these issues."

 © 2009 Scripps Newspaper Group — Online

# EXHIBIT 4

## SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE

     1.    **AGREEMENT:** This writing represents a Settlement Agreement and Mutual General Release ("Agreement") between Community Memorial Hospital of San Buenaventura ("Hospital"), Buenavista Medical Properties, Inc. ("Buenavista"), Caduceus Medical Management, Inc., and all subsidiaries and related entities of each (hereinafter collectively referred to as "Organization") and Michael D. Bakst, Ph.D. ("Employee"),

**[REDACTED]**

**[REDACTED]**

164722.4

1

**[REDACTED]**

      d.    <u>General Release</u>:  With the exception of the obligations of Employee referred to in Paragraph 3.a. below, Organization releases Employee from all liabilities, causes of action, charges, complaints, suits, claims, obligations, costs, losses, damages, injuries, rights, judgments, attorney's fees, bonds, bills, penalties, fines, and all other legal responsibilities of any form whatsoever, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, which the Organization now has, or may have had, including, but not limited to, all claims arising out of or pertaining directly or indirectly to any controversy between Employee and Organization, including, but not limited to, any controversy arising from Employee's employment with the Organization, or his service on any of Organization's Boards of Directors, or his actions in connection with advances to Employee, prior to the effective date of this Agreement.

      e.    <u>Indemnification</u>:  The Organization shall indemnify Employee against any action in violation of subsection 2.d. above, whatsoever, brought by the Organization, or the Organization's successors in interest, or any other on the Organization's behalf, including reasonable attorney's fees and costs associated with Employee's legal defense against any such action in violation of subsection 2.d. above.  In addition, the Organization shall provide Employee with all indemnification and/or defense rights Employee has existing under the Organization's bylaws or under pertinent statutes for events arising out of Employee's employment with the Organization prior to the effective date of this Agreement.

**[REDACTED]**

**[REDACTED]**

    b.    <u>Confidentiality Agreement</u>:  The Organization and the Employee shall not disclose, to any person, the existence or contents of this Agreement, with the following exceptions:

**[REDACTED]**

    Should the Organization breach this Confidentiality Agreement, the terms of this Agreement shall remain in full force and effect.  The Employee may sue Organization for actual damages, with the prevailing party to have its attorney's fees paid by the other party.

**[REDACTED]**

    c.    <u>No Derogatory or Disparaging Comments</u>:  There shall be a mutual covenant that Employee and the Organization shall not make any disparaging comments, orally, in writing, electronically, or by any other means about each other or about any of the remaining workers of the Organization.

164722.4

6

**[REDACTED]**

        f.    <u>Attorney's Fees Upon Lawsuit For Breach</u>:  Should either Employee or the Organization be required to sue the other due to a breach of this Agreement, the prevailing party shall be awarded reasonable attorney's fees.

**[REDACTED]**

164722.4

7

## [REDACTED]

6.   <u>EFFECTIVE DATE OF THIS AGREEMENT</u>:

    This Agreement shall be effective on the date signed by Employee and Organization and if those signatures are on different dates, the effective date of this Agreement shall be the latter of those dates.

Date: _____11/26/03_____    _____
                                          By:  Michael Bakst, PhD

Date: _____11-26-2003_____    _____
                                          By:  Gary Wolfe
                                          On behalf of the Organization