1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-Filed: 03.07.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL D. BAKST, an individual,          )   CASE NO. CV 09-08241 MMM (FFMx)
                                          )
                    Plaintiffs,           )
                                          )
            vs.                           )
                                          )
COMMUNITY MEMORIAL HEALTH                 )
SYSTEM, INC., a California non-profit     )   ORDER ON MOTIONS *IN LIMINE*
public benefit corporation formerly known )
as COMMUNITY MEMORIAL                     )
HOSPITAL OF SAN                           )
BUENAVENTURA, INC., a California          )
non-profit public benefit corporation; and )
DOES 1 through 10, inclusive              )
                                          )
                    Defendants.           )
                                          )

        Michael D. Bakst commenced this action on November 10, 2009, against Community

Memorial Health System, Inc. ("CMH") and certain fictitious defendants.[1]  Bakst alleges claims

for breach of contract and violation of California Labor Code § 2802 based on a series of events

that followed his resignation as Executive Director of CMH in September 2003.  On January 31,

_____

        [1]Complaint for (1) Breach of Contract; (2) Violation of California Labor Code Section
2802; (3) Intentional Infliction of Emotional Distress; and (4) Negligent Infliction of Emotional
Distress, Docket No. 1 (November 10, 2009).   On December 14, 2009, Bakst voluntarily
dismissed his claims for intentional and negligent infliction of emotional distress.  (Stipulation Re
Plaintiff's Voluntary Dismissal of Negligent and Intentional Infliction of Emotional Distress
Claims, Without Prejudice, Docket No. 6 (December 14, 2009)).

2011, the court granted in part and denied in part CMH's motion for summary judgment.[2]  The court granted the motion as to Bakst's claim for breach of the non-disparagement clause in the parties' November 2003 Settlement Agreement and Mutual General Release to the extent the claim was based on CMH's disclosures to the Internal Revenue Service and Office of the Inspector General ("OIG"), as well as to the extent it was based on statements made prior to November 10, 2005.  Because Bakst failed to raise triable issues of fact as to whether he sustained damage prior to 2007 as a result of CMH's alleged breaches of the non-disparagement clause, and as to whether he sustained damage prior to May 2008 as a result of CMH's alleged breach of the confidentiality provision, the court deemed it established that any actionable breach of the Agreement's non-disparagement provision by CMH did not cause Bakst's inability to obtain employment between 2003 and 2007, and that any breach by CMH of the confidentiality provision did not cause Bakst damage prior to May 2008.  The motion was denied in all other respects.

On January 14, 2011, CMH filed eleven motions *in limine*, seeking to exclude: (1) evidence of disparaging statements made by individual doctors as opposed to CMH;[3] (2) evidence supporting Bakst's time-barred claim for breach of the non-disparagement clause;[4] (3) evidence that CMH caused plaintiff to suffer emotional distress or harm to his reputation;[5] (4) evidence regarding CMH's purported motive in allegedly breaching the non-disparagement

---

[2]Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgement ("Order"), Docket No. 148 (January 31, 2011).

[3]Motion *in Limine* (#1) to Preclude Plaintiffs from Introducing Alleged Disparaging Statements Made by Individual Doctors and Not the Hospital ("CMH MIL #1"), Docket No. 88 (January 14, 2011).

[4]Motion *in Limine* (#2) to Preclude Plaintiff from Introducing Evidence in Support of Bakst's Time-barred Claim for Breach of the Non-disparagement Clause ("CMH MIL #2"), Docket No. 89 (January 14, 2011).

[5]Motion *in Limine* (#3) to Preclude Plaintiff from Introducing Evidence That the Hospital Caused Plaintiff to Suffer Emotional Distress or Harm to his Reputation ("CMH MIL #3"), Docket No. 90 (January 14, 2011).

clause;[6] (5) the testimony of plaintiff's expert witness, Robert Wunderlich;[7] (6) evidence of attempts plaintiff made to find comparable employment that were not reflected in his discovery responses;[8] (7) evidence of deposition Exhibit 135, and related testimony and argument;[9] (8) evidence that plaintiff received job offers prior to his November 26, 2003 settlement with CMH;[10] (9) evidence of CMH's insurance coverage;[11] (10) evidence that CMH requested indemnity from its insurer in connection with the OIG investigation;[12] and (11) any statements made by third-party insurance carrier RSUI regarding CMH's alleged duty to indemnify plaintiff.[13] Plaintiff opposes all of the motions except the ninth and eleventh.[14]

---

[6]Motion *in Limine* (#4) to Preclude Plaintiff from Introducing Evidence Regarding the Hospital's Motive in Allegedly Breaching the Non-Disparagement Clause ("CMH MIL #4"), Docket No. 91 (January 14, 2011).

[7]Motion *in Limine* (#5) to Preclude Plaintiff from Introducing Testimony of Plaintiff's Expert Witness Robert Wunderlich ("CMH MIL #5"), Docket No. 103 (January 14, 2011).

[8]Motion *in Limine* (#6) to Preclude Plaintiff from Introducing Evidence of Any Attempts Plaintiff Made to Find Comparable Employment Not Reflected in His Discovery Responses ("CMH MIL #6"), Docket No. 92 (January 14, 2011).

[9]Motion *in Limine* (#7) to Preclude Plaintiff from Introducing Deposition Exhibit 135, and Related Testimony and Argument  ("CMH MIL #7"), Docket No. 104 (January 14, 2011).

[10]Motion *in Limine* (#8) to Preclude Plaintiff from Introducing Evidence That Plaintiff Received Any Job Offers Prior to His November 26, 2003 Settlement with the Hospital  ("CMH MIL #8"), Docket No. 84 (January 14, 2011).

[11]Motion *in Limine* (#9) to Preclude Plaintiff From Introducing Evidence of the Hospital's Insurance Coverage in This Action ("CMH MIL #9"), Docket No. 85 (January 14, 2011).

[12]Motion *in Limine* (#10) to Preclude Plaintiff From Introducing Evidence That the Hospital Requested Insurance Coverage in Connection With the OIG Investigation ("CMH MIL #10"), Docket No. 86 (January 14, 2011).

[13]Motion *in Limine* (#11) to Preclude Plaintiff From Introducing Any Statements Made by Third-Party Insurance Carrier RSUI Regarding the Hospital's Alleged Duty to Indemnify Plaintiff ("CMH MIL #11"), Docket No. 87 (January 14, 2011).

[14]Bakst Opposition #1, Docket No. 122 (January 24, 2011); Bakst Opposition #2, Docket No. 107 (January 24, 2011); Bakst Opposition #3, Docket No. 108 (January 24, 2011); Bakst

That same day, Bakst filed nine motions *in limine*, seeking to exclude: (1) the legal conclusions of defendant's expert witness;[15] (2) evidence regarding defendant's internal investigation of plaintiff and defendant's basis for refusing to indemnify plaintiff;[16] (3) evidence of plaintiff's alleged intimate personal relationships;[17] (4) duplicative evidence of plaintiff's settlement with the OIG;[18] (5) the testimony of defendant's expert witness, Martin B. Ross, Ph.D.;[19] (6) testimony by plaintiff's counsel regarding counsel's website;[20] (7) evidence regarding past negative events involving plaintiff;[21] (8) evidence and argument regarding any alleged right

---

Opposition #4, Docket No. 109 (January 24, 2011); Bakst Opposition #5, Docket No. 124 (January 24, 2011); Bakst Opposition #6, Docket No. 110 (January 24, 2011); Bakst Opposition #7, Docket No. 111 (January 24, 2011); Bakst Opposition #8, Docket No. 116 (January 24, 2011); Bakst Non-Opposition #9, Docket No. 112 (January 24, 2011); Bakst Opposition #10, Docket No. 113 (January 24, 2011); Bakst Non-Opposition #11, Docket No. 114 (January 24, 2011).  As plaintiff has filed a notice of non-opposition to defendant's ninth and eleventh motions *in limine*, the court grants them in their entirety.

[15]Motion *in Limine* (#1) to Exclude Evidence Regarding Legal Conclusions of Defendant's Expert Witness ("Bakst MIL #1), Docket No. 93 (January 14, 2011).

[16]Motion *in Limine* (#2)to Exclude Evidence Regarding Defendant's Internal Investigation of Plaintiff and Defendant's Basis for Refusing to Indemnify Plaintiff ("Bakst MIL #2), Docket No. 94 (January 14, 2011).

[17]Motion *in Limine* (#3) to Exclude Evidence of Plaintiff's Alleged Intimate Personal Relationships ("Bakst MIL #3), Docket No. 95 (January 14, 2011).

[18]Motion *in Limine* (#4) to Exclude Duplicative Evidence of Plaintiff's Settlement with the Office of Inspector General ("Bakst MIL #4), Docket No. 96 (January 14, 2011).

[19]Motion *in Limine* (#5) to Exclude Defendant's Expert Witness Martin B. Ross, Ph.D. ("Bakst MIL #5), Docket No. 97 (January 14, 2011).

[20]Motion *in Limine* (#6) to Preclude Defendant from Calling Plaintiff's Counsel as a Witness and Excluding Evidence Regarding Counsel's Website ("Bakst MIL #6), Docket No. 98 (January 14, 2011).

[21]Motion *in Limine* (#7) to Exclude Evidence Regarding Past Negative Events Involving Plaintiff ("Bakst MIL #7), Docket No. 99 (January 14, 2011).

to make disparaging statements;[22] and (9) certain lay opinion regarding plaintiff's employability.[23] Defendant CMH opposes each motion *in limine*.[24]

## I. DISCUSSION

**A.    CMH's Motion *in Limine* to Preclude Evidence of Disparaging Statements Made by Individual Doctors as Opposed to CMH**

CMH first seeks to exclude evidence of statements "made by the medical staff or its individual members" under Rules 401, 402, and 403 of the Federal Rules of Evidence.[25] Defendant contends that it cannot, as a matter of law, be held liable for these statements because the individual speakers were not bound by the settlement between Bakst and CMH.  Defendant further contends that "allowing Bakst to render their statements actionable against [CMH] would infringe on [the speaker's] constitutional free speech rights. . . ."[26]  While CMH frames its motion in general terms, it attaches three articles from the Ventura County Star ("the Star"), dated November 15, 2007, December 20, 2007, and October 5, 2009, as well as a letter signed by Richard Fleming, Jr., dated February 23, 2008.[27]  Defendant does not cite specific statements in these document that it contends should be excluded.  As a result, the court will attempt to address

---

[22]Motion *in Limine* (#8) to Exclude Evidence and Arguments Regarding Any Alleged Right to Make Disparaging Statements ("Bakst MIL #8), Docket No. 100 (January 14, 2011).

[23]Motion *in Limine* (#9) to Exclude Evidence Regarding Certain Lay Opinion Regarding Plaintiff's Employability ("Bakst MIL #9), Docket No. 101 (January 14, 2011).

[24]CMH Opposition #1, Docket No. 119 (January 24, 2011); CMH Oppostion #2, Docket No. 130 (January 24, 2011); CMH Opposition #3, Docket No. 105 (January 24, 2011); CMH Opposition #4, Docket No. 117 (January 24, 2011); CMH Opposition #5, Docket No. 123 (January 24, 2011); CMH Opposition #6, Docket No. 121 (January 24, 2011); CMH Opposition #7, Docket No. 115 (January 24, 2011); CMH Opposition #8, Docket No. 106 (January 24, 2011); CMH Opposition #9, Docket No. 127 (January 24, 2011).

[25]CMH MIL #1 at 1.

[26]CMH MIL #1 at 1.

[27]*Id.* at 2.

5

1    each statement contained in the articles and letter attached to defendant's motion.

2         This issue was previously addressed in the context of defendant's motion for summary

3    judgment.  There, CMH argued that Bakst could not recover for allegedly disparaging statements

4    made by Dr. John Hill in 2003 and 2004, because the statements were made in Hill's individual

5    capacity, and not as a representative of CMH.[28]   Because these statements fell outside the

6    limitations period, the court determined that it did not need to address whether Hill spoke as an

7    individual or as CMH's representative.[29]   CMH did not contend that any allegedly disparaging

8    statements made after November 10, 2005, were made by CMH employees in their individual

9    capacities rather than as representatives of CMH.[30]   A motion *in limine* is not a proper vehicle by

10   which to seek summary judgment on all or a portion of a claim.  See *Ekweani v. Ameriprise*

11   *Financial, Inc.*, No. CV-08-01101-PHX-FJM, 2010 WL 749648, *2 (D. Ariz. Mar. 3, 2010) ("At

12   the final pretrial conference, we noted that it was highly unusual to raise a statute of limitations

13   defense by way of a motion *in limine*.  We indicated that, with trial looming, it was too late to

14   decide a motion properly construed as one for summary judgment"); *Medtronic Vascular Inc. v.*

15   *Abbott Cardiovascular Systems, Inc.*, No. C 06-1066 PJH, 2009 WL 2171058, *1 (N.D. Cal. July

16   17, 2009) ("Even putting aside these fundamental issues regarding infringement, the primary

17   problem with plaintiffs' request is that the parties appear to view it as a vehicle through which to

18   argue for the very first time substantive arguments that should have been raised on claim

19   construction or summary judgment. . . . [P]laintiffs then advance arguments as to whether certain

20   prior art and other illustrations read upon those heretofore un-construed claim limitations i.e., a

21   classic summary judgment argument.  This is wholly improper"); *Via Waves Communications,*

22   *LLC v. ARC Phone Canada, Inc.*, No. CV-01-10370 CAS (MANx), 2004 WL 5486633, *4

23   (C.D.Cal. October 19, 2004) (denying a motion *in limine* that was "a late and improper attempt

24

25   _____

26   [28]Order at 15 n. 63.

27   [29]*Id.*

28   [30]*Id.*

1   to obtain summary judgment.").[31]  The court would thus act well within its discretion to deny the

2   motion as a procedurally improper attempt to seek partial summary judgment through the vehicle

3   of filing a motion *in limine*.

4          Even were the court to consider the merits of the argument, however, it would conclude

5   that there is sufficient evidence from which a jury could find that statements made by CMH

6   employees or board members after November 10, 2005 were made on behalf of CMH.  Thus,

7   excluding evidence of the statements would be inappropriate.  The documents attached to CMH's

8   motion include the following statements by individual physicians: (1) a statement by Gary Wilde,

9   CMH's "top administrator" who succeeded Bakst, that "'[w]e can't ignore $100,000 for things

10  we can't explain,'" and "that the hospital [was] legally bound to report it";[32] (2) a statement by

11  Wilde, identified as "president and CEO of Community Memorial," that "the hospital board was,

12  with the exception of an interest-free home loan to a doctor, unaware of any of the transactions";[33]

13  (3) a statement by Hill, "who led the doctors' battle against Bakst's management," that "[t]his

14  money that is being paid to the federal government doesn't punish the perpetrator. . . .  That

15

16  ───────────────

17      [31]See also *NIC Holding Corp. v. Lukoil Pan Americas*, No. 05-CV-09372(MEA), 2009 WL
18  996408, *2 (S.D.N.Y. April 14, 2009) (stating in an order on a motion *in limine*, "we will not
    indulge NIC's efforts to revive its unsuccessful summary judgment arguments," citing *Baxter
19  Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94-C-5220, 1998 WL 665138, *10 (S.D.N.Y. Sept.
    25, 1998) (denying a motion *in limine* where plaintiff's arguments regarding defendant's lost
20  profits were "largely re-hashes of arguments made in its earlier summary judgment motion"); *U.S.
    Underwriters Ins. Co. v. Falcon Constr. Corp.*, No. 02-C-4182, 2006 WL 3146422, *2-3
21  (S.D.N.Y. Oct. 30, 2006) (denying a motion *in limine* where the party's argument was "an
    improper attempt to relitigate an issue that [the court] previously decided in her opinion denying
22  [defendant's] prior motion for summary judgment"); *Rattigan v. Commodore Int'l Ltd.*, No.
    87-C-2729, 1989 WL 151678, *5 (S.D.N.Y.  Dec. 8, 1989) (noting that plaintiff "has filed a
23  motion for summary judgment in the guise of a motion *in limine*"); *Hein v. Cuprum*, S.A., No.
    99-C-1360, 2002 WL 34453309, *1 (S.D.N.Y. Jan. 23, 2002) (denying motions *in limine*
24  concerning an expert witness where defendant had advanced the same arguments in a prior
25  unsuccessful summary judgment motion).

26      [32]CMH MIL #1, Attachment 1 (Bledsoe Decl. #1), Exh. A (11/15/07 Star Article) at 1.

27      [33]*Id.*, Exh. B (12/20/07 Star Article) at 1.

28

money is being taken from the hospital. . . .  The ultimate penalty is misplaced";[34] (4) a statement by Hill, identified as a retired physician and continuing member of CMH's Board, that "[y]ou don't just pay $64,000 unless you have concerns";[35] and (5) a February 23, 2008 letter signed by Richard Fleming, Jr., and sent from the "Medical Staff Office" to a potential employer, describing Bakst's "extremely deleterious presence at our hospital . . . blatant disregard for laws, rules and human decency," and noting that the recipient should "feel free to contact any member of the Board of [CMH], and especially John Hill, M.D., if [he] require[s] more evidence/proof as to the thoroughly undesirable characteristics of Michael Bakst."[36]

CMH correctly notes that these statements are directly relevant only to the extent that they are attributable to it, since the individual physicians are not parties, and CMH cannot be held liable for disparaging statements they made in their individual capacities.  Because CMH is a corporation as opposed to a natural person, however, it must rely on natural persons such as its officers and directors to act on its behalf.  See *Katenkamp v. Superior Court*, 16 Cal.2d 696, 700 (1940) ("A corporation, as an artificial entity, cannot of itself perform or refrain from performing an act; only its officers and agents can").  It follows that a corporation is liable for the acts of its officers and directors so long as they are acting within the scope of their agency for the corporation.  See, e.g., *Signal Oil & Gas Co. v. Ashland Oil & Refining Co.*, 49 Cal.2d 764, 779 (1958) ("It has long been settled that '[t]he Directors are the chosen representatives of the corporation, and constitute, . . . [for] all purposes of dealing with others, the corporations.  What they do within the scope of the objects and purposes of the corporation, the corporation does,'" citing *Maynard v. Fireman's Fund Ins. Co.*, 34 Cal. 48, 57 (1867)).  CMH, therefore, would be liable for statements made by an officer, director, or agent of CMH within the scope of his or her agency.

It is clear that under California law, CMH can be held liable for the statements made by

---

[34]*Id.* at 2.

[35]*Id.*, Exh. C (10/5/09 Star Article) at 2.

[36]*Id.*, Exh D (2/23/08 Letter) at 1-2.

1   Wilde as CMH's president and CEO.  The president of a corporation "is the general manager and
2   chief executive officer of the corporation."  CAL. CORP. CODE § 312.  As general manager, the
3   president "is more than an agent and acts and speaks directly for the corporation in conducting its
4   activities and objects. . . .  [I]t is well established that the general manager has implied authority
5   to bind the corporation and do in the transaction of its ordinary affairs whatever the corporation
6   itself could do within the scope of its powers." *Monteleone v. Southern California Vending Corp.*,
7   264 Cal.App.2d 798, 806 (1968) (citing *Jeppi v. Brockman Holding Co.*, 34 Cal.2d 11 (1949);
8   *Greig v. Riordan*, 99 Cal. 316 (1968); and *Pac. Concrete Products Corp. v. Dimmick*, 136
9   Cal.App.2d 834, 838 (1956)); *Moore v. Phillips*, 176 Cal.App.2d 702, 711 (1959) ("Where the
10  president of a corporation is also its general manager, having the power to superintend and
11  conduct its business, he has implied authority to make any contract or do any other act appropriate
12  in the ordinary course of its business"); see also *Commercial Security Co. v. Modesto Drug Co.*,
13  43 Cal.App. 162, 173-74 (1919) ("A corporation['s] . . . president or general manager . . . is its
14  agent, empowered, . . ., to do anything which naturally and ordinarily has to be done to carry out
15  its paramount purposes; and where authority to do [an] act . . . included in the ordinary affairs
16  of such a corporation, is not specifically given to any particular officer, . . . the intention of the
17  board of directors to confer upon the [president or general manager] of such corporation authority
18  to perform such particular act will be inferred from the general authority so given.  And where
19  . . . an officer of a corporation is held out by such corporation to be possessed of power to
20  perform all acts involved in its ordinary or usual business, the law will not permit third parties to
21  suffer from such acts of such officer by the plea of the corporation that the ostensible authority
22  of such officer was not in fact conferred upon him").

23      Bakst has proffered evidence that CMH initiated the interviews with Star reporter Kathleen
24  Wilson, and that Wilson believed Wilde was speaking with her as a representative of CMH.[37]

25

26      [37]Declaration of Michael M. Amir in Support of Opposition to Motion for Summary
27  Judgment ("Amir Decl."), Docket No. 54 (October 8, 2010), Exh. E (Deposition of Kathleen
    Wilson ("Wilson Depo.") at 33:5-34:25 ("[Wilde] and, I believe, Dr. Hill came in to discuss the
28  settlement they had made with the federal government." . . . Q: "You understood that CMH was

This is borne out by the fact that Wilde is identified in the articles as the president, CEO, and "top administrator" of CMH.[38]  There is thus sufficient evidence from which a jury could find that Wilde had express authority as CMH's general manager to make statements on behalf of the hospital.  There is also sufficient evidence from which a jury could find that Wilde had ostensible authority because CMH held Wilde out as being "possessed of power to perform all acts involved in its ordinary or usual business," including authority to make statements on its behalf; Wilson believed him to be speaking for the corporation; and he was identified to the public as speaking for the corporation.  See *LaChapelle v. Toyota Motor Credit Corp.*, 102 Cal.App.4th 977, 992 (2002) ("Although questions of ostensible agency usually involve triable issues of fact, they do so only if there is some evidence that the 'ostensible' principal in fact caused the third party to believe another to be its agent, and also some evidence that the third party actually harbored such a belief."); see also CAL. CIV. CODE § 2317 ("Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess").

CMH next contends that it cannot be held liable for the statements attributed to Hill because Hill spoke as an individual rather than as a board member or representative of CMH.  In support of this argument, CMH proffers Hill's deposition testimony, in which Hill states that "[e]ach time" and "before [they] started to talk," he told the Star reporter "that [he] [was] speaking not on behalf of the hospital but on behalf of John Hill personally."[39]  CMH also cites authority for the proposition that a hospital and its medical staff are separate entities.[40]

---

settling with the justice department, right?" A: "Correct." . . . Q: "[W]ho did you understand Mr. Wilde to be talking on behalf of?"  A: "The hospital").

[38]11/15/07 Star Article at 1; 12/20/07 Star Article at 1.

[39]Bledsoe Decl. #1, Exh. F (Hill Depo.) at 159:6-25.

[40]See CMH MIL #1 at 3-5 (citing *Smith v. Selma Cmty. Hosp.*, 164 Cal.App.4th 1478, 1482 (2008) ("Every acute care hospital must have 'an organized medical staff responsible to the governing body for the adequacy and quality of the medical care rendered to patients in the hospital.' As a result, hospitals and medical staffs are separate legal entities.  Generally, medical

10

Under California law, a corporation may be liable for the acts of any officer or director that it holds out as having authority to act or speak on its behalf. See *Signal Oil*, 49 Cal.2d at 779; CAL. CIV. CODE § 2317; see also *California Canning Peach Growers v. Harris*, 91 Cal.App. 654, 660 (1928) ("[W]here a corporation holds out to the world as its agents persons apparently clothed with power to transact ordinary business, third parties will not be permitted to suffer from the acts of such agents by the corporation's attempted defense that the ostensible authority was not in fact conferred"). The act or declaration of the agent alone, however, is insufficient to establish ostensible authority; there must be some conduct on the part of the alleged principal. *Torrance Nat. Bank v. Enesco Federal Credit Union*, 134 Cal.App.2d 316, 322 (1955) ("[T]he doctrines of ostensible agency or agency by estoppel are not based upon the representations of the agent but upon the representations of the principal.").

Bakst has proffered evidence that Hill and Wilde contacted the Star and asked for an interview to discuss CMH's settlement with the federal government. Bakst has also proffered evidence that Wilde and Hill then had a "face-to-face meeting[ ]" with Wilson to discuss the CMH settlement. Wilson testified that, during that meeting, she believed Wilde was speaking on CMH's behalf, and that neither Hill nor Wilde ever told her "that [ ] Hill [was] not speaking on behalf of the hospital[.]"[41] In the 2009 article, which quoted Hill as saying "[y]ou don't just pay $64,000 unless you have concerns"[42] about Bakst's settlement with the OIG, Hill is specifically identified as a current member of the board. Wilson thus directly disputes Hill's statement that he told her he was speaking as an individual, rather than as a member of the CMH Board. Given that the meeting was arranged to discuss CMH's settlement with the federal government, that Hill was a CMH Board member at the time the meeting took place, and that, according to Wilson, neither Wilde nor Hill said that Hill was not speaking on CMH's behalf, a reasonable jury could find that CMH held Hill out as its representative in making the statements later quoted in the Star. Because

staffs are organized as unincorporated associations" (citations omitted)).

[41]Wilson Depo at 34:23-25; 59:20-25.

[42]10/5/09 Star Article at 2.

1  Bakst has adduced sufficient evidence to raise triable issues as to whether Hill was speaking on

2  behalf of CMH at the time he made the alleged disparaging statements, the court cannot conclude

3  as a matter of law that CMH cannot be held liable for the statements Nor can it exclude the

4  evidence.

5         Finally, CMH moves to exclude the February 23, 2008 letter that Richard Fleming, Jr. sent

6  a prospective employer of Bakst's, believing that Bakst had just been offered a position with the

7  employer's organization.  Bakst does not appear to argue that Fleming spoke with the express

8  authorization of CMH or that he was a director or officer of the corporation.  Indeed, the letter

9  was written on "Medical Staff Office" letterhead and appears to have emanated from that source.

10 Bakst contends that the letter is admissible because "the statements of medical staff members may

11 also be attributable to the hospital. . . ,"[43] and asserts that "[n]othing in the California regulations

12 governing the relationship between hospitals and their medical staffs bars a finding that a medical

13 staff member's acts or speech can bind the hospital."[44]

14        Bakst has adduced no evidence, however, that CMH held Fleming out as a representative

15 of the hospital or that a reasonable recipient of the letter would have believed that Fleming was

16 speaking on CMH's behalf.  As Bakst has failed to demonstrate that Fleming was acting as an

17 agent of CMH at the time he sent the letter, CMH cannot be held liable for damage caused by his

18 statements.  Thus, the court grants CMH's motion to exclude the letter as irrelevant.[45]

19        The court next considers CMH's contention that holding it liable for statements made by

20 Wilde and Hill would violate the physicians' free speech rights.  It is important first to note that

21 the "First Amendment protects individuals only against government, not private, infringements

22 upon free speech rights. See *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 [ ](1982). Individuals

23

24        [43]Bakst Opp. #1 at 9 n.6.

25        [44]*Id.*

26        [45]CMH objects repeatedly to Bakst's motions to exclude negative statements about him
made by non-CMH employees on the grounds that such statements are relevant to negate Bakst's
27 proof of causation and damages.  CMH's attempt to exclude Fleming's letter is inconsistent with
its position regarding these other statements.
28

1   bringing actions against private parties for infringement of their constitutional rights, therefore,

2   must show that the private parties' infringement somehow constitutes state action." *George v.*

3   *Pacific-CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996).   The same is true of

4   California's free speech law. See *Golden Gateway Center v. Golden Gateway Tenants Assn.*, 26

5   Cal.4th 1013, 1023 (2001) ("We now fill this gap and conclude that California's free speech

6   clause contains a state action limitation").   Thus, there is nothing to prevent CMH, as a private

7   employer, from limiting its employees' free speech rights. *George*, 91 F.3d at 1229-30 ("Since

8   George is not a public employee, he must plead facts which show that Pacific's firing of him

9   constituted state action.   Demonstrating state action is a necessary threshold which George must

10  cross before we can even consider whether Pacific infringed upon his First Amendment rights to

11  free speech").

12      To the extent that Hill and Wilde were acting as CMH's agents when making statements

13  to the press about the hospital's settlement with OIG and related events, CMH cannot shield itself

14  from liability by citing the physicians' free speech rights.   As the California Court of Appeal

15  recently noted, "nondisparagement clauses appear to have become fairly common, both to protect

16  employers and employees when an employment relationship ends.   Certainly, we discern nothing

17  inherently unlawful about a party generally agreeing not to disparage another." *Edwards v. Arthur*

18  *Andersen LLP*, 142 Cal.App.4th 603, 811 (2006), aff'd in part, rev'd in part on other grounds in

19  *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937 (2008).   Because corporate entities can only act

20  through human agents, no employee would agree to be bound to a non-disparagement agreement

21  with a corporate employer if the employer could not be held liable for the disparaging statements

22  of its officers or agents.   Such contracts would be an empty gesture by the employer, who could

23  never be held liable for its breach.

24      Moreover, the question in this case is not whether Wilde and Hill can be held personally

25  liable for the statements, which would raise more serious free speech concerns than those CMH

26  argues, but rather whether a corporation can be held liable for the statements of its officers and

27  directors within the scope of their agency or employment.   If the jury were to find that Wilde and

28  Hill acted outside the scope of their agency, and thus were speaking as individuals rather than

representatives, there would be no grounds for imposing liability on CMH. For this reason, the case simply does not implicate the same free speech concerns as those at issue in *Sahlolbei v. Montgomery*, No. E047099, 2010 WL 197298 (2010), the case on which CMH relies heavily. There, the court found that Montgomery, an elected board member of the Palo Verde Healthcare District ("PVHD"), could not be held personally liable for breaching a non-disparagement contract between PVHD and Sahlolbei. The court noted that "[t]he evidence provided by Sahlolbei does not reflect that Montgomery, as an individual, was a party to the settlement agreement. Rather, the evidence reflects that the PVH Board brought charges against Sahlolbei and the PVH[D] Board settled the suit with Sahlolbei. Further, Sahlolbei does not provide sufficient evidence that Montgomery was bound by the non-disparagement and non-interference clauses. . . . In sum, Sahlolbei has not met his burden of demonstrating that a non-disparagement contract existed between himself and Montgomery." *Id.* at *12. Here, it is undisputed that CMH, the only entity Bakst seeks to hold liable, was a party to the non-disparagement contract. The only question is whether the statements of its alleged agents can be imputed to CMH. Because there is sufficient evidence from which a reasonable jury could find that Hill and Wilde spoke as agents of CMH, the evidence CMH seeks to exclude must be presented to the jury for its consideration. The court therefore denies CMH's motion to exclude evidence of the statements as irrelevant or a violation of the physicians' free speech rights.

## B. CMH's Motion *in Limine* to Preclude Evidence Supporting Bakst's Time-Barred Claim for Breach of the Non-Disparagement Clause

CMH next moves to preclude Bakst from presenting any argument or evidence regarding CMH's alleged breach of the non-disparagement clause because CMH contends that he is precluded as a matter of law from asserting a cause of action based on the conduct alleged. CMH asserts that all aspects of Bakst's claim for breach of the non-disparagement clause are time-barred because he failed to assert the claim within four years of the *first* allegedly disparaging statement. CMH argued that Bakst's claim was time-barred in its motion for summary judgment, but made an argument different than the one it asserts now. Then, CMH contended that "Bakst [could not] recover on statements made more than four years ago . . . , because the statute of limitations for

breach of a written contract is only four years,"[46] and that "because the statute of limitations for breach of contract is four years, statements contained in articles published more than four years before this suit's filing are time-barred. . . . "[47]   The court agreed and found that any claim based on statements made before November 10, 2005 was time-barred.   Because Bakst had proffered no evidence of statements made by CMH between November 2005 and the end of 2006, moreover, the court deemed it established, under Rule 56(d) of the Federal Rules of Civil Procedure, that any actionable breach of the Agreement's non-disparagement provision did not cause Bakst's inability to obtain employment between 2003 and 2007.   It concluded that the only positions for which Bakst could assert damages were those for which he applied during or after 2007.   At the hearing on defendant's motion for summary, after having an opportunity to review the court's tentative ruling, CMH failed to assert the alternative theory it now presents – that Bakst is precluded from asserting a claim based on statements made during and after 2007 because he "failed to bring [such a claim] within four years of the *first* alleged disparaging statement (made on November 26, 2003)."[48]

As noted, a motion *in limine* is not a proper vehicle by which to seek summary judgment on a claim.   See *Ekweani*, 2010 WL 749648 at *2 ("At the final pretrial conference, we noted that it was highly unusual to raise a statute of limitations defense by way of a motion *in limine*. We indicated that, with trial looming, it was too late to decide a motion properly construed as one for summary judgment."); *Medtronic Vascular Inc.*, 2009 WL 2171058 at *1 ("Even putting aside these fundamental issues regarding infringement, the primary problem with plaintiffs' request is that the parties appear to view it as a vehicle through which to argue for the very first time substantive arguments that should have been raised on claim construction or summary judgment. . . . [P]laintiffs then advance arguments as to whether certain prior art and other illustrations read upon those heretofore un-construed claim limitations i.e., a classic summary judgment argument.

---

[46]Motion for Summary Judgment, Docket No. 48 (September 17, 2010) at 6.

[47]*Id.* at 7.

[48]CMH MIL #2 at 1.

1   This is wholly improper"); *Via Waves Communications*, 2004 WL 5486633 at *4 (denying a
2   motion *in limine* that was "a late and improper attempt to obtain summary judgment."). The court
3   could thus deny the motion as a procedurally improper attempt to seek summary judgment through
4   the vehicle of filing a motion *in limine*.

5       Even if it considered the merits of the motion, however, CMH's argument that Bakst's
6   claim for breach of the non-disparagement clause is barred because he did not file it within four
7   years of the first alleged breach of the clause fails. CMH contends that "[u]nlike a tort claim for
8   libel, or a claim for breach of an installment contract, each alleged disparaging statement is not
9   subject to separate, discrete limitations periods. Rather, because the non-disparagement clause
10  is a non-severable, indivisible provision, Bakst's claim accrued just once: upon the first alleged
11  breach in November 2003.[49] The four-year statute of limitations clock began to run at that time,
12  and subsequently expired in November 2007 – two years before Bakst filed this lawsuit. As such,
13  his entire claim for breach of the non-disparagement clause is time-barred."[50]

14      CMH's suggestion that a cause of action for breach of contract ordinarily accrues at the
15  time of the breach, and that the statute of limitations begins to run at that time is generally correct.
16  See *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal.App.4th 1375, 1388 (2004)
17  ("As a general rule, a cause of action accrues and a statute of limitations begins to run when a
18  controversy is ripe-that is, when all of the elements of a cause of action have occurred and a suit
19  may be maintained."). "Where there is a continuing wrong, however, with periodic new injury
20  to the plaintiff, the courts have applied what Justice Werdegar has termed a 'theory of continuous
21  accrual.'" *Id.* (citing *Howard Jarvis Taxpayers Assn. v. City of La Habra*, 25 Cal.4th 809, 822
22  (2001); *Utility Audit Co., Inc. v. City of Los Angeles*, 112 Cal.App.4th 950, 960-61 (2003)
23  ("Because the claims involve a continuing wrong, with a new claim arising with each
24  overpayment, the provisions effectively limit each claim to one year"); *Wells Fargo Bank v. Bank*

25  ─────────────

26      [49]CMH notes that Bakst contends the initial breach occurred when certain statements were
27  published in a Los Angeles Times article on November 26, 2003. (CMH MIL #2, Attachment 1 (Bledsoe Decl. #2), Exh. A (Bakst's Interrogatory Responses), Nos. 1, 8-9, 17).

28      [50]CMH MIL #2 at 1.

*of America*, 32 Cal.App.4th 424, 439 n. 7 (1995) ("Accordingly, in the present case relief is unavailable for damages incurred more than four years before the action was filed (see Code Civ.Proc., § 337), and a new breach occurs each month the bank persists in its refusal to pay rent at the gold clause rate")).   The theory of continuous accrual has frequently been found to apply to contracts with ongoing obligations.

The Ninth Circuit applied the continuous accrual rule in *Peterson v. Highland Music, Inc.*, 140 F.3d 1313 (9th Cir. 1998), a case in which plaintiff musicians asserted claims for royalties under a recording contract that had been formed thirty years earlier.   Plaintiffs requested rescission of the contract, based on defendants' failure to pay royalties for the four years prior to commencement of the action, not on any failures to pay during the twenty-six years following the first breach.   The court noted:

> "Defendants also contend that the district court erred in holding that the statute of
> limitations does not bar a remedy of rescission in this case. In California, the statute
> of limitations for an action seeking rescission of a contract is four years.   See Cal.
> Code Civ. Proc. § 337.   Specifically, the statute provides that an aggrieved party
> must commence such an action within four years 'from the date upon which the
> facts that entitled the aggrieved party to rescind occurred.'   Both parties agree that
> the period of limitations has long since run with respect to the first occasions on
> which defendants breached their agreement.   Both parties also agree that defendants
> have breached their agreement repeatedly over the course of the past thirty years,
> and did so, repeatedly, within four years of the time that plaintiffs commenced this
> action.   Defendants' claim is that, even in the face of multiple and continuing
> breaches of the agreement, the California statute should be read to bar any action
> that is not commenced within four years of the first occasion on which an aggrieved
> party could have requested rescission.   Defendants cite no authority for this
> proposition, and we reject it."   *Id.* at 1320.

The court went on to say that "[t]here is no fixed amount to be paid out over time under the Kingsmen's contract, but rather a continuing obligation to pay a portion of the profits and royalties

on 'Louie, Louie' as the recording gets used over time." *Id.* at 1321. "The district court in this case made it clear that . . . it was relying upon breaches that had occurred within the limitations period. *To find for defendant under these circumstances would be to hold that California law forever bars a party from seeking a remedy of rescission after it has once passed up the opportunity to do so, regardless of the nature of any future breaches of the other party's obligations.* We have found no authority that would support such a reading of California law." *Id.* (emphasis added). CMH's proposed application of the statute of limitations runs counter to the principle articulated in *Peterson* in the sense that it would prevent Bakst from asserting a claim for damages based on continuing breaches of the Agreement simply because he once "passed up the opportunity to do so."

Likewise, in *Dean v. United of Omaha Life Ins.*, No. CV 05-6067-GHK (FMOx), 2007 WL 7079558 (C.D. Cal. Aug. 27, 2007), the court discussed the rule in the context of an indivisible contract for life insurance. It noted that "[a] contract for life insurance is not typically considered divisible."[51] *Id.* at *9. Nonetheless, it concluded that "[t]he fact that the Policy [was] entire, and not divisible, [did] not mean it [could] be breached only once." *Id.* (citing *Lee v. Allstate Life Ins. Co.*, 361 Ill.App.3d 970, 978, 838 N.E.2d 15, 23 (2005) (holding, with respect to a claim that an insurer improperly increased the cost of insurance rate, that "[b]ecause each breach of a continuous duty has its own accrual date, a plaintiff may sue on any breach which occurred within the limitations period" (citation omitted)); and *Phillips v. Alaska Hotel & Restaurant Emp. Pension Fund*, 944 F.2d 509, 521 (9th Cir. 1991) ("A continuous series of breaches may allow a plaintiff to argue that a new cause of action accrues with each new breach.")).

In *Dean*, plaintiff claimed that defendant had repeatedly violated the terms of the insurance

---

[51]See Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 69:5 (3d ed., West) ("As a general rule, a contract of insurance for a term of years is regarded as an entire contract for that term, even though the premiums are paid in annual installments"); see also *N.Y. Life Ins. Co. v. Statham*, 93 U.S. 24, 28 (1876) ("[T]he contract is not an assurance for a single year, with a privilege of renewal from year to year by paying the annual premium, but . . . is an entire contract of assurance for life").

policy by including undisclosed expenses on her monthly bill.  The court rejected defendant's argument that because the "rates were set at the inception of the Policy . . . , if there was any breach, it was when that rate was first applied to Dean in 1996." *Id*. at *10. The court noted that "United fail[ed] to explain why the subsequent applications of the inflated rate would not also constitute breaches," and questioned "what, if anything, is special or unique about the first imposition of the [undisclosed] charge?" *Id*.  Ultimately, it held that the "[c]omplaint allege[d] multiple breaches of contract," and that, if he "prove[d] at trial that United breached the Policy within the limitations period, [those] . . . breaches [would] not be foreclosed by the statute of limitations." *Id*. at *11.

As the *Dean* court did, the court here rejects CMH's argument that because the Settlement Agreement was indivisible, i.e., not an installment contract, the theory of continuing obligation/continuing violation is inapplicable.  As in *Dean*, CMH has failed to demonstrate what was so legally significant about the first alleged breach of the non-disparagement clause that it should bar Bakst from asserting a cause of action based on subsequent breaches.

Moreover, "where the purpose of a unilateral or independent obligation – as an insurance policy, a fidelity bond, or a continuing guaranty – is to give continuing or ongoing security, the law does not allow the purpose of the parties to be defeated by the substitution of a single right of action for the obligation as soon as a material breach has occurred.  In such a case each breach gives rise to a separate cause of action." 31 WILLISTON ON CONTRACTS § 79:23 (4th ed. 2010).[52]

---

[52]See *Green v. Petersen*, 218 N.Y. 280, 281-83 (1916) ("We think that the bond was intended as a continuing security; that each breach as it was committed gave rise to a separate cause of action; and that the loss through lapse of time of the remedy for one wrong has therefore no effect upon the remedy for the others. The defendant refers to cases in which it has been held that, however numerous the breaches assigned in the complaint, the cause of action on such a bond is single and entire.  But there is nothing in those cases hostile to our conclusion. Causes of action divisible and separate as they arise, may, after they have arisen, coalesce, and, at least for some purposes, become inseparable and single.  The rule against splitting a cause of action is an everyday example of that truth.  The seller of goods may sue for each installment of the price as it matures; but if he waits till a later installment becomes due, he must combine all that are in default.  The landlord who sues for rent is subject to like restrictions.  But the rule against splitting does not mean that because the remedy for one installment is lost through lapse of time, the

In this case, the Settlement Agreement was exactly that – a contract for ongoing security that neither party would be disparaged publicly by the other.  That obligation did not end with CMH's first alleged breach because its duty was a continuing one.  The contract itself evinces such an intent.  It expressly states that "failure by ether Employee or Organization to comply with any provision, or to require the other to comply with any provision, shall not affect the rights of either to thereafter comply or require the other to comply."[53]   Thus, the fact that CMH allegedly breached the contract in 2003 did not render it void or prevent Bakst from attempting to enforce it at a later time.

The Seventh Circuit considered just this question in a closely analogous case involving the breach of a non-competition agreement.  See *Hi-Lite Products Co. v. American Home Products Corp.*, 11 F.3d 1402 (7th Cir. 1993).  There, the parties entered into a contract in 1977, which was subsequently breached in October 1985 and May 1986.  Because the breaches occurred more than five years before the filing of the complaint, they were barred by the Illinois statute of limitations.[54]  The court stated the question before it as "whether the October 1985 and May 1986 breaches caused the statute of limitations to run for all breaches of the 1977 contract, or whether a separate accrual date exists for each breach."  It noted that answering the question was "important [ ] in determining whether breaches occurring during the December 30, 1986 to February 17, 1987 window [were] barred by the statute of limitations[.]"  *Id.* at 1408.  The district court had concluded that the October 1985 and May 1986 breaches caused the statute of

remedy for later installments is also lost.  The only penalty for omitting an installment which could have been included is that it may not be sued upon again.  It is in this sense that successive breaches of the same bond create a single cause of action.  The remedy for one breach may slip by without prejudice to the remedy for others.  For the purpose of measuring the effect of the statute of limitations, the wrongs are distinct and severable").

[53]Motion for Summary Judgment, Attachment 1 (Bledsoe Decl.), Exh. D (Wolfe Depo.), Exh. 33 (Settlement Agreement) at 7.

[54]The court notes, as did the *Dean* court, that although *Hi-Lite* "is not a California case, it involves a basic proposition of contract law – the accrual of causes of action for breach of contract.  There is no reason to believe . . . that California law on this issue is different from the Illinois law applied in" *Hi-Lite*.  *Dean*, 2007 WL 7079558 at *9 n. 4.

limitations to run for all future breaches.  The Seventh Circuit reversed, holding that

> "the district court [had] erred because it failed to consider the nature of the contract and the nature of the breaches.  'There are contracts . . . that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made.'  Contracts requiring continuous performance are capable of being partially breached on numerous occasions.  Each partial breach is actionable and is subject to its own accrual date and own limitation period.  Accordingly, because each breach of a continuous duty has its own accrual date, a plaintiff may sue on any breach which occurred within the limitation's period, even if earlier breaches occurred outside the limitation period."  *Id.* at 1408-09 (citations omitted).

The *Hi-Lite* court discussed *Segall v. Hurwitz*, 339 N.W.2d 333 (1983), a case in which plaintiff alleged that defendant violated a covenant not to compete from August 31, 1972 through August 31, 1977.  In *Segall*, the trial court found that plaintiff's claims were barred because he knew of instances in which defendant had breached the contract in early 1973, but did not file a complaint until May 23, 1979.  "The appellate court reversed, finding that a covenant not to compete imposes a continuing duty upon the defendant.  The court reasoned that when a continuing duty exists, a new claim generally accrues for each separate breach.  Accordingly, the court found that the plaintiff may be able to recover for breaches of the continuous duty not to compete which occurred within the limitations period."  *Hi-Lite*, 11 F.3d at 1409.

Ultimately, the *Hi-Lite* court remanded the action so that the district court could determine whether any of the earlier breaches had been total, resulting in a repudiation of the contract, and extinguishing any continuing obligation.  It noted, however, that "if a total breach did not occur, each breach [would] have a separate accrual date and those alleged to have occurred after December 30, 1986 [would] be actionable."  *Id.* at 1409-10.[55]  Here, because the contract

---

[55]The Ohio Court of Appeals reached a similar result in *Singleton v. Adjutant General of Ohio*, No. 02AP-971, 2003 WL 1848773 (Ohio App. Apr. 10, 2003).  There, the court considered an alleged breach of a duty of confidentiality due to the military's failure to purge

1  expressly provided that a single breach would not result in its repudiation,[56] it is clear that each

2  independent breach has its own accrual date.[57]

3  _____

4  certain documents from plaintiff's personnel file as agreed.  Plaintiff argued that the presence of
   the documents resulted in him being passed over for promotion.  The Court of Appeal noted that

5  "[c]ounsel for Mr. Singleton argues that the breach has been ongoing, especially as to
   confidentiality, so the statute of limitations did not begin to run on some violations until much later

6  than the date of the agreement [which required the miliary to purge the file].  Specifically, the use
   of the documents in August 2000 was a breach of the confidentiality agreement which occurred

7  less than two years before the complaint was filed in the Court of Claims of Ohio. . . . Since the
   failure to abide by the earlier agreement/contract could be viewed as an ongoing breach of the

8  agreement/agreement regarding confidentiality, the trial court was not in a position to grant a

9  dismissal under Civ.R. 12(B)(6).  We, therefore, sustain the third assignment of error and remand

10 the case for further proceedings."  Id. at *3.

11     [56]See Settlement Agreement at 7 ("failure by either Employee or Organization to comply

12 with any provision, or to require the other to comply with any provision, shall not affect the rights
   of either to thereafter comply or require the other to comply").

13
14     [57]At the February 14, 2011 hearing on these motions, CMH again referenced Boon Rawd
   Trading Int'l Co. v. Paleewong Trading Co., 688 F.Supp.2d 940, 948 (N.D. Cal. 2010), a case

15 cited in its moving papers.  The court finds the case distinguishable.  In Boon, counterclaimant's
   second counterclaim alleged that beginning in 2006 and continuing thereafter, the counter-

16 defendant exported products in violation of a purported exclusive importation and distribution
   agreement.  Because a two year statute of limitations applied, and the case was not filed until

17 November 20, 2009, the counter-defendant sought to have the counterclaim dismissed.  The court

18 found that the counterclaim was time-barred because it had accrued in 2006, when the exclusivity
   contract was first breached.  It noted: "[Counterclaimant] asks the Court to (1) ignore [its']

19 admitted knowledge of [counter-defendant]'s actual breach of the alleged exclusivity agreement

20 in 2006 and (2) toll the statute of limitations indefinitely until the date [counterclaimant] elected
   to treat the breach as terminating the contract.  If this were really the rule, had [counter-defendant]

21 not terminated the contract itself in 2009, [counterclaimant] could have waited fifty years before

22 filing this action, and would be entitled to the full fifty years worth of damages.  This is not the
   law in California. . . .  It would lead to absurd and inequitable results.  As such, this order finds

23 that [the] second counterclaim accrued in 2006."  Id. at 949.

24     Unlike the counterclaimant in Boon, Bakst does not seek to toll the statute of limitations
   in order to recover for breaches that occurred prior to November 2005.  Thus, there is no concern

25 here, as there was in Boon, that Bakst "could have waited fifty years before filing this action, and
   [collected] . . . fifty years worth of damages."  Additionally, in Boon, there was a single, ongoing

26 breach of the exclusivity agreement from 2006 through the filing of the action, rather than separate

27 breaches punctuated by periods of performance, as occurred in this case.  Thus, the Boon court's
   conclusion that there was a single date – i.e., the date of first breach – on which the claim could

28 have accrued likewise distinguishes that case from this one.  Id. at 949 ("Additionally, since the

1      This rule is consistent with the expressed purpose of a statute of limitations.   "The purpose

2  of statutes of limitations is to promote justice by preventing surprises through the revival of claims

3  that have been allowed to slumber until evidence has been lost, memories have faded, and

4  witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put

5  the adversary on notice to defend within the period of limitation, and the right to be free of stale

6  claims in time comes to prevail over the right to prosecute them." *Cutujian v. Benedict Hills*

7  *Estates Assn.*, 41 Cal.App.4th 1379, 1387-88 (1996).  The sound policies underlying the statute

8  of limitations are not circumvented here, where Bakst only seeks to recover for conduct occurring

9  within the past four years.  This is not a case where Bakst is attempting to revive stale claims by

10  asserting that CMH's ongoing violation of the contract allows him to recover for conduct that

11  occurred as early as 2003.  In fact, Bakst has conceded that he may recover only for conduct

12  occurring after November 10, 2005; additionally, in light of his failure to adduce evidence of

13  alleged disparagements occurring between November 10, 2005 and the beginning of 2007, the

14  court has limited his damages to those occurring during or after 2007.  There can be no question

15  that a claim for breach of contract based on conduct occurring two years prior to suit is not stale.

16  CMH, therefore, has not been prejudiced by Bakst's failure to file claims within four years of the

17  first alleged breach because he cannot recover for any alleged breach occurring before 2007.

18      Consequently, the court finds that plaintiff's cause of action for breach of the non-

19  disparagement clause is not time-barred as a result of his failure to assert the claim within four

20  _____

21  alleged agreement between PTC and BRTI was open-ended, there was no specific point in time

22  – or 'time for performance' as explained in *Romano* – where the parties could definitively gauge

   whether an actual breach 'd[id] in fact occur.'  Indeed, an actual breach had already occurred in

23  2006, as readily admitted in PTC's answer").  Here, CMH is alleged to have breached the

   contract a handful of times between 2003 and 2009.  Each disparaging statement that was made

24  gives rise to a cause of action that is separate from those that came before or might follow.  This

   was not the case in *Boon*, where the counter-defendant was alleged to have violated the exclusivity

25  clause continuously from 2006 through the end of 2009.

26      Finally, there is no indication in *Boon* that the parties' contract contained an express

27  provision, like the one in the parties' agreement here, that a single breach would not constitute a

   repudiation or cause its termination.  For all of these reasons, *Boon* is factually less similar to this

28  case than *Hi-Lite* and *Segall*.

years of the first alleged breach.  The court thus reaffirms its summary judgment ruling that Bakst can assert a claim for any alleged breach occurring during or after 2007.

**C.    CMH's Motion *in Limine* to Preclude Evidence that It Caused Bakst to Suffer Emotional Distress or Harm to His Reputation**

CMH also seeks to preclude Bakst from "presenting any argument or introducing any evidence purporting to establish that [CMH] caused Bakst emotional distress or mental suffering, or that it damaged his reputation or purported good name."[58]  CMH asserts that such evidence should be excluded as irrelevant and unfairly prejudicial because tort damages, such as damage to reputation or emotional distress, are not available on any of Bakst's remaining claims. Specifically, CMH contends that under California law, damages for breach of contract cannot include recovery for harm to reputation or for emotional distress.  See *O'Neil v. Spillane*, 45 Cal.App.3d 147, 159 (1975) (noting "the invariable rule pronounced by a legion of cases that damages are not recoverable for mental suffering or injury to reputation resulting from breach of contract"); 23 CALIFORNIA JURISPRUDENCE 3d Damages § 80 ("Ordinarily, a plaintiff cannot recover damages for mental suffering experienced as the result of a breach of contract"). Similarly, a violation of California Labor Code § 2802 does not constitute a tort, and authorizes recovery only of the required indemnity.  See CAL. LAB. CODE § 2802 ("An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful").

Bakst concedes that he is not entitled to tort damages as he previously dismissed his claims for intentional and negligent infliction of emotional distress.  He also represents that he does not intend to seek emotional distress damages at trial.[59]  As the parties are in agreement on this point, the court grants CMH's motion *in limine* to the extent that it seeks to preclude Bakst from

---

[58]CMH MIL #3 at 1.

[59]Bakst Opp. #3 at 2 n.1.

24

1   proffering evidence of emotional distress.

2       Bakst asserts, however, that evidence of damage to his reputation is relevant to prove the

3   essential elements of his claim for breach of the non-disparagement clause.   To prevail on his

4   breach of contract claim, Bakst must prove the existence of a valid  contract, his performance of

5   the contract or excuse for nonperformance, CMH's breach, and resulting damage.  See *Coprich*

6   *v. Superior Court*, 80 Cal.App.4th 1081, 1092 (2000); *Harris v. Rudin, Richman & Appel*, 74

7   Cal.App.4th 299, 307 (1999); *Walsh v. West Valley Mission Community College District*, 66

8   Cal.App.4th 1532, 1545 (1998).  See also *Kremen v. Cohen*, 99 F.Supp.2d 1168, 1171 (N.D.

9   Cal. 2000).  "Implicit in the element of damage is that the defendant's breach caused the plaintiff's

10  damage."  *Troyk v. Farmers Group, Inc.*, 171 Cal.App.4th 1305, 1352 (2009).

11      To prove that CMH breached the contract, plaintiff must demonstrate that the hospital made

12  disparaging statements about him.   Black's Law Dictionary defines disparagement as "[a]

13  derogatory comparison of one thing with another"; "[t]he act or an instance of castigating or

14  detracting from the reputation of, esp. unfairly or untruthfully"; and "[a] false and injurious

15  statement that discredits or detracts from the reputation of another's character, property, product,

16  or business."  BLACK'S LAW DICTIONARY (9th ed. 2009).  whether CMH's statements "detract[ed]

17  from [Bakst's] reputation" is thus inextricably intertwined with whether CMH breached the

18  contract by making the statements.  If a jury finds that a statement made by CMH "detract[ed]

19  from [Bakst's] reputation," he will have satisfied his burden of proving that CMH breached the

20  contract.  If a jury finds that CMH did not "castigat[e] or detract[ ] from [Bakst's] reputation,"

21  then he will be unable to prevail on his first claim for relief.  Thus, whether the statements were

22  of a kind that would cause harm to Bakst's reputation is relevant to determine whether they

23  constitute a breach of the contract.

24      It is also relevant to prove causation and damages.  To establish these elements, Bakst must

25  demonstrate that the allegedly disparaging statements caused him to lose employment

26  opportunities.  "The test for causation in a breach of contract . . . action is whether the breach was

27  *a substantial factor* in causing the damages."  *U.S. Ecology, Inc. v. State*, 129 Cal.App.4th 887,

28  909 (2005) (emphasis added).  "The term 'substantial factor' has no precise definition, but 'it

seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.'" *Id.* at 909 (citing *Espinosa v. Little Co. of Mary Hospital*, 31 Cal.App.4th 1304, 1314 (1995)).   Given that it is generally impossible to get inside the mind of a prospective employer to prove the exact reason it chose not to hire Bakst, see *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1982) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes"), Bakst will have to rely on circumstantial evidence to show causation and damages.

Bakst contends that CMH's disparaging statements impugned his reputation and caused prospective employers not to hire him, either because they did not want to work with him or because they were concerned that his poor reputation might be a liability to their organization. This is particularly evident in the declaration of Conrad Vernon, discussed in detail in the court's order on summary judgment.   Vernon stated that he would have liked to hire Bakst, but was concerned that Vernon's consulting clients would not want to work with Bakst given his poor reputation.  Evidence that CMH's statements harmed Bakst's reputation is thus directly relevant in assessing whether the statements were a substantial factor causing Bakst to lose employment opportunities.  Cf. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 704 n.2 (1988) (Broussard, J., concurring and dissenting) ("breach of an employment contract by the employer can, in some situations, cause severe harm to an employee's reputation and ability to find new employment," citing *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 780 (1984) (Bird, J., concurring and dissenting)).

CMH contends that Bakst's theory of damages is legally flawed because he cannot adduce "specific facts" that "a specific job [was] lost due to [CMH's] statements[ ]."[60]  CMH appears to believe that Bakst is attempting to recover damages for generalized harm to his reputation.  As discussed at length in the court's summary judgment order, however, Bakst has proffered direct evidence of specific jobs that he contends he lost as a result of CMH's breach.  It does not appear that Bakst is seeking damages for the generalized harm to his reputation, but only for those

---

[60]CMH Reply #3, Docket No. 149 (January 31, 2011).

1   employment opportunities lost because of CMH's allegedly disparaging conduct.  Whether Bakst

2   can adequately show the existence of a causal link between those lost opportunities and CMH's

3   purportedly disparaging statements will be a question the jury will have to resolve.

4           In sum, while Bakst cannot proffer evidence that he has suffered emotional distress as a

5   result of CMH's allegedly disparaging statements, he may offer evidence of harm to his reputation

6   both to establish that CMH's breached the non-disparagement clause and that its alleged breach

7   caused him to lose employment opportunities.  He may not, however, proffer evidence of

8   generalized reputational harm that is not directly tied to a particular lost employment opportunity.

9           **D.    CMH's Motion *in Limine* to Preclude Evidence of Its Purported Motive in**

10          **Allegedly Breaching the Non-Disparagement Clause**

11          CMH has also moved to exclude evidence of its motive for allegedly breaching the non-

12  disparagement clause as irrelevant and unfairly prejudicial.  As an example of the type of evidence

13  it seeks to exclude, CMH states that the complaint alleges that it "engaged in 'a concerted effort

14  . . . to destroy Bakst's personal and professional reputation through the willful[ ] and egregious

15  dissemination of falsehoods . . . intended to forever ruin the reputation of Bakst.'"[61]  It asserts that

16  in addition, Bakst has proffered evidence that "[o]ne of CMH's top executive[s] admit[ted] that

17  high-level members of CMH engaged in a 'vendetta' against Bakst – a vendetta 'that would make

18  it impossible for [Bakst] to find another position as a CEO of [a] hospital.'"[62]  CMH seeks to

19  exclude this type of evidence because a defendant's motive or state of mind in breaching an

20  agreement is irrelevant under California law.

21          As stated, to prevail on his breach of contract claim, Bakst must prove that he had a valid

22  contract, that he fully performed or was excused from performing, that CMH breached the

23  contract, and that he suffered damages as a result.  Bakst need not prove CMH's motive to recover

24  on the claim.  As a result, numerous courts have agreed with CMH that evidence of motive is

25  irrelevant and inadmissible.  See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th

26  _____

27          [61]CMH MIL #4 at 1 (citing Complaint, ¶ 3).

28          [62]CMH MIL #4 at 2.

503, 516 (1994) ("But the law generally does not distinguish between good and bad motives for breaching a contract. '[I]n traditional contract law, the motive of the breaching party generally has no bearing on the scope of damages that the injured party may recover . . . ; the remedies are limited to contract damages.' 'Varying personal or economic reasons motivate one to breach his contract, but the general rule is that . . . motives . . . are immaterial and cannot be inquired into on the question of compensatory damages" (citations omitted)); *Rich v. Shrader*, No. 09-CV-0652-MMA (WMc), 2010 WL 3717373, *4 (S.D. Cal. Sept. 17, 2010) ("Motive is not an element of a breach of contract action"); *Davis v. Leal*, 43 F.Supp. 2d 1102, 1112 (E.D. Cal. 1999) ("For the contractual remedies, Leal's motive or other state of mind in breaching the agreement is not pertinent to the discussion").

This general rule applies no matter how egregious or malicious a motive is alleged. See *JRS Products, Inc. v. Matsushita Elec. Corp. of America*, 115 Cal.App.4th 168, 182 (2004) ("Thus motive, regardless of how malevolent, remains irrelevant to a breach of contract claim and does not convert a contract action into a tort claim exposing the breaching party to liability for punitive damages"); see also *SST Sterling Swiss Trust 1987 AG v. New Line Cinema, Corp.*, No. CV 05-2835 DSF (VBKx), 2005 WL 6141290, *5 (C.D. Cal. Oct. 31, 2005) (finding irrelevant an allegation that various breaches of contract were motivated by racial discrimination).[63]

Bakst counters that evidence regarding CMH's motive is admissible to assist the jury in understanding the case. He cites several out-of-circuit cases indicating that background evidence explaining why a defendant acted with particular hostility toward a plaintiff may be relevant if it helps the jury make sense of the events in question. First, none of the cases Bakst cites involve

---

[63]Plaintiff attempts to distinguish cases holding that motive is irrelevant in the context of a breach of contract claim by noting that they focus on whether motive is relevant to prove damages. (See Bakst Opp. #4 at 5 ("the *motive* of the breaching party generally has no bearing on the ***scope of damages***")). He fails, however, to cite any authority suggesting that motive is relevant to some other element of a breach of contract claim. While many courts focus on whether motive is relevant in proving damages in response to attempts by plaintiffs to seek punitive damages for bad faith contract breaches, the precedent clearly indicates that the motive of the breaching party is not relevant to any element of a breach of contract claim.

a breach of contract claim.  Second, the cases are distinguishable because unlike in this case, evidence of motive was directly relevant to an element of a claim or a defense.  In *Bowden v. McKenna*, 600 F.2d 282, 283 (1st Cir. 1979), for example, the court held that evidence of a decedent's motive to resist arrest was relevant in a wrongful death action against two police officers who shot him.  While the decedent's estate claimed the shooting was unprovoked, the officers argued that the decedent had tried to run one of them over with his car, causing them to shoot him.  The background evidence the officers sought to admit was information that the decedent was wanted for robbery and thus had a motive to run over them with his car.  Likewise, in *Roshan v. Fard*, 705 F.2d 102, 103 (4th Cir. 1983), the court held that evidence a party had previously been convicted of a crime based on another party's testimony was relevant to determine which party was the aggressor in a bar fight, and which had instead been acting in self-defense. As in *Bowden*, motive was relevant to determination of a fact in issue – i.e., the party with a stronger motive to start the fight was more likely the one who did.

Here, there appears to be no question that the statements in issue were made.  Thus, unlike in *Roshan* or *Bowden*, evidence of CMH's motive for making the statements has no tendency to make a fact at issue more or less probable.  As California courts have repeatedly held that motive is irrelevant in the context of a breach of contract claim, the court grants CMH's motion.

**E.    CMH's Motion *in Limine* to Preclude the Testimony of Plaintiff's Expert Witness Robert Wunderlich, Ph.D.**

CMH next seeks to exclude the testimony of plaintiff's damages expert, Robert Wunderlich, Ph.D., on the grounds that his testimony is unreliable under Rule 702 of the Federal Rules of Evidence.  Rule 702 governs the admission of expert testimony.  Under Rule 702,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact

to understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto

in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of

the case." FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D. Cal. 2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999), in turn citing *Daubert*, 509 U.S. at 592 n. 10)); see also *Walker v. Contra Costa County*, No. C 03-3723 TEH, 2006 WL 3371438, *1 (N.D. Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States*, 483 U.S. 171, 172 (1987), and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).[64]

"In determining whether expert testimony is admissible under Rule 702, the district court

---

[64]This showing must be by a preponderance of the evidence. See *Daubert*, 509 U.S. at 594 n. 10 (citing *Bourjaily*, 483 U.S. at 175-76).

must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)).

Wunderlich has an MBA with an emphasis in finance from the Anderson Graduate School of Management at UCLA and a Ph.D. in physics from Harvard.[65]  He has been a consultant on financial and economic matters for two decades, and is currently a principal at Discovery Economics.[66]  Wunderlich's resume indicates that he testified as an expert on several occasions. CMH does not appear to dispute his qualifications to provide expert testimony, and the court will thus focus its analysis on the objections CMH has raised regarding the reliability of his opinions.

Wunderlich's Rule 26 expert report contains two opinions: (1) that Bakst would have earned $5,917,729 in total compensation from July 2007 until he retired in November 2016; and $4,675,979 if he had retired in November 2014;[67] and (2) that Bakst incurred expenses of $137,357 defending against and settling the OIG investigation.[68]  Bakst has not opposed CMH's motion to preclude Wunderlich from offering the second opinion on the grounds that expert testimony is not required to total Bakst's reported expenses.  Consequently, the court grants CMH's motion to exclude Wunderlich's second opinion.

CMH contends that Wunderlich's first opinion regarding Bakst's lost earnings is unreliable because it fails to account for (1) other causes of Bakst's inability to find employment; and (2) for

---

[65]CMH MIL#5, Attachment 1 (Bledsoe Decl #5), Exh. A (Wunderlich Report) at 29.

[66]*Id.*

[67]Wunderlich's report actually contained an additional damage calculation beginning in 2005. But, as a result of the court's order on summary judgment, Bakst has agreed to utilize only those damages calculations beginning in July 2007, after the first allegedly actionable statement.

[68]Wunderlich Report at 2.

the impact of non-actionable statements.  In support of its first objection, CMH cites *Prepaid Wireless Services, Inc. v. Southwestern Bell Wireless*, No. M-00-302, 2002 WL 34367328, *4-5 (S.D. Tex. July 23, 2002).  There, in a case where defendant had allegedly forced plaintiff out of business, the court considered a *Daubert* challenge to the economic damages analysis of expert Gilbert Cardenas, who had "estimate[d] the economic losses of profit to Prepaid Wireless had they continued in business to 2005." *Id.* at *2.  Defendants alleged that Cardenas' report was defective because it did not consider whether defendants' conduct was the proximate cause of plaintiff's lost profits.  Although noting that "the case law does not squarely address whether the proposed economic damages expert must also be the expert to opine on causation," *id.* at *4, the court found that "Dr. Cardenas's damages model does not address which damages were caused by Defendants' breaches and Plaintiff offers no other causation analysis or explanation as to whether Dr. Cardenas's report addresses only those damages that Plaintiff claims were caused by Defendants. . . . Whether or not the attorneys plan to address how Defendants['] breaches caused Plaintiff's damages, the damages model itself is still defective if it fails to separate lawful from unlawful conduct.  Again, without a rebuttal from Plaintiff, either assuring the Court that the damages model addresses only those damages Plaintiff claims were caused by Defendants' breaches, or explaining to the Court where the causation analysis will come from, the evidence suggests Defendants' challenge is valid and the damages model is defective." *Id.*

The *Prepaid Wireless* decision, of course, is not controlling on this court.  More fundamentally, however, *Prepaid Wireless* is at odds with other district court decisions in this circuit as well as distinguishable from the case at bar.  Numerous district courts have permitted damages experts to testify solely to the quantification of plaintiff's damages and to allow the jury separately to determine the issue of causation.  See, e.g., *Lee v. U.S. Taekwondo Union*, No. 04-00461 SOM-LEK, 2006 WL 5240611, *1 (D. Haw. Jan. 26, 2006) ("Lee has retained Loudat, an economist, as his expert witness to testify about Lee's alleged damages.  At the hearing on the present motion, Lee represented that Loudat is being offered as an expert on the amount of damages Lee personally suffered, not on the causation of those damages.  In other words, Loudat will be assuming that Lee was damaged by Defendants' alleged violation of § 1981 and will

merely be asked to opine on the amount of damages suffered by Lee"); *Wrather v. Farnam Companies, Inc.*, No. SACV 03-967-JVS(RCx), 2003 WL 25667639, *2 (C.D. Cal. Nov. 3, 2003) ("A typical damage expert is usually not qualified to determine the injury for which he establishes a value.  For example, an expert in United States wage trends might be called to assess the value of lost income in a wrongful death case, but he is unlikely to express an expert opinion on the cause of death.  He simply assumes the injury which he evaluates"); see also *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F.Supp.2d 384, 442-43 (D.N.J. 2009) ("Mr. Malackowski assumed that causation existed.  Mr. Malackowski has no expertise as to why doctors prescribe certain drugs or why GPOs award certain contracts.  Thus, he was qualified only as an expert with respect to the quantification of damages, not the issue of causation").  These courts do not appear to accept the *Prepaid Wireless* court's view that Wunderlich, as a damages expert, must also opine on causation.

Moreover, this case is unlike in *Prepaid Wireless*, where plaintiff failed to provide the court with information as to "where the causation analysis will come from."  As discussed in the court's summary judgment order, Bakst has adduced evidence that Vernon will testify CMH's allegedly disparaging statements caused Bakst to lose an employment opportunity with Vernon's consulting firm.  The parties' briefing on defendant's sixth motion *in limine* suggests that Steven Valentine may provide similar testimony regarding causation.  Thus, the court concludes that the fact that Wunderlich will not address whether the disparaging statements were the proximate cause of Bakst's alleged damages does not preclude him from offering an expert quantification of those damages.  See *Lee*, 2006 WL 5240611 at *3-4 ("Defendants are not challenging Loudat's expertise in economics, but are instead challenging the reliability of his opinions. . . . But Loudat did what economic experts typically do, applying a discount rate to calculate present value, as well as examining Lee's work-life expectancy, and tax consequences.  See *Crane v. Crest Tankers, Inc.*, 47 F.3d 292, 295 (8th Cir. 1995) ("If the case involves an issue of future lost wages, generally an expert witness is employed who, once qualified, opines on various issues including work life expectancy, future damages, and methods for discounting the same to present value").  Such typical expert testimony is generally relevant to damage claims and helpful to the trier of

fact. . . .  For the most part, Defendants' claims of unreliability attack the underlying assumptions made by Loudat, rather than his methodology.  Defendants' arguments therefore go to the weight that should be accorded Loudat's testimony, rather than its admissibility").

As in *Lee*, CMH's arguments regarding the assumptions made by Wunderlich and whether they square with or take into account alternative explanations for Bakst's failure to obtain employment, such as the availability of more highly qualified candidates or the publicity surrounding the federal government's investigation, go to the weight of Wunderlich's testimony, not to its admissibility.  If a jury finds that CMH's conduct was not a substantial factor in causing Bakst to lose employment opportunities, it will undoubtedly disregard Wunderlich's damages calculation.[69]

At the February 14, 2011 hearing, CMH asserted that regardless of the reliability of Wunderlich's proffered damages calculation, his testimony did not satisfy *Daubert*'s "fit" requirement.  In *Daubert*, the Supreme Court noted that the question of relevance is whether the evidence is sufficiently tied to the facts of the case that it will assist the jury in resolving the issues before them.  It continued:

> "The consideration has been aptly described . . . as one of 'fit.' . . .  'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . .  The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of

---

[69]CMH also moves to exclude Wunderlich's testimony on the ground that he fails to take into account the statute of limitations.  CMH's objection appears to focus entirely on Wunderlich's 2005 damages model, which it suggests relies improperly on allegedly disparaging statements that are not actionable because they are time-barred, i.e. they were made before November 10, 2005.  In his opposition, Bakst responds that in light of the court's summary judgment ruling, Wunderlich will offer only his July 2007 damages calculation.  CMH's reply mentions the statute of limitations twice, both times referencing Bakst's withdrawal of Wunderlich's testimony regarding damages caused by statements made prior to the statute of limitations.  Because Bakst will offer only Wunderlich's July 2007 damages calculation, and CMH has not objected to that calculation on statute of limitations grounds, the court need not address its argument on this point further.

fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

As stated by the Ninth Circuit on remand in *Daubert*,

"The Supreme Court recognized that the 'fit' requirement 'goes primarily to relevance,' . . . but it obviously did not intend the second prong of Rule 702 to be merely a reiteration of the general relevancy requirement of Rule 402.   In elucidating the 'fit' requirement, the Supreme Court noted that scientific expert testimony carries special dangers to the fact-finding process because it '"can be both powerful and quite misleading because of the difficulty in evaluating it."' . . . Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 n. 17 (9th Cir. 1995).

The court's gatekeeper function under *Daubert* does not, however, replace the role of the factfinder.  Indeed, the district court may not "evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies[.]" *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996)).  The jury is entitled to hear expert testimony and decide whether to accept or reject it after considering whether the predicate facts on which the expert relied were accurate. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (11th Cir. 2002) ("Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits. . . .  The fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which Dr. Coco relied are accurate").  For this reason, the Ninth

1   Circuit has emphasized:

2       "Judges in jury trials should not exclude expert testimony simply because they

3       disagree with the conclusions of the expert.  The *Daubert* duty is to judge the

4       reasoning used in forming an expert conclusion.  The test is whether or not the

5       reasoning is scientific and will assist the jury.  If it satisfies these two requirements,

6       then it is a matter for the finder of fact to decide what weight to accord the expert's

7       testimony.  In arriving at a conclusion, the fact finder may be confronted with

8       opposing experts, additional tests, experiments, and publications, all of which may

9       increase or lessen the value of the expert's testimony.  But their presence should not

10      preclude the admission of the expert's testimony – they go to the weight, not the

11      admissibility."  *Kennedy v. Collagen Corporation*, 161 F.3d 1226, 1230-31 (9th

12      Cir. 1998).

13      CMH contends that Wunderlich's damages calculation fails *Daubert*'s "fit" requirement

14  because it is not tied to the facts of the case.[70]  Specifically, CMH asserts that Wunderlich's

15  damages calculation is based on an assumption that Bakst would obtain employment as a hospital

16  _____

17      [70]See *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985) ("An additional
consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony

18  proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving
a factual dispute"); *Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817-FL(2), 2005

19  WL 6000369, *11 (E.D.N.C. 2005) (holding that an expert's damages model was not "sufficiently

20  tied to the facts of the case" because there was no evidence in the record to support his assumption
that defendant "caused the loss of all potential sales of [the product] in that year, much less for

21  five years into the future.  [The expert's] damages model, under the guise of an expert report,
would encourage the jury to make just such an analytical leap from specific past lost sales

22  opportunities to all potential lost sales opportunities into the future, even though the evidence of

23  record does not support this inference"); *Henry v. Hess Oil Virgin Islands Corp.*, 163 F.R.D.
237, 247 (D. V.I. 1995) (recognizing that "an expert's testimony on economic damages is only

24  as sturdy as the foundation on which it is built," and holding that expert testimony on lost future
earnings should have been excluded because it "lacked an adequate factual foundation" since the

25  expert did not contact plaintiff's former employer or any potential employer to determine whether

26  the jobs for which plaintiff was qualified were available and if so, how much they would pay).
Absent a sufficient factual foundation, or where "there is simply too great an analytical gap

27  between the data and the opinion proffered," a court may exclude an expert's opinion as

28  impermissibly speculative.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

CEO.  As discussed in the court's summary judgment ruling, however, plaintiff has failed to proffer evidence that he applied for and was rejected for a hospital CEO position after 2007.  As the court has limited Bakst's damages to those flowing from positions for which he applied during and after 2007, and Bakst has failed to proffer evidence that he applied for CEO positions during and after 2007, CMH contends that Wunderlich's testimony is insufficiently tied to the facts of the case to meet the *Daubert* fit requirement.[71]

---

[71]At the February 14, 2011 hearing, Bakst's counsel asserted: ". . . [D]efendant is just wrong when he says that there is no evidence that Mr. Bakst applied for CEO positions during the relevant time period, not the time barred period, but the relevant time period. There is a CEO position to [St. Mary's] that he applied for. There's also headhunters that he used that were searching for a CEO position."  (See Reporter's Rough Transcript of February 14, 2011 Proceedings).  To evaluate the parties' competing arguments regarding the "fit" of Wunderlich's testimony, the court reviewed the summary judgment record to determine if it contained references to a position at St. Mary's or headhunters searching for CEO positions for Bakst during the relevant time period.  The court could find no such reference.  Because the issue was potentially dispositive of CMH's motion *in limine*, the court directed Bakst to file supplemental evidence "regarding CEO positions he applied for during the relevant time period."  (Order Requesting Supplemental Evidence, Docket No. 171 (March 3, 2011) at 2).  In response, Bakst submitted fifty-two pages of evidence that purportedly demonstrated that he applied for several CEO positions during the relevant time period.  (Plaintiff's Brief to Court Re: Supplemental Job Attempts, Docket No. 172 (March 4, 2011).)

Having reviewed the evidence Bakst adduced, the court concludes that, even if much of the evidence were not hearsay, which it is, it fails to raise a triable issue as to whether Bakst applied for CEO positions during the relevant period.  First, Bakst submitted several exhibits indicating that he applied for non-CEO positions during the relevant time period.  (See *id.*, Exhs. 254, 217 (August 2008 and April 2010 emails between Bakst and Vernon and Bakst and Brent Hardaway regarding potential consulting positions); *id.*, Exh. 286 (June 2008 description of an opening for a medical school president); *id.*, Exh. 290 (August 2008 communication with "Sara" about a position as a Director of Clinical Planning in Dubai); *id.*, Exh. 291 (September 5, 2008 job listing from Korn/Ferry regarding a Senior Vice President/COO position at Allegheny General Hospital, which reported to the CEO)).  Because Wunderlich's damages calculation assumes that Bakst would have found a position as a hospital <u>CEO</u>, the fact that he applied for non-CEO jobs does not assist in showing that Wunderlich's testimony meets *Daubert*'s fit requirement.  Other communications that Bakst submitted fail to mention the type of position for which Bakst intended to apply and do not suggest that a CEO position was available.  (See *id.*, Exh. 292 (August 11, 2008 letter from Michael Bakst to Pioneer Behavioral Health expressing interest in working to "enhance Pioneer's presence in Nevada. . ."); *id.*, Exh. 288 (July 21, 2008 email from Bakst to Vijay A. Chevil, thanking Vijay for "sending [him] the information on Redcord Inc. It sounds like a terrific opportunity for someone with knowledge about the US Health Care Industry . . .

The court agrees that because Wunderlich's damages calculation is based on factual assumptions that are entirely unsupported in the record, it fails meet the second prong of *Daubert*. See, e.g., *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 474-76 (9th Cir. 1977) (rejecting a damages award as "impermissibly conjectural" because an expert's damages testimony was based on "sheer fantasy" rather than actual evidence); see also *United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004) ("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 & n. 13 (3d Cir. 2000) (concluding that the district court should have excluded an expert opinion based on "empirical assumptions that were not supported by the record," and noting that an expert "who renders an opinion about a plaintiff's future economic harm based on economic assumptions not present in the plaintiff's case cannot be said to 'assist the trier of fact,' as Rule 702 requires"); *id.* (noting that although Rule 703 does not "specifically address the exclusion of expert testimony based on assumptions lacking a foundation in the record, it is not a stretch from the requirement that other 'experts in the particular field' would 'reasonably rel[y]' on such data in 'forming opinions . . . on the subject' . . . to suggest that an expert should not depend on fictional or random data when rendering an opinion about the quantum of economic harm in a particular plaintiff's case"); *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony is not inadmissible simply because it contradicts eyewitness testimony. Expert testimony, however, is inadmissible when the

_____

[and] a proven track record in management at the CEO level")). Still other evidence proffered does not clearly indicate that Bakst was applying for a position as opposed merely to soliciting job advice. (See *id.*, Exh. 285 (email to Steve Valentine asking for advice on "reentering the field")). Finally, the evidence proffered regarding Bakst's application for a CEO position at St. Mary's fails to raise a triable issue as to whether CMH's conduct caused Bakst to lose that position. The evidence indicates that Bakst sent an email about the St. Mary's CEO position on a Sunday and received a message back the following day stating that someone else had already been selected for the job. (See *id.*, Exh. 287 ("We have been working on this search for several months and are presenting [our] candidate to our client this week.")).

Because none of the evidence proffered by Bakst raises triable issue of fact as to whether he applied for CEO positions during the relevant period, Wunderlich's testimony is too speculative and based on assumptions unsupported in the record to be helpful to the trier of fact.

facts upon which the expert bases his testimony contradict the evidence").  Based on the record, it is entirely speculative for Wunderlich to testify that Bakst would have obtained a CEO-level position and received compensation commensurate with such a job.  Bakst has proffered no evidence that he applied for such a position during the relevant time period.  To the extent, moreover, that the jury finds he lost specific job opportunities, such as the consulting position with Vernon's firm, expert testimony will not be necessary to calculate his damages, since Bakst can elicit testimony from Vernon and other specific employers regarding the salaries they pay other similarly qualified consultants and how their compensation increases over time.

Consequently, CMH's motion *in limine* to exclude Wunderlich's testimony is granted in its entirety.

## F.   CMH's Motion *in Limine* to Preclude Evidence of Attempts Plaintiff Made to Find Comparable Employment Not Reflected in His Discovery Responses

CMH asks the court to preclude Bakst from offering evidence of attempts he made to find employment that were not referenced in his discovery responses, citing Rules 26 and 37 of the Federal Rules of Civil Procedure.  CMH propounded an interrogatory to Bakst asking: "Identify all attempts YOU made to find comparable employment in the healthcare industry between September 1, 2003 and May 1, 2010."[72]  Bakst's verified response, which CMH received on August 2, 2010, stated that "the information sought is reflected in the documents bates numbered 0000241-0000429."[73]  CMH has also proffered evidence that it asked Bakst during his September 24, 2010 deposition to confirm that his interrogatory response remained accurate.[74]  In reliance on Bakst's response to the interrogatory and his statement that the response remained accurate,

---

[72]CMH MIL #6, Attachment 1 (Bledsoe Decl. #6), Exh. A (Interrogatory Responses) at 16-17.

[73]*Id.* at 17.

[74]Bakst was asked if he had "located any additional documents concerning your attempts to find comparable employment in the health care industry between September 1st, 2003 and May 1st, 2010?"  Bakst responded: "No."  (See Bledsoe Decl. #6, Exh. B (Bakst Depo.) at 272:25-273:4).

1   CMH deposed Bakst regarding each reported attempt to find employment.[75]  Bakst did not identify

2   any job search efforts other than those contained in the interrogatory response during the course

3   of his deposition.   CMH asserts that Bakst now seeks to call "head hunter" Peter Becker as a trial

4   witness to testify regarding his efforts to find employment for Bakst, and that such efforts were

5   not mentioned in Bakst's interrogatory response or during Bakst's deposition.   Becker was first

6   identified as a witness with knowledge regarding Bakst's damages on July 27, 2010.[76]

7        Rule 26(e) provides that "[a] party who has made a disclosure under Rule 26(a) – or who

8   has responded to an interrogatory, request for production, or request for admission – must

9   supplement or correct its disclosure or response: (A) in a timely manner if the party learns that

10   in some material respect the disclosure or response is incomplete or incorrect, and if the additional

11   or corrective information has not otherwise been made known to the other parties during the

12   discovery process or in writing[.]"

13        The sanction for failing to comply with this disclosure obligation is set forth in Rule 37.

14   It provides that "[i]f a party fails to provide information or identify a witness as required by

15   Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence

16   on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

17   harmless."   FED.R.CIV.PROC. 37(c)(1); see also *Yeti by Molly v. Deckers Outdoor Corp.*, 259

18   F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding

19

20   ――――――――――――

21   [75]See, e.g., *id.* at 276:22-277:5 (regarding the year 2003); 277:6-13 (regarding 2004); 277:14-278:8 (regarding 2005); 294:16-295:1 (regarding 2006); 295:2-10 (regarding 2007);

22   295:11-18 (regarding 2008); 295:19-296:23 (regarding 2009); and 300:6-8 (regarding 2010).

23   [76]Consolidated Declaration of Michael M. Amir ("Amir Opp. Decl."), Docket No. 126 (January 24, 2011), Exh. 6 (Amended Disclosures) at 7.  On July 27, 2010, plaintiff served its

24   Amended Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1) on CMH.  Under Rule

25   26(a)(1), "a party must, without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have

26   discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]"

27   While Bakst provided Becker's name and a two-sentence description of the discoverable

28   information he might have, he failed to provide contact information for Becker.

the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed. . . .  This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. . . .  The Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material. . . .'  Courts have upheld the sanction even when a litigant's entire cause of action or defense has been precluded. . .").  "Limiting the automatic sanction to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations: e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures."  FED.R.CIV.PROC. 37(c), Advisory Committee Notes, 1993 Amendment.

It is the obligation of the party facing sanctions to show that its failure to comply with Rule 26(a) was either justified or harmless.  *Yeti*, 259 F.3d at 1107; accord *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 310 F.3d 592, 596 (4th Cir. 2003) (the burden is on the party facing sanctions to prove harmlessness); *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) (same); *Finely v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (same).  "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court."  *Mid-America Table Wares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1361 (7th Cir. 1996).

Interrogatory No. 10 sought information regarding "all attempts" by Bakst to find comparable employment.  CMH contends that under Rule 26(e), Bakst was required to correct his response to the interrogatory if he had made other, undisclosed efforts to obtain comparable employment.  Bakst counters that he did not need to supplement the interrogatory response because "the additional or corrective information [had] otherwise been made known to [CMH] during the discovery process[.]"  See FED.R.CIV.PROC. 26(e).  In support of this argument, Bakst notes that on July 27, 2010, he amended his Rule 26(a) disclosures to include Becker as an

"individual likely to have discoverable information[.]"[77]  His amended disclosure stated that "Mr. Becker owned the American Consulting Group [and that Bakst] believe[d] Mr. Becker has knowledge about Plaintiff's damages."[78]  Bakst maintains that this amended disclosure was "additional or corrective information" that was made known to CMH and that obviated the need to supplement or amend his response to Interrogatory No. 10 and his deposition testimony that the response remained accurate.      The timing of the amended disclosure does not support Bakst's argument that it constituted "additional or corrective information" that excused the need for him to supplement his interrogatory response and deposition testimony under Rule 26(e).  Bakst gave CMH an amended list of potential witnesses on July 27, 2010, which included Becker.[79]  On August 2, 2010, he served his response to Interrogatory No. 10 in which that he purportedly identified "all attempts" he had made to find comparable employment, but failed to mention that he had engaged Becker to search for employment on his behalf.[80]  On September 24, 2010, Bakst testified at his deposition regarding all attempts he had made to find employment, and once again failed to mention Becker.[81]  Given that the disclosure of Becker as an "individual likely to have discoverable information" about Bakst's "damages" occurred *before* Bakst's two other discovery responses in which he purported to provide information regarding all attempts he had made to find employment, CMH was justified in assuming that whatever information Becker possessed, it was not related to the "attempts [Bakst] made to find comparable employment[.]"

This conclusion is further supported by comparing the disclosure Bakst made regarding Becker with those he made regarding other witnesses with information about his attempts to find employment.  As respects Vernon, for example, Bakst's disclosure stated that "Mr. Vernon

---

[77]Amended Disclosures at 7.

[78]*Id.*

[79]*Id.*

[80]Interrogatory Responses at 17.

[81]Bakst Depo. at 272:25-273:4.

[would] provide testimony regarding Plaintiff's inability to find employment or secure business opportunities as a result of Defendants' derogatory statements."[82]   Likewise, as respects Steve Valentine, Bakst disclosed that "Mr. Valentine is president of the Camden Group, [which] provides physician practice management services and hospital consulting.   Plaintiff believes Mr. Valentine has knowledge about Plaintiff's damages, including Plaintiff's inability to find work because of Defendant's derogatory statements."[83]   Bakst's disclosure concerning Becker was vague and substantially more general – he disclosed only that he "believe[d] Mr. Becker ha[d] knowledge about Plaintiff's damages."[84]   Unlike his disclosure regarding Vernon and Valentine, whom he indicated had information regarding his attempts to secure employment, Bakst did not make such a statement regarding Becker.   This failure was compounded by Bakst's failure to mention Becker in his later interrogatory response or at his deposition.

CMH has proffered evidence that it would be prejudiced if Bakst were permitted to present evidence of Becker's efforts to seek comparable employment for Bakst.   CMH contends that it relied on Bakst's interrogatory response and conducted discovery and trial preparation accordingly.   For example, CMH prepared for and took Bakst's deposition based on his representation that all job search efforts were "reflected in the documents bates numbered 0000241-0000429."   CMH also retained experts to rebut the opinions of Bakst's expert.   David Nolte, a rebuttal damages expert, relied on Bakst's description of his job search efforts to (a) rebut the lost income and damages calculations of Bakst's expert, and (b) form an opinion regarding Bakst's failure to mitigate his damages (based on the fact that there were years during which Bakst was not actively seeking employment).[85]   Finally, CMH relied on Bakst's interrogatory response in seeking summary judgment on the basis that the job search evidence was insufficient to raise

---

[82]Amended Disclosures at 8.

[83]*Id.* at 7.

[84]*Id.*

[85]*Id.*, Exh. E (Nolte Depo.) at 79:11-17; 159:17-160:4.

43

triable issues of fact as to whether CMH's alleged breach caused any of Bakst's damages.

Bakst proffers little evidence or argument to demonstrate that his failure to include information regarding Becker in his interrogatory response or deposition testimony was either "justified or harmless." The only argument he makes regarding CMH's claim of prejudice is a suggestion that "any harm or prejudice that may befall defendant is due to defendant's own failure to depose" Becker.[86] While it is true that CMH might have discovered Becker's role in Bakst's employment search had it deposed him, this does not demonstrate that Bakst's failure to present complete and accurate discovery responses was harmless. CMH could not be expected to depose all twenty-two individuals identified by Bakst as likely to have discoverable information. Moreover, given that Bakst's deficient discovery responses were made *after* he had amended his Rule 26(a)(1) disclosures to include Becker, CMH acted reasonably in believing that the discovery responses, rather than the amended disclosure, contained all information regarding Bakst's attempts to seek comparable employment. It was entitled to conclude that, even if Becker had some unspecified information concerning Bakst's damages, it would not include undisclosed information about additional attempts to seek employment.

As the court cannot conclude that Bakst's error was either harmless or substantially justified, it excludes any testimony by Becker regarding his efforts to assist Bakst in finding employment under Rule 37 for failure to comply with Rule 26.

**G.    CMH's Motion *in Limine* to Preclude Introduction of Deposition Exhibit 135 and Related Testimony and Argument**

CMH next moves to exclude an email from Richard A. Resiman, M.D. to Bakst on August 5, 2010, that was introduced during Reisman's deposition as Exhibit 135.[87] The email states, in pertinent part:

> "During that entire difficult battle with the medial staff, I remained firmly in support of you and of what I felt was in the best interests of CMH. . . . I

---

[86]Bakst Opp. #6 at 4.

[87]Blesdoe Decl. #7, Exh. A (Reisman email) at 1.

maintained my support of your position despite being subjected to considerable intimidation and ridicule by the medical staffs of CMH [and other hospitals]. . . . Events progressed to a point that it was clear to me and other of your strongest supporters that the war was lost and the Board was unwilling to continue to support your position. *It was no longer a question of who would prevail but rather what would be the additional price extracted from you. As your friend it hurt me to see the price you had to pay and I knew of future planned actions by certain members of the medical staff that would make it impossible for you to find another position as a CEO of a hospital*. . . .

*I hoped that you would then be released without further injury in order to pursue your career elsewhere. I could never have foreseen the vindictiveness and mean spirited behavior on the part of certain members of the medical staff and Board to continue their vendetta with you even after your resignation.*

I have made it clear to Gary and other VPs that I continue to maintain my friendship with you and have publicly expressed my displeasure about the way you have been unfairly treated. . . .

So, I hope that you will understand my actions in the context that I have explained and I hope that we can continue to remain friends even through this current difficult chapter as you litigate against the hospital."[88]

Defendant contends that the email is inadmissible double hearsay, irrelevant because it is evidence of motive, and unfairly prejudicial.

It is clear from the parties' arguments that CMH is focused on excluding two statements in the email: (1) "It was no longer a question of who would prevail but rather what would be the additional price extracted from you. As your friend it hurt me to see the price you had to pay and I knew of future planned actions by certain members of the medical staff that would make it impossible for you to find another position as a CEO of a hospital"; and (2) "I hoped that you

---

[88]*Id.* at 1-2 (emphasis added).

1   would then be released without further injury in order to pursue your career elsewhere.  I could

2   never have foreseen the vindictiveness and mean spirited behavior on the part of certain members

3   of the medical staff and Board to continue their vendetta with you even after your resignation."

4   Both portions of the document fall within the ambit of the court's ruling on CMH's fourth motion

5   to exclude evidence of motive.  As there is no question that the allegedly disparaging statements

6   were made, the only issues are (1) whether they are attributable to CMH; (2) whether they

7   constituted a breach of the Agreement; and (3) whether the statements caused Bakst to suffer

8   damage.[89]  For the reasons stated with regard to CMH's fourth motion *in limine*, these two

9   statements by Reisman, which go to the motive certain members of the medical staff and the Board

10  had for taking the actions they took, are not relevant to any of the matters in dispute in this action

11  and are inadmissible as a consequence.

12      Having excluded the statements regarding CMH's alleged vendetta against Bakst, the court

13  next considers whether the remainder of the email is relevant, and concludes that it is not.  Bakst

14  proffers no argument as to why it is relevant that Reisman "remained firmly in support of [Bakst]

15  and of what [Reisman] felt was in the best interests of CMH. . . ," or that he "maintained [his]

16  support of [Bakst's] position despite being subjected to considerable intimidation and ridicule by

17  the medical staffs of CMH [and other hospitals]."  This evidence has no tendency to make any fact

18  of consequence to this litigation more or less probable.  The same is true of the statement that

19  "[e]vents [had] progressed to a point that it was clear to [Reisman] and other of [Bakst's] strongest

20  supporters that the war was lost and the Board was unwilling to continue to support [Bakst's]

21  position."  The fact that Bakst left his position at the request of the Board is undisputed and

22  Reisman's statements are not relevant in assessing whether CMH breached any provision of the

23  Settlement Agreement or failed to indemnify Bakst as required by Labor Code § 2802.  Reisman's

24  statement that "he made it clear to Gary and other VPs that he [would] continue to maintain [his]

25

26      [89]These, of course, are not the *only* questions remaining in this litigation.  CMH will
attempt to negate Bakst's proof with respect to the validity of the contract and whether Bakst fully

27  performed or excused from fully performing his obligations under it.  Bakst's argument regarding

28  the relevance of Exhibit 135, however, relates only to the three questions noted in text.

1    friendship with [Bakst,] . . . ha[d] publicly expressed displeasure about the way [Bakst] ha[d] been

2    unfairly treated . . . and hope[d] that [they could] continue to remain friends even through this

3    current difficult chapter as [Bakst] litigate[d] against the hospital" is also irrelevant.  The fact that

4    Reisman believed that Bakst had been unfairly treated does not make it more or less likely that

5    CMH is liable.  Nor does the fact that the litigation represented a "difficult chapter" in Bakst's

6    life.  The only effect of admitting these statements would be a potential risk of unfair prejudice

7    that the jury might react emotionally to hearing about Bakst's "unfair treatment" at the hands of

8    CMH, the "difficult chapter" in Bakst's life, or the fact that Reisman was "subjected to

9    considerable intimidation and ridicule by  the medical staffs of CMH."  Because the statements

10   have no relevance in assessing whether CMH is liable on Bakst's claims, the court excludes the

11   totality of the Reisman email as irrelevant.[90]

12       **H.    CMH's Motion *in Limine* to Preclude Evidence That Plaintiff Received Job**

13               **Offers Prior to His November 26, 2003 Settlement with CMH**

14           CMH also moves to preclude Bakst from testifying that he received job offers during the

15   summer of 2003, prior to his resignation from CMH and the signing of the Settlement Agreement.

16   CMH contends the evidence is irrelevant, unfairly prejudicial, and inadmissible hearsay.  CMH

17   states that during Bakst's deposition, he testified that in May 2003, Phillip Drescher noticed two

18   job prospects on Bakst's desk and had a lengthy conversation with Bakst about whether he planned

19   to leave the hospital.[91]  Bakst testified that Drescher attempted to convince him to remain at CMH.

20

21   ────────────

22       [90]To the extent Bakst believes the email can be used for impeachment purposes, he is
     directed to raise the issue outside the presence of the jury before offering the exhibit or asking
23   Reisman questions regarding the communication.

24       [91]CMH MIL #8, Attachment 1 (Bledsoe Decl. #8), Exh. B (Bakst Depo.) at 338:13-339:14
     ("[I]n May of 2003, I had met with Mr. Drescher in my officer, and Mr. Drescher . . . noticed
25   that there were two job prospects on my desk and asked me what they were about.  I explained
     that in light of the dissension going on with the medical staff, I didn't know what the Board
26   wanted to do and I wanted to keep my options open.  Mr. Drescher entered into a lengthy
     discussion, implored me to destroy those job announcements, if you will, and asked me to commit
27   to four [ ] more years stating that if I left before he did, at that time he would resign as well.  On
     that basis, I shook his hand and said 'No problem, and we'll see if we can't resurrect this
28

47

Drescher has stated that he does not recall this conversation,[92] and Bakst has proffered no evidence, other than his own testimony,[93] that he received offers of employment in the summer of 2003.      CMH contends that any testimony that Bakst received employment offers in the summer of 2003 is irrelevant.  It asserts that the claims against it are based entirely on conduct occurring after that period.  As the court noted in its summary judgment order, the first allegedly disparaging statement that is actionable was made in June 2007.

The court disagrees with CMH's relevance argument.  As Bakst notes, he alleges that CMH's statements damaged his ability to obtain employment.  Thus, evidence that he was employable, i.e., received job offers or overtures, prior to the time the allegedly disparaging remarks were made is relevant in that it tends to make more probable the fact that the allegedly disparaging statements harmed Bakst's ability to obtain employment.  Because contract damages are designed only to put a plaintiff in as good a position as he would have been in had there been no breach, whether Bakst was employable prior to the purported breach is relevant to Bakst's claim under Rule 401.  CMH's own theory of the case supports this conclusion.  CMH has repeatedly argued that Bakst was unemployable prior to June 2007 due to the dispute he had with the medical staff in 2003, and possibly as a result of non-actionable disparagement that occurred prior to June 2007.  CMH cannot argue, on the one hand, that evidence of Bakst's inability to find employment between 2003 and 2007 is relevant to demonstrate that its alleged breach of the non-disparagement clause did not cause his damage, but assert, on the other, that the fact that he received two job offers in 2003 is irrelevant.

_____

situation.' . . .  At the time of my termination . . . I felt sort of betrayed, . . . on the one hand I was asked to give a four-year commitment and three months later I was terminated").

[92]Bledsoe Decl #8, Exh. A (Drescher Depo) at 89:18-90:1.

[93]Bakst did not testify at his deposition that he was *offered* employment during the summer of 2003.  Instead, he referenced "job prospects" and "job announcements."  Neither party proffers evidence that Bakst was offered a job during this period.  As the motion is premised on an assumption that Bakst intends to testify he received two employment offers that summer, however, the court assumes this fact for purposes of deciding the motion.

CMH's hearsay argument, however, merits greater consideration.  Rule 801 of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  FED.R.EVID. 801(c).  It appears that the only evidence of Bakst's receipt of two job offers in the summer of 2003 is Bakst's own testimony.  As noted, neither party has cited testimony in which Bakst affirmatively stated that he received job offers in 2003; the court has assumed for purposes of this motion, however, that Bakst intends to testify to this effect.  Testimony by Bakst that he received a job offer would be the equivalent of testimony by Bakst that "an unspecified employer offered me a job in 2003."  Because his testimony regarding the communication to him of a job offer includes an out-of-court statement by the prospective employer, the court must consider whether any of the exceptions to the hearsay rule applies.  Bakst does not dispute this.

Bakst contends that the testimony is non-hearsay because it is not being offered to prove the truth of the matter asserted.  See *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) ("We find that the statement properly was treated as non-hearsay because it was not introduced for the truth of the matter asserted").  He asserts he "only seeks to introduce the evidence to show that such statements were made, that is, that several employers made an expression of interest in [him], regardless of whether those employers were in fact being truthful or not.  Thus, the relevance of the statements depends not on the credibility of the out-of-court declarants – as Bakst is not attempting to force the employers to go through with each offer – but instead . . . on the credibility of the testifying witness, as it depends on whether these expressions were in fact made or not."[94]   Bakst's argument is facially appealing, but falls apart when the court considers his arguments with regard to the relevance of this evidence.  Bakst contends, and the court agrees, that this evidence is relevant to demonstrate that Bakst was employable prior to his settlement agreement with CMH.  Thus, the evidence is only relevant if an unspecified employer actually wanted to hired Bakst.  If the unspecified employer had been lying when he made the offer to Bakst and did not actually want to hire Bakst, the evidence would not prove anything with respect

---

[94]Bakst Opp. #8 at 5.

49

to Bakst's employability.  Bakst's *belief* that he was offered a job is irrelevant to his claims in this litigation.  Thus it is clear that Bakst actually intends to offer the out of court statements of the unspecified employer for the truth of the matter asserted – that Bakst was in fact offered these jobs – and they are thus inadmissible hearsay.  See *Phan v. Trinity Regional Hosp.*, 3 F.Supp.2d 1014, 1019 (N.D. Iowa 1998) ("The court concludes first that these statements are indeed hearsay, because they are offered 'to prove the truth of the matter asserted,' that is, for the proposition that the Hospital offered Lampe the promotion before either of the candidates had been interviewed").  As Bakst has made no argument with regard to the applicability of other possible exceptions to the hearsay ban, the court grants defendant's eighth motion *in limine*.

I.    **CMH's Motion *in Limine* to Preclude Evidence that It Requested Insurance Coverage in Connection with the OIG Investigation**

Finally, CMH moves to exclude evidence that it requested, but did not receive, insurance coverage in connection with the OIG investigation.  CMH contends that Bakst will offer at least seven exhibits that refer or relate to CMH's tender of the OIG investigation to its insurance carrier: (1) a draft letter prepared by CMH's counsel, Foley & Lardner, LLP ("Foley"), to CMH's insurance provider, RSUI Indemnity Company ("RSUI"); (2) a June 16, 2006, letter from Foley requesting RSUI's consent to settle with the OIG; (3) an e-mail reflecting the contents of RSUI's response to CMH's request; (4) a letter from RSUI to Foley dated June 27, 2006; (5) a follow-up letter from RSUI to Foley dated June 30, 2006; (6) another letter from RSUI to Foley dated December 6, 2006; and (7) a final letter from RSUI to Foley dated December 29, 2006.[95]  These letters reflect CMH's efforts to obtain coverage for its settlement with the OIG, and RSUI's later denial of coverage due to CMH's failure to provide the insurer with necessary information.

CMH asserts that this evidence is inadmissible under Rule 411 of the Federal Rules of Evidence, and that it is irrelevant and unfairly prejudicial.  Rule 411 states that "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully.  This rule does not require the exclusion of

---

[95]CMH MIL #10, Attachment 1 (Bledsoe Decl. #10), Exh. C - I.

evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness." FED.R.EVID. 411.  As stated in the Advisory Committee Notes to Rule 411, the purpose of the rule is to ensure that juries do not decide cases on improper grounds.  See FED.R.EVID. 411, Advisory Committee Notes, 1972 Proposed Rules ("The courts have with substantial unanimity rejected evidence of liability insurance for the purpose of proving fault, and absence of liability insurance as proof of lack of fault.  At best the inference of fault from the fact of insurance coverage is a tenuous one, as is its converse.  More important, no doubt, has been the feeling that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds").

CMH contends that Bakst seeks to offer evidence of its tender to its insurance carrier and the insurer's denial of that tender to prove that its disclosures to the OIG were somehow wrongful.  The court has already held that CMH's disclosure of information to the federal government is protected by the litigation privilege and cannot form the basis for Bakst's breach of the non-disparagement clause claim.  Because Bakst cannot present evidence or argue that the disclosures were wrongful or constituted a breach of contract, he cannot introduce RSUI's rejection of CMH's tender to show that CMH acted wrongfully in connection with the OIG investigation.

Evidence that CMH tendered the OIG investigation to its carrier and that RSUI rejected the tender is irrelevant is any matter actually at issue with respect to the OIG investigation.  Bakst contends that he

> "is *not* offering [the] evidence to show that CMH's acted wrongfully because it had
> insurance[, which would be prohibited by Rule 411].  Rather, Bakst will offer the
> evidence to rebut CMH's argument that it had to pay the OIG $1.5 million because
> of what Bakst did or failed to do.  In particular, one of CMH's central themes at
> trial will be that, as a sole result of what occurred during the Bakst administration,
> CMH had to pay $1.5 million to settle the OIG matter. . . .  CMH is directly
> blaming Bakst for its obligation to pay $1.5 million to the OIG.  Discovery in this
> case, however, has revealed that CMH had to pay the $1.5 directly because it
> utterly failed to cooperate with its insurer.  In particular, the evidence demonstrates

that CMH brazenly stonewalled the carrier, refusing to provide it with the most basic information."[96]

While Bakst has identified a reason for admitting the evidence that is not expressly prohibited by Rule 411, it is clear that neither CMH's "central theme" nor Bakst's planned response to it is relevant to the issues that will actually be tried.  CMH does not have a claim for damages; specifically, it is not seeking to recover the $1.5 million it paid to the OIG.  Any argument by CMH that it was forced to pay $1.5 million to the OIG would be irrelevant in assessing whether it (a) breached the Settlement Agreement by disparaging Bakst; or (b) breached a duty to indemnify Bakst for his settlement with the OIG.  The OIG investigation is relevant only because CMH contends Bakst failed to perform his obligations under the Settlement Agreement by refusing to respond to CMH's requests that he provide it with information during the investigation, and because Bakst contends CMH is obligated to indemnify him for the expenses he incurred in connection with the investigation.  While the parties' respective contentions make the fact of the OIG investigation relevant, they do not make its outcome relevant.  Stated differently, whether CMG paid $1.5 million to the OIG is not relevant in assessing whether Bakst performed his obligations under the Agreement.  It is similarly not relevant in determining whether CMH was obligated to indemnify Bakst for his expenses.  Consequently, CMG is precluded from introducing evidence or arguing that it "was forced" to pay $1.5 million to the OIG as a result of Bakst's conduct.  Bakst is similarly precluded from attempting to rebut such a showing by offering evidence that CMH's tender of the OIG investigation to its insurance carrier was rejected due to CMH's failure to cooperate with the carrier.

## J.    Bakst's Motion *in Limine* to Exclude Legal Opinions Offered by CMH's Damages Expert David Nolte

Bakst's first motion seeks to exclude legal opinions that will purportedly be offered by defendant's rebuttal expert, David Nolte, regarding causation, mitigation, and the statute of limitations.  In light of the order excluding the testimony of Bakst's affirmative damages expert,

---

[96]Bakst Opp. #10 at 4.

1    Wunderlich, whose testimony Nolte was retained to rebut, this motion is moot.  Because the

2    testimony Nolte was hired to rebut will not be offered, Nolte may not testify.

3        **K.**      **Bakst's Motion** *in Limine* **to Exclude Evidence Regarding Defendant's Internal**

4             **Investigation of Plaintiff and Defendant's Basis for Refusing to Indemnify**

5             **Plaintiff**

6        Bakst also moves to preclude CMH from introducing evidence that it did not produce

7    during discovery regarding its internal investigation of his conduct and its basis for refusing to

8    indemnify him.  Bakst asserts that during discovery, he questioned CMH witnesses extensively

9    about private meetings at which CMH officials discussed an internal investigation of Bakst's

10   conduct and declined to indemnify him for his settlement with the OIG.  In response to Bakst's

11   questions, CMH attorneys directed the witnesses to invoke the attorney-client privilege.[97]  The

12   witnesses testified that lawyers from Foley were present at these ad hoc committee meetings, for

13   the purpose of advising CMH.  As a consequence, CMH contended that any discussions that took

14   place during the meetings were protected by the attorney-client privilege.[98]

15       Because it asserted the attorney-client privilege during discovery, Bakst contends that CMH

16   should be precluded from waiving the privilege now and having its witnesses testify on these

17   subjects.  Bakst is particularly concerned that CMH may attempt to offer testimony regarding the

18   substance of the internal investigation and discussions that took place at the ad hoc committee

19

20

21   [97]Bakst's MIL #2 at 4 (asserting that Bakst attempted to discover the substance of the
     investigation and committee meetings, but "in each instance, CMH claimed the events were
22   privileged because CMH's attorneys were present).

23   [98]See, e.g., Amir Decl., Exh. 6 (Glyer Depo.) at 127:6-128:19 ("Q: Did you personally
     communicate with Foley [ ] lawyers regarding their investigation?  A. Yes.  Q. . . . Did you have
24   an understanding that they were providing you with legal advice?  A.  Providing me personally?
     [OBJECTION]  A. My understanding was that the[y] were advising the board on the legal status
25   of the transactions that they looked at.  Q.  What is that understanding based on?  MR.
     BLEDSOE: I am going to caution you not to disclose the substance of any communications you
26   had with Foley [ ] attorneys.  It would be attorney-client privilege.  A. Then I can't answer that.
27   Q.  Do you know whether or not Foley['s] investigation resulted in any findings? [OBJECTION]
     A. Anything I know would also be covered under attorney-client privilege").
28

                                                    53

meetings.[99]  CMH does not appear to dispute the basic premise of the motion – that it should not be permitted to invoke the attorney-client privilege during discovery and then waive it at trial.[100] It contends, however, that "Bakst's motion is an ill-disguised attempt to preclude his opponent from defending against Bakst's baseless claims."[101]

As this is a diversity case, California privilege law applies.  See FED.R.EVID. 501 ("[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government State, or political subdivision thereof shall be determined in accordance with State law"); *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 284 (C.D. Cal. 1998) ("In a federal action based on diversity of citizenship jurisdiction, state law governs privilege claims"); *Upjohn Co. v. Hygieia Biological Laboratories*, 151 F.R.D. 355, 358 (E.D. Cal. 1993) ("State privilege law applies, as in the instant case, to state claims brought in federal court pursuant to diversity jurisdiction").

Under California law, a deponent may not invoke a privilege during discovery and then waive the privilege and testify at trial.  Cf. *A & M Records, Inc. v. Heilman*, 75 Cal.App.3d 554, 566 (1977) ("[T]he enactment of the Discovery Act of 1957 was intended to take the 'game element' out of trial preparation and do away with surprise at trial.  The accomplishment of this purpose compels the court to prevent a litigant claiming his constitutional privilege against self-incrimination in discovery and then waiving the privilege and testifying at trial.  Such a strategy subjects the opposing party to unwarranted surprise.  A litigant cannot be permitted to blow hot and cold in this manner"); see also *Gaggero v. Knapp, Petersen & Clarke*, No. B207567, 2010 WL 1796575, *9 (Cal. App. May 6, 2010) ("Moreover, as the Knapp firm points out, the issue is more properly characterized as whether a party may assert a privilege to block

---

[99]Bakst's MIL #2 at 4.

[100]CMH Opp #2 at 1 ("To the extent the Hospital asserted attorney-client privilege it did so only when Bakst sought to intrude on privileged communications between the Hospital and its attorney; the Hospital will not attempt to introduce any such privileged information at trial").

[101]*Id.*

discovery and then waive that privilege and testify at trial.  The answer is that he may not");[102] *Hashimoto v. Republic Ins. Co.*, No. B138066, 2002 WL 220601, *9 (Cal. App. Feb. 13, 2002)("[C]ourts do not allow a plaintiff to use the privilege against self-incrimination as both a shield and a sword").  See also *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008) ("Trial courts generally will not permit a party to invoke the privilege against self-incrimination with respect to deposition questions and then later testify about the same subject matter at trial.  The Federal Rules of Civil Procedure 'contemplate . . . 'full and equal discovery' . . . so as to prevent surprise, prejudice and perjury' during trial.  '[B]ecause the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent'" (citations omitted)).

This rule has been explicitly applied to invocation of the attorney-client privilege.  See *In re Marriage of Hoffmeister*, 161 Cal.App.3d 1163, 1171 (1984) ("It has been held that [former Code of Civil Procedure § 2019(b)(1)][103] grants the court the power to preclude at trial the use of evidence withheld by a party at deposition on the basis of the Fifth Amendment privilege against self incrimination.  No reason appears why the same cannot be done where relevant evidence sought to be discovered at deposition is withheld on the basis of the attorney-client privilege.  'So long as the penalty is appropriate to the dereliction and does not exceed the protection required to protect the interests of the party entitled to but denied discovery, its imposition is within the

---

[102]"Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220  n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

[103]California Code of Civil Procedure § 2019(b)(1) was repealed in 2004 to facilitate non-substantive reorganization of the rules governing civil discovery.  It was replaced by § 1258.020(c), which contains the same content.  See CAL. CODE CIV. PROC. § 1258.020(c) ("The court, upon noticed motion by the person subjected to discovery pursuant to subdivision (b), may make any order that justice requires to protect such person from annoyance, embarrassment, or oppression").

discretion of the trial judge.' In short, the trial court had the power to preclude at the hearing the use of any evidence withheld from appellant at deposition. . .").  See also *Columbia Pictures Indus. v. Krypton Broadcasting of Birmingham*, 259 F.3d 1186, 1196 (9th Cir. 2001) (affirming a district court decision to preclude defendant from relying on an advice of counsel defense where he had asserted the attorney-client privilege at deposition, and noting that defendant "sought to argue that he continued his infringing activities based on the advice of his attorney, while at the same time refusing to answer questions regarding relevant communications with counsel until the 'eleventh hour,'" citing William A. Schwarzer, et al., FEDERAL CIVIL PROCEDURE BEFORE TRIAL, ¶ 11:37, at 11-29 (2000) ("the court may fashion remedies to prevent surprise and unfairness to the party seeking discovery.  For example, where the party claiming privilege during discovery wants to testify at the time of trial, the court may ban that party from testifying on the matters claimed to be privileged")).

Indeed, these cases fit within a larger body of case law that precludes the use of evidence not produced during discovery.  See, e.g., *Juarez v. Boy Scouts of America, Inc.*, 81 Cal.App.4th 377, 389-90 (2000) (holding that the trial court properly excluded evidence plaintiff had repeatedly refused to produce during discovery on privilege grounds); *Vallbona v. Springer*, 43 Cal.App.4th 1525, 1545-46 (1996) (holding that the trial court properly excluded evidence that plaintiff previously claimed had been stolen and that was therefore unavailable for production).  Consequently, under California law, CMH may not elicit testimony about any subject as to which it or its witnesses invoked the attorney-client privilege during discovery.

CMH contends, however, that Bakst seeks to preclude it from offering a defense to his indemnification claim.  The court does not construe the motion this broadly.  As Bakst's brief makes clear, he seeks an order preventing CMH from testifying about the internal investigation conducted by Foley and the discussions Foley attorneys had with CMH officers during which the decision was made not to indemnify Bakst.  The evidence Bakst has adduced suggests that CMH invoked the attorney-client privilege with respect to these two topics during discovery.  Although it concedes it invoked the attorney-client privilege with regard to the discussions that led to the denial of Bakst's indemnification request, CMH contends it "produced the *results* of its

investigations and findings to Bakst."[104]   It is unclear what CMH means by "results" and "findings." If by results and findings, CMH means the ultimate decision not to indemnify Bakst, there is no dispute. Bakst has not alleged that CMH failed to inform him of the "result" of the investigation and ad hoc committee meetings, i.e. its decision not to indemnify him. CMH has adduced no evidence, however, that it provided any discovery regarding the "findings" of the Foley investigation or committee discussions. It cites no reports, memoranda, or testimony on this subject.[105] Thus, to the extent CMH failed to produce such evidence during discovery, it cannot present it to the jury at this point.

CMH also asserts that Bakst seeks to prevent it from "present[ing] evidence that Bakst himself breached the Settlement Agreement . . . and that Bakst is not entitled to be indemnified by the Hospital for the legal repercussions of acts Bakst committed in bad faith and in flagrant disregard of his fiduciary obligations and moral responsibilities to the hospital community he was charged with serving."[106] It similarly contends that Bakst seeks to preclude it from adducing evidence that he refused to "cooperate with the Hospital's attempts to comply with its regulatory and reporting obligations."[107] The court agrees that CMH can adduce evidence regarding these defenses, i.e., that Bakst breached the Settlement Agreement and/or acted in bad faith, and that he failed to cooperate with CMH's efforts to satisfy regulatory and reporting requirements. As

[104]CMH Opp #2 at 1.

[105]CMH asserts that it "fully submitted to discovery on its defenses [ ] by disclosing thirty-three (33) witnesses likely to have discoverable information . . . and producing voluminous documents." (CMH Opp #2 at 1). It adds that its "document production also included the Hospital's extensive efforts to obtain Bakst's cooperation in the Hospital's investigations of its regulatory compliance issues, the Hospital's self disclosures to the government reporting on the findings of its investigations, and the Hospital's responses to Bakst's's indemnity demands." (*Id.*) These generalized assertions regarding CMH's compliance with discovery do not, however, specifically address whether CMH produced evidence of the results of the Foley investigation or the findings of the ad hoc committee.

[106]*Id.*

[107]*Id.*

57

the court construes Bakst's motion, however, it does not seek to limit CMH's ability to do so. Bakst merely seeks to preclude CMH from offering evidence concerning Foley's investigation and conversations that occurred during the ad hoc committee meetings.  This order, does not however, prevent CMH from presenting evidence that Bakst was not entitled to indemnification under California Labor Code § 2802, either because he breached the Settlement Agreement or "committed [particular acts] in bad faith and in flagrant disregard of his fiduciary obligations and moral responsibilities to the hospital community he was charged with serving."[108]

Thus, CMH can present evidence at trial regarding its internal investigation of Bakst's conduct and the findings and conclusions of its ad hoc committee only to the extent they were disclosed during discovery.  This does not preclude CMH from offering evidence of specific acts of bad faith, contractual breach or lack of cooperation by Bakst that it contends justified its refusal to indemnify him under Labor Code § 2802.  See *AMCO Ins. Co. v. Madera Quality Nut LLC*, No. 1:04-cv-06456-SMS, 2006 WL 931437, *13 (E.D. Cal. Apr. 11, 2006) ("although it is extremely unlikely, even if it were true that MQN could only know the facts supporting these defenses via the internal investigation, the facts, as distinct from the investigation itself, are available to Amco via discovery").

## L.   Bakst's Motion *in Limine* to Exclude Evidence of His Intimate Personal Relationships

Bakst next seeks to exclude evidence that refers to any intimate personal or romantic relationships he may have had with hospital employees.[109]  He asserts that such evidence is irrelevant and unfairly prejudicial.[110]  CMH contends the motion should be denied with respect

---

[108]CMH may contend that Foley's investigation uncovered evidence of Bakst's bad faith, contractual breaches and lack of cooperation.  The underlying facts that were learned are distinct from the process that led to their discovery, however.  Presumably, CMH can present evidence of the underlying facts without presenting evidence regarding the investigation, as to which it invoked the attorney-client privilege during discovery.

[109]Bakst MIL #3 at 2.

[110]*Id.*

to two individuals with whom Bakst allegedly had "intimate personal relations[ ]" and to whom he gave gifts for which he sought reimbursement from CMH.[111]

CMH contends the evidence is relevant to its defense of Bakst's indemnification claim. Specifically, it asserts that the evidence is relevant to prove: (1) whether Bakst acted in good faith, (2) whether he received a personal benefit from the transactions, and (3) whether he was acting within the scope of his employment when he gave gifts to hospital employees.[112] CMH argues that evidence of Bakst's romantic relationships with two hospital employees bears directly on whether he acted within the scope of his employment in using hospital funds to purchase gifts and that the evidence is therefore highly probative with respect to his indemnity claim.[113] Bakst counters that evidence of the romantic relationships should be excluded because it does not have any "tendency to prove whether or not [he] acted with good faith in the discharge of his professional duties as CEO of the hospital."[114]

Under § 2802, "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." "The test for recovery under [§] 2802 is whether the conduct defended against was within the course and scope of employment." *Jacobus v. Krambo Corp.*, 78 Cal.App.4th 1096, 1100 (2000) (citing *Douglas v. Los Angeles Herald-Examiner*, 50 Cal.App.3d 449, 463-65 (1975)).

---

[111]CMH Opp. # 3 at 1.

[112]*Id.* at 7.

[113]*Id.* at 2-3.

[114]Bakst MIL #3 at 5.  As noted in the court's order on summary judgment, plaintiff's indemnity claim falls under California Labor Code § 2802.  Therefore, California Corporations Code § 317(b) does not apply and the court will only consider the relevancy of the evidence to plaintiff's claim for indemnification under § 2802.  Therefore, the court will not consider defendant's arguments regarding whether the evidence is relevant to demonstrate plaintiff's lack of "good faith" under §317(b).

In determining whether an employee's acts were within the course and scope of his employment for indemnification purposes, courts apply the respondeat superior doctrine.  See, e.g., *Devereaux v. Latham & Watkins*, 32 Cal.App.4th 1571, 1583 (1995) (referencing the test used to assess "within the scope of employment" for respondeat superior purposes in discussing indemnification under § 2802).

"Under [the doctrine of respondeat superior], an employer is vicariously liable for risks broadly incidental to the enterprise undertaken by the employer – that is, for an employee's conduct that, in the context of the employer's enterprise, is 'not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.'" *Jacobus*, 78 Cal.App.4th at 1101 (citations omitted); *Devereaux*, 32 Cal.App.4th at 1583 (same).  An employer is "not vicariously liable for an employee's conduct if the employee substantially deviates from his or her course of duty so as to amount to a complete departure.  However, acts that are necessary to the comfort, convenience, health, and welfare of the employee while at work, though personal and not acts of service, do not take the employee outside the scope of his employment.  Moreover, an employee's conduct may fall within the scope of his employment even though the act does not benefit the employer, even though the act is willful or malicious, and even though the act may violate the employer's direct orders or policies." *Id.* at 1101-02 (citations omitted).

Here, evidence of Bakst's romantic relationships is directly relevant in assessing whether his acts were within the scope of his employment.  Bakst alleges that he received no "personal[ ] benefit from these transactions."[115]  CMH, however, contends that Bakst had "intimate personal relations[ ]" with two employees to whom he gave gifts funded by CMH.[116]  If a jury were to credit this evidence, it might be more likely conclude that Bakst acted not in his role as CEO, but in his role as lover or friend when he decided to give the employees gifts.  In this way, the

---

[115]Memorandum in Opposition to Defendant's Motion for Summary Judgment at 5-6, Docket No. 52 (Oct. 8, 2010).

[116]CMH Opp. #3 at 1.

evidence has some tendency to make a fact of consequence to the litigation more or less probable. In *Jacobus*, the court found that a plaintiff's "entirely consensual interchange" with another employee, which involved the sharing of sexual materials, "was simply part of the social intercourse that occasionally occurs in modern office settings." 78 Cal.App.4th at 1103 (noting that " social interactions among employees, including sharing of private or personal information, are broadly incidental to the enterprise of an employer"); see *id.* at 1104 (noting that the exchange "was no more unusual or startling that forms of everyday conversation among coworkers"). Here, by contrast, Bakst's contact with the two employees allegedly involved intimate, romantic relations and the giving of gifts paid for by CMH. As a result, a reasonable jury could find that Bakst's conduct fell outside the scope of employment. Thus, evidence of the alleged personal relationships is relevant to prove whether Bakst acted within the scope of his employment for purposes of § 2802. Consequently, it is admissible under Rule 401.

Bakst contends that even if relevant, the evidence should be excluded under Rule 403 because its probative value is outweighed by the danger of unfair prejudice.[117] FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); *United States v. Cruz-Garcia*, 344 F.3d 951, 956 (9th Cir. 2003) ("Even though evidence is admissible under 404(b), it may nonetheless be excluded under Rule 403's balancing test, which weighs the 'probative value' of the evidence against the 'danger of unfair prejudice'"). Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Haney*, 203 F.3d 1160, 1172 (9th Cir. 2000) (citing the Advisory Committee Notes for Rule 403).

Bakst contends the evidence would improperly influence the jury to conclude that CMH's disparagement of him was justified.[118] CMH acknowledges that the evidence is prejudicial, but

---

[117]Bakst MIL #3 at 6.

[118]*Id.*

61

argues that the risk of *unfair* prejudice does not substantially outweigh the probative value of the proof.[119]   As discussed, evidence of Bakst's intimate relations with employees is highly probative in assessing whether he acted within or outside the scope of his employment when engaging in the conduct for which he was investigated by the OIG and for which he sought indemnification.  Bakst has failed to meet his burden of demonstrating that the probative value of the evidence is substantially outweighed by the risk that the jury will find for CMH on an improper basis, namely the fact that Bakst had intimate relations with two of his employees.   Given that the allegedly disparaging statements do not reference the relationships, it is not immediately apparent why the fact of the relationships would lead a jury to conclude that the disparagement was warranted. While some jurors might not approve of the fact that Bakst had intimate relationships with subordinate employees, the risk of prejudice associated with those feelings does not substantially outweigh the probative value of the evidence, which is directly relevant to CMH's defense to the indemnification claim.   To the extent Bakst is concerned that the evidence may be used for an improper purpose, the court is prepared to give a limiting instruction, and invites Bakst to submit a proposed instruction for its consideration.

### M.   Bakst's Motion *in Limine* to Exclude Duplicative Evidence of His Settlement with the Office of Inspector General

Bakst also moves to exclude allegedly duplicative evidence of his settlement with the OIG,[120] citing nine September 2009 press releases or articles regarding the settlement and asserting that they should be excluded as cumulative under Rule 403 because his settlement with OIG will be introduced, and as inadmissible hearsay under Rule 802.

Bakst believes that CMH will introduce the articles to show that he settled with OIG in September 2009, a fact Bakst contends could be proved more directly by offering the settlement

---

[119]CMH Opp. #3 at 5.

[120]Bakst MIL #4 at 2.

1    agreement itself.[121]  He contends the articles should be excluded because "no legitimate purpose

2    is served by the introduction of needless[ly] duplicative . . . evidence reporting the same basic

3    fact."[122]  Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative

4    value is substantially outweighed by the danger of . . . waste of time, or needless presentation of

5    cumulative evidence."  FED.R.EVID. 403.  "Rule 403's cumulative evidence provision does not

6    prohibit the introduction of cumulative evidence; rather, it merely permits courts to exclude

7    cumulative evidence when it has little incremental value."  *United States v. Miguel*, 87 Fed. Appx.

8    67, 68 (9th Cir. Jan. 30, 2004) (Unpub. Disp.); see also *United States v. Taylor*, 127 F.3d 1108,

9    1997 WL 661153, *2 (9th Cir. Sept. 25, 1997) (Unpub. Disp.) ("even cumulative evidence is not

10   necessarily excludable under Rule 403 – evidence must be needless[ly] cumulative before its

11   admission by the district court amounts to an abuse of discretion," citing *United States v.*

12   *Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990)).

13       Bakst contends that admitting the articles will create an "improper inference that CMH's

14   public disparagement of Bakst was somehow justified or appropriate because of wrongdoing on

15   the part of Bakst . . . [and will] obfuscate[ ] the fact that absolutely no liability was admitted by

16   Bakst as part of his settlement with the OIG."[123]  He also asserts that the evidence will cause the

17   jury to "misunderstand the legal effect and practical considerations of a settlement without

18   admission of liability."[124]

19       CMH contends the articles are relevant to causation and damages.[125]  Specifically, it asserts

20   contends that the articles are relevant to prove that plaintiff's unemployability "was caused by

21

22

23       [121]*Id*. at 6.

24

25       [122]Bakst MIL #4 at 6.

26       [123]*Id*.

27       [124]*Id*. at 7.

28       [125]CMH Opp. #4 at 1.

63

1   factors completely independent of any allegedly disparaging statements by the Hospital."[126]   For
2   example, CMH cites a statement in a press release by Lewis Morris, Chief Counsel to the OIG,
3   that "'[t]he Office of Inspector General strongly believes that, in addition to holding corporations
4   accountable for healthcare fraud, individuals who caused the fraud should also be held
5   accountable.'"[127]   The press release mentioned Bakst's involvement in such as way that a
6   reasonable reader would understand that he was the "individual[ ]" to whom Morris referred.
7   CMH contends that this public statement by the OIG, and other press coverage of the settlement,
8   was more significant to Bakst's alleged inability to obtain employment than any actionable
9   statements it made.   The court agrees with CMH that, to the extent it seeks to admit the evidence
10   not to prove the fact of the settlement, but to prove that the settlement was public knowledge, the
11   articles are not cumulative under Rule 403.

12       Bakst also contends, however, that the article containing Morris' statement is inadmissible
13   hearsay.[128]   As has been stated, "[h]earsay" consists of an out-of-court "statement," including a
14   "written assertion," "offered in evidence to prove the truth of the matter asserted."   FED.R.EVID.
15   801.   Hearsay is generally inadmissible at trial.   See FED.R.EVID. 802.   Here, however, CMH
16   does not offer the article to prove the truth of the matter asserted – that individuals who cause the
17   fraud *should* be held accountable – but rather to prove that the statement was made.   For the same
18   reasons the article is not cumulative, the fact that the statement was made, regardless of its truth,
19   is relevant to CMH's defense that factors other than its allegedly disparaging statements led to
20   Bakst's inability to obtain employment.[129]

21

22       [126]*Id.* at 3.

23       [127]

24       [128]Bakst Reply #4 at 2.

25       [129]Bakst also contends that the articles containing Morris's statement constitute multiple
26   levels of hearsay and are inadmissible as a consequence.   In order for a hearsay statement within
27   another hearsay statement to be admissible, both statements must satisfy a hearsay exception.
28   *Padilla v. Terhune* , 309 F.3d 614, 621 (9th Cir. 2002) ("Hearsay included within hearsay is not
   excludable by the hearsay rule under California law [ ] or federal law [ ], so long as each link in

When evidence is admitted for a reason other than to prove its truth, a limiting instruction is appropriate. See, e.g., *Payne*, 944 F.2d at 1472 (finding no error where "[t]he defense objected to this testimony on hearsay grounds but was overruled by the court, which explained to the jury: 'I am overruling this objection, but I want you to understand I'm overruling it so that the witness can explain why she did what she did after that, or to give meaning to what happened after that, not necessarily that what somebody told her was the truth'"). Jurors are generally presumed to follow the instructions they are given by the court. See *Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions," citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); see also *United States v. Erevia-Suarez*, 132 F.3d 40, 1997 WL

---

the hearsay chain conforms to a separate hearsay exception."). To the extent Bakst's argument rests on the fact that Morris' statement is hearsay, the court has concluded that it is not. Likewise, because the articles are being introduced simply to show that they were published with Morris' purported statements in them, they are not being offered for the truth of the information contained in them. Stated differently, whether or not they contained true information – i.e., whether or not the statements quoted in the articles were actually made – a jury could find that the fact that the articles were published damaged Bakst's reputation. Cf. *United States v. Isaacs*, 359 Fed. Appx. 875, 877 (9th Cir. Dec. 22, 2009) (Unpub. Disp.) ("Judge King did not err when he took judicial notice of the Times articles because the articles were not hearsay. Hearsay is an out of court statement offered for the truth of the matter asserted. Fed.R.Evid. 801(c). The out of court statements contained in the Times articles were not offered for the truth of the matter asserted. Judge King's determination of whether Judge Kozinski's recusal was proper under § 455(a) required Judge King to assess whether a reasonable person with knowledge of all of the facts would question Judge Kozinski's impartiality. Because Judge King's judicial notice accepted only the existence of the Times articles, the articles were not hearsay");*United States v. Lewis*, 62 Fed. Appx. 757, 761 (9th Cir. Feb. 28, 2003) ("Hearsay evidence is generally not admissible. . . . A statement is only hearsay, however, if it is offered 'to prove the truth of the matter asserted.' . . . Here, the district court did not abuse its discretion because the government introduced the partially redacted article to show Appellants' knowledge and not for the truth of the allegations in the article"); *Hiram v. United States*, 354 F.2d 4, 6 (9th Cir. 1965) ("The newspaper article was not hearsay since it was not offered for the truth of the matter stated therein but only to show notice to the appellant, as the district court's limiting instruction to the jury correctly stated"); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, __ F.Supp.2d __, 2010 WL 3835673, *12 n. 3 (C.D. Cal. Sept. 30, 2010) ("The Court considers the newspaper article offered by VITI because statements attributable to the FIJI CEO are non-hearsay admissions, and the statements in the article are offered as evidence of "touting," not for the truth of the matter asserted").

759111, *2 (9th Cir. Dec. 09, 1997) (Unpub. Disp.) (affirming a conviction where "[t]he testimony regarding Agent Valencia's statement was properly admitted solely for the purpose of its effect on the listener, Agent LaGasse[,]" and "[t]he jury was instructed as such"); *Highland Capital Management, L.P. v. Schneider*, No. 02 Civ. 8098(PKL), 2008 WL 3884363 (S.D.N.Y. Aug. 20, 2008) ("[D]uring the trial, the Court issued a limiting instruction to the jury regarding evidence admitted under the state of mind exception to the hearsay rule, stating that it may only be considered as evidence of the state of mind of the speaker or listener.  In addition to repeating the instruction at appropriate times during the trial, the Court included the limiting instruction in its Jury Charge. . . . The instruction cured any potential unfair prejudice that defendants might have suffered").  The court thus concludes that a limiting instruction will be sufficient to prevent the confusion about which plaintiff is concerned.

Given the probative nature of the articles, and the fact that jurors can be given an appropriate limiting instruction, the risk of unfair prejudice due to juror confusion is minor and does not justify the exclusion of this evidence.  Consequently, the court denies plaintiff's motion *in limine* to exclude articles regarding plaintiff's settlement with the OIG.  The court concludes, however, that it would be unnecessarily cumulative to admit nine newspaper articles, containing duplicative information regarding Bakst's settlement and Morris' statements, for the purpose of demonstrating that entities other than CMH publicly disparaged Bakst.  The court therefore directs the parties to meet and confer in an effort to agree on two articles regarding Bakst's settlement with the OIG that can be admitted into evidence, and on a stipulation that can be read to the jury regarding the total number of similar articles that were published.

**N.     Bakst's Motion *in Limine* to Preclude the Testimony of CMH's Expert, Martin B. Ross, Ph.D.**

Bakst also moves to preclude the testimony of CMH's damages expert, Martin B. Ross, Ph.D., asserting that he is an improper rebuttal expert.  As the testimony of Bakst's affirmative damages expert, Wunderlich, has been excluded, and Ross was allegedly retained to rebut Wunderlich's testimony, this motion is moot.  Because the testimony Ross was hired to rebut will not be offered, Ross may not testify.  The court notes, moreover, that even had it not excluded

Wudnerlich's testimony, it would have precluded Ross from testifying as an improper rebuttal
expert because his testimony did not directly refute any opinion in Wunderlich's report.

Rule 26(a)(2)(D)(ii) defines a rebuttal expert as one who offers evidence "intended solely
to contradict or rebut evidence on the same subject matter identified by another party[.]"
FED.R.CIV.PROC. 26(a)(2)(D)(ii).  "The supplemental or 'rebuttal' experts[, therefore,] cannot
put forth their own theories; they must restrict their testimony to attacking the theories offered by
the adversary's experts.  In this respect, a party can control the scope of the testimony of its
adversary's rebuttal experts by limiting its own experts' testimony to a given subject matter."
*International Business Machines Corp. v. Fasco Indus., Inc.*, C-93-20326 RPA, 1995 WL
115421, *3 (N.D. Cal. Mar. 15, 1995).

Judge Otis D. Wright II of this district recently considered a similar issue in *Vu v.
McNeil-PPC, Inc.*, No. CV 09-1656 ODW (RZx), 2010 WL 2179882 (C.D. Cal. May 7, 2010).
There, plaintiff designated a forensic toxicologist, one Dr. Kelly, who provided a Rule 26 report
"focus[ing] on the risks associated with administering cold and cough medicine that contain the
same components found in Children's Tylenol to children." *Id.* at *2.  Dr. Kelly "opine[d] that
the combination of such components could be 'very toxic to small children, with many emergency
room visits, hospitalizations[,] and several deaths to their credit[ ]' [and] conclude[d] that [the
plaintiff's son] 'died of the acute intoxicating effects of the children's cold formulation' that was
administered to him the night before his death." *Id.*  Defendant designated two purported rebuttal
experts whose reports "include[d] an examination of possible alternative causes of [the child's]
death, including co-sleeping, viral bronchiolitis, sudden infant death syndrome [ ], and E. coli."
*Id.*  The court found defendant's "blanket characterization of Drs. Banner and Beckwith as
'rebuttal experts' . . . disingenuous" because their "opinions [went] beyond the boundaries of Dr.
Kelly's report." *Id.* at *3.  It rejected defendant's argument that "because Dr. Kelly opined on
[the child's] cause of death, [defense] [e]xperts [were] entitled to opine on alternative causes of
death because all of the[ ] opinions deal with the same subject matter." *Id.*  The court noted that

> "[i]f the phrase 'same subject matter' is read broadly to encompass any possible
> topic that relates to the subject matter at issue, it will blur the distinction between

'affirmative expert' and 'rebuttal expert.'  More importantly, such broad reading of Rule 26(a)(2)(C)(ii) will render the scope of the subject matter limitless and will lead to unjust results . . . .  Here, as a result of Costco's belated disclosure, Plaintiffs are prevented from rebutting any of Costco's expert opinions dealing with matters outside the scope of Dr. Kelly's report because the deadline for disclosing rebuttal experts has passed.  This is a hornbook example of sandbagging, a litigation tactic this Court will not tolerate." *Id.*

As a consequence, the court excluded the testimony of the two experts, with the exception of a small portion of one's testimony that directly rebutted Dr. Kelly's opinions regarding the risks associated with administering cold medicine to children and the toxicity of the active ingredients in Children's Tylenol.  *Id.*

*Vu* is persuasive.  As the court has noted, Wunderlich is a damages expert.  His testimony amounts to an economic calculation of the compensation Bakst would have received had he been able to find a comparable position in the healthcare industry, based on his age, experience, and the healthcare market at the time.  Ross is a causation expert.  While causation and damages are closely linked, Ross' testimony does not "solely . . . contradict or rebut [the] evidence" in Wunderlich's report; it "put[s] forth [Ross'] own theories" rather than simply "attacking the theories offered by" Wunderlich.  As in *Vu*, a finding that an employability expert's report rebuts a damages expert's report simply because it undermines plaintiff's damages calculation is too broad a reading of the "same subject matter" limitation in Rule 26(a)(2)(D)(ii).  In *Vu*, the purported rebuttal experts sought to undermine Dr. Kelly's report by offering opinions on alternative causes of death.  Here, Ross seeks to undermine Wunderlich's damages calculation by offering opinions as to alternative causes of Bakst's failure to obtain employment.  As in *Vu*, Ross' testimony "go[es far] beyond the boundaries of" Wunderlich's report."[130]

---

[130]It is particularly telling that Ross's report does not state he reviewed Wunderlich's export report in reaching his conclusions.  Ross later testified that he reviewed Wunderlich's report solely to obtain guidance as to how to format his report.  Ross in fact acknowledged that he "didn't review [Wunderlich's report] to find out – to determine if it was accurate" or "for the purpose of

Ross, therefore, was improperly designated a rebuttal expert; since he is clearly an affirmative expert, his designation and the disclosure of his report came too late. In this regard, CMH has not met its burden of demonstrating that its failure to disclose Ross in a timely fashion as an affirmative expert was "harmless." FED.R.CIV.PROC. 37(c)(1); *Yeti*, 259 F.3d at 1107. Although Bakst had an opportunity to depose Ross, CMH's belated disclosure prevented Bakst from designating an expert to rebut Ross' opinions regarding causation because the deadline for disclosing rebuttal experts had passed. CMH's failure to disclose Ross as an affirmative expert thus prejudiced Bakst's ability to combat Ross' testimony effectively. For these reasons, the court would grant Bakst's motion *in limine* to exclude Ross' testimony even if Wunderlich's testimony had not been excluded.

**O.**    **Bakst's Motion *in Limine* to Preclude CMH from Calling Bakst's Counsel as a Witness and to Exclude Evidence of Counsel's Website**

Bakst seeks an order (1) precluding CMH from calling his attorney, Michael Amir, as a witness; and (2) excluding evidence regarding the re-posting of a November 15, 2007 Star article on Amir's website. CMH intends to have Amir testify regarding the following matters: (1) his communications with the press concerning Bakst and CMH; (2) his communications with CMH representatives regarding Bakst's cooperation with the OIG investigation under the terms of the Settlement Agreement; and (3) his communications with CMH representatives concerning Bakst's indemnity demands.[131] CMH also plans to introduce evidence that Amir re-posted the November 15, 2007 Star article, which allegedly contains disparaging statements about Bakst, to show that

rebutting any opinion that [Wunderlich] put forth in his report." (Amir Decl., Exh. 7 (Ross Depo.) at 71:8-23.) This demonstrates that his testimony was not "intended solely to contradict or rebut evidence on the same subject matter identified by" Bakst. FED.R.CIV.PROC. 26(a)(2)(D)(ii).

[131]CMH deposed Amir on September 23, 2010. CMH contends that although Amir "agreed to the deposition without precondition," he "repeatedly asserted objections." (CMH Opp. #6 at 10-11).

plaintiff is responsible for aggrandizing his own injuries.[132]

"A tribunal should not permit a lawyer to call opposing trial counsel as a witness unless there is a compelling need for the lawyer's testimony."  RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 108(4).  Allowing an attorney to serve as an advocate and as a witness during the same trial can undermine the goals of the adversarial system.  See, e.g., *Smith, Smith & Kring v. Sup. Ct. (Oliver)*, 60 Cal.App.4th 573, 578 (1997) ("Where a lawyer representing a party in trial is also a witness during the trial, his or her effectiveness, both as a lawyer and as a witness, may be impaired in the eyes of the fact finder.  Such disadvantage inures to the detriment of the party being represented by the lawyer serving the dual function"); RESTATEMENT § 106 cmt.e. ("Calling opposing counsel may also create the false impression in the eyes of a jury that the lawyer was improperly involved in the underlying transaction"); see also *Guam Election Com'n v. Responsible Choices for Adults Coalition*, No. CVA06-018, 2007 WL 4689002, *19 (Guam Ter. Dec. 28, 2007) ("Normally, [a] tribunal should not permit a lawyer to call opposing trial counsel as a witness . . . in part because it may interfere with counsel's function as an advocate").

Consequently, courts have required "extraordinary circumstances" or "compelling reasons" before allowing trial counsel to participate as a witness.  See, e.g., *United States v. Lorenzo*, 995 F.2d 1448, 1452 (9th Cir. 1993) ("A federal prosecutor may testify at a trial in which he is participating only if there is a compelling need"); *Reece v. Pocatello/Chubbuck Sch. Dist.* No. 25, No. 4:09-CV-087-BLW, 2010 WL 4066395, *4 (D. Idaho Oct. 14, 2010) ("Absent extraordinary circumstances or compelling reasons, an attorney who participates in a case should not be called as a witness"); see also *United States v. Dack*, 747 F.2d 1172, 1176 n. 5 (7th Cir. 1984) ("Where evidence is easily available from other sources and absent 'extraordinary circumstances' or 'compelling reasons' an attorney who participates in the case should not be called as a witness," citing *United States v. Johnston*, 690 F.2d 638, 644 (7th Cir. 1982)).

CMH contends it has compelling reasons to call Amir because he has information regarding

---

[132]*Id.*

70

events that cannot be obtained from other sources.  Bakst disagrees, stating that any unprivileged

information can be obtained from other sources.[133]  The court agrees with Bakst. All three of the

issues about which CMH intends to question Amir involve Amir's *communications* with

newspaper reporters or CMH officials.   To the extent these communications are relevant to

CMH's case, it can call other witnesses who participated in the conversations.  The is particularly

true of Amir's communications with CMH officials.  There is no question that CMH can procure

the presence at trial of its own officers and directors to testify regarding their communications with

Amir regarding Bakst's cooperation with the OIG investigation and Bakst's indemnity demands.

Amir's testimony on these subjects is therefore unnecessary.  To the extent, moreover, that CMH

seeks to introduce statements Amir made to members of the press, it can call the reporters who

interviewed Amir.[134]

---

[133]Bakst MIL #6 at 2.

[134]Although CMH contends the "reporters' shield" will prevent it from obtaining a full account of Amir's conversations with reporters (CMH Opp. #6 at 14), it proffers no evidence that any reporter plans to invoke the reporter's shield.  Indeed, to the extent information is sought from Star reporter Kathleen Wilson, her willingness to sit for a lengthy deposition and testify to conversations she had prior to writing her articles suggests the concern is misplaced.

Both Bakst and CMH assert that they intend to offer these articles as exhibits.  (Bakst MIL #6 at 2).  Though neither party has addressed this issue, the court notes that the articles themselves may be barred as inadmissible hearsay.  Generally, newspaper articles are considered hearsay when offered for the truth of the matter asserted.  See *United States ex rel. Woods v. Empire Blue Cross and Blue Shield*, No. 99 Civ. 4968(DC), 2002 WL 1905899, *1 n. 1 (S.D.N.Y. Apr. 19, 2002); *In re Columbia Securities Litigation*, 155 F.R.D. 466, 474 (S.D.N.Y. 1994) (holding that press reports were hearsay because they were out-of-court statements offered to prove the truth of the matter asserted).  Even when the actual statements quoted in a newspaper article are nonhearsay, their repetition in the newspaper creates a hearsay problem.  See *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991) ("As the reporters never testified nor were subjected to cross-examination, their transcriptions of Gates's statements involve a serious hearsay problem").  For this reason, statements in newspapers often constitute double hearsay.  See *United States Football League v. Nat'l Football League*, No. 84 CIV. 7484 (PKL), 1986 WL 5803, *2 (S.D.N.Y.  May 16, 1986) (holding that statements of belief by unknown declarants reiterated in a newspaper article constituted hearsay within hearsay).

Here, the statements in the newspaper articles may be admissible non-hearsay because, to the extent they are attributable to Amir as Bakst's agent or to CMH, they are the statements of a party opponent.  This does not, however, make the articles themselves admissible to prove the

The court likewise concludes that there is no compelling reason to call Amir as a witness to question him regarding his firm's posting of the November 15, 2007 Star article on its website. Any witness who viewed the article on Amir's website can authenticate it, and CMH has identified no "compelling need" as to why Amir's testimony on the point is required.  The court disagrees with Bakst, however, that evidence of the re-posting is irrelevant or cumulative because the article in question will be offered as a trial exhibit.[135]  The argument is not persuasive because CMH intends to offer evidence of the re-posting to show that Bakst is in part responsible for his own damages.  Because evidence that the article was posted on the website will be offered for a different purpose than the article itself, it is not cumulative.

The court thus grants Bakst's motion to the extent it seeks to preclude CMH from calling Amir as a trial witness; it denies Bakst's request to exclude evidence that Amir posted the November 15, 2007 Star article on his website.

## P.   Bakst's Motion *in Limine* to Exclude Evidence Regarding Past Negative Events Involving Him

Bakst next asks the court to exclude evidence of any negative event involving him that predated the parties' November 26, 2003 Settlement Agreement, "such as the prior dispute between Bakst and the medical staff, discontent with Bakst's administration expressed by certain CMH employees, negative videos made by certain physician associations regarding Bakst's viewpoints, and even negative comments originating from Bakst's political opponents."[136]  Bakst contends the evidence is inadmissible because (1) CMH released all claims regarding these events in the Settlement Agreement; and (2) the evidence is irrelevant or unfairly prejudicial.

Bakst contends first that the general release in the November 23, 2003 Settlement

---

truth of the matter asserted – that Amir or CMH's alleged agents actually made the statements quoted.  If the parties, therefore, intend to offer the newspaper articles they have identified to prove that particular statements were made, they should be prepared to explain why the articles are non-hearsay and are admissible.

[135]Bakst MIL #6 at 2.

[136]Bakst MIL #7 at 3-4.

Agreement bars CMH from accusing Bakst of engaging in allegedly negative conduct prior to that date.  The general release states, in pertinent part,

> "General Release: . . . Organization releases Employee from all liabilities, causes of action, charges, complaints, suits, claims, obligations, costs, losses, damages, injuries, rights, judgments, attorney's fees, bonds, bills, penalties, fines, and all other legal responsibilities of any form whatsoever, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, which the Organization now has, or may have had, including, but not limited to, all claims arising out of or pertaining directly or indirectly to any controversy between Employee and Organization, including, but not limited to, any controversy arising from Employee's employment with the Organization, or his service on any of Organization's Boards of Directors, or his actions in connection with advances to Employee, prior to the effective date of this Agreement."[137]

Bakst contends that CMH's broad release of all "charges, complaints, suits, claims" arising out of Bakst's employment with the organization, not only prevents CMH from filing legal claims against Bakst, but was "intended to prohibit the general use and exploitation of the parties' negative history."[138]

Bakst has not cited authority supporting his extraordinarily broad interpretation of the release.  The interpretation of a release or settlement agreement is governed by the same principles applicable to contracts generally.  *Cohen v. Five Brooks Stable*, 159 Cal.App.4th 1476,1483 (2008) ("Contract principles apply when interpreting a release, and normally the meaning of contract language, including a release, is a legal question").  "In ascertaining the legal effect of a release, one must look to the instrument itself to determine the intent of the parties."  *Hofland v. Gustafson*, 132 Cal.App.2d Supp. 907, 909 (1955); *Cohen*, 159 Cal.App.4th at 1485 ("The

---

[137]Declaration of Steven E. Bledsoe ("Bledsoe Decl."),  No. 48 (September 17, 2010), Exh. D (Wolfe Depo.), Exh. 33 (Settlement Agreement) at 2.

[138]Bakst MIL #7 at 4.

scope of a release is determined by its express language"). It is accepted that "a general or unconditional release is the broadest form of release. Typically, by its terms it releases all claims, actions, and damages arising from or relating to a particular incident or event or relationship between the parties." 29 WILLISTON ON CONTRACTS § 73:4 (4th ed. 2010) (citing cases from fourteen state and federal jurisdictions).

Under California law, the language contained in the Settlement Agreement is meant to provide a broad release of legal claims. See, e.g, *Villacres v. ABM Industries Inc.*, 189 Cal.App.4th 562, 587 (2010) (interpreting a general release of "any and all claims, debts, liabilities, demands, obligations, . . . damages, action or causes of action . . . wages, penalties, interests, costs and attorneys' fees" to cover legal claims under the Private Attorney General Act); *Perez v. Uline, Inc.*, 157 Cal.App.4th 953, 959 (2007) (applying general release to bar claims of defamation and violations of the California Labor Code). The court has found no case law, however, suggesting that such a release prevents a party from making reference to pre-release conduct in the context of a lawsuit brought by the other party to the settlement. Indeed, the law seems to be to the contrary.

This reading is also consistent with the doctrine of *noscitur a sociis*. Under this canon, "an ambiguous term may be given more precise content by the neighboring words with which it is associated." *United States v. Stevens*, 559 U.S. ___, 130 S.Ct. 1577, 1587 (2010). In this case, Bakst contends that the terms "charges" and "complaints" should be construed to mean any "accusation[s]" or the "general use and exploitation of [the parties'] negative history[.]"[139] When considered in the context of the full sentence, however, it is clear that the terms "charges" and "complaints" are legal terms of art, which prohibit CMH from bringing formal legal action against Bakst. In the Settlement Agreement, CMH releases Bakst from "all liabilities, causes of action, charges, complaints, suits, claims, obligations, . . . and all other legal responsibilities of any form whatsoever . . . ." Black's Law Dictionary defines "charge" as "[a] formal accusation of an offense as a preliminary step to prosecution" and "complaint" as "[t]he initial pleading that starts

---

[139]*Id.* at 5.

a civil action and states the basis for the court's jurisdiction, the basis for the plaintiff's claim, and the demand for relief." BLACK'S LAW DICTIONARY (9th ed. 2009). Both definitions suggest that the terms refer to the initiation of formal legal process. Thus, the Settlement Agreement evinced the parties' intent that CMH be precluded from taking legal action against Bakst based on his conduct as CEO. It does not evince an intent that CMH be precluded from from referencing the parties' history in the event Bakst files suit against CMH.

Even *Bell v. Vista Unified School Dist.*, 82 Cal.App.4th 672 (2000), the case heavily relied on by Bakst, is not to the contrary. There, the court interpreted the meaning of "charges" and "complaints" in California Government Code § 54957, which requires "[a]s a condition to holding a closed session on specific *complaints or charges* brought against an employee by another person or employee, [that] the employee . . . be given written notice of his or her right to have the *complaints or charges* heard in an open session rather than a closed session, which notice shall be delivered to the employee personally or by mail at least 24 hours before the time for holding the session." See CAL. GOV'T CODE § 54957(b)(2). The court noted that "[b]oth complaint and charge connote an accusation, something which is brought against an individual." *Bell*, 82 Cal.App.4th at 683. Bakst quotes this portion of *Bell* as support for his argument that "complaint" and "charge," as used in the general release, should be read to preclude CMH from making any accusation against or negative statement about him. Later in the opinion, however, the *Bell* court equated an "accusation" with "an indictment brought against [plaintiff] with potential disciplinary consequences." *Id.* Thus the only case Bakst cites to support his broad reading of the release suggests that the terms in the release are meant to refer to the initiation of a formal action with legal consequences, not to defense of an action initiated by the released party. Cosnequently, the court finds that the Settlement Agreement does not prevent CMH from adducing evidence regarding Bakst's pre-2003 conduct and the history of the parties' relationship.

The evidence Bakst seeks to exclude is directly relevant to both of his causes of action. Most notably, Bakst contends that CMH breached a duty to indemnify him for the costs he incurred in connection with the OIG investigation. As noted, California Labor Code § 2802 requires indemnification "for all necessary expenditures or losses incurred by the employee in

75

direct consequence of the discharge of his or her duties[.]" To determine whether Bakst is entitled to indemnification under § 2802, the jury must decide whether he was acting within the scope of his employment when he engaged in the conduct for which he was investigated by the OIG, i.e., the making of gifts and loans to physicians and other medical staff. This conduct occurred before the 2003 settlement with CMH. It would be impossible for the jury to evaluate whether or not Bakst was acting within the scope of his employment if CMH were barred from introducing evidence Bakst's conduct prior to 2003. Bakst tacitly acknowledges this in his reply.[140]

Additionally, Bakst seeks to exclude evidence of his "prior dispute [with] the medical staff, discontent with Bakst's administration expressed by certain CMH employees, negative videos made by certain physician associations regarding Bakst's viewpoints, and even negative comments originating from Bakst's political opponents." CMH contends that all of this evidence is relevant to its arguments regarding causation. CMH asserts that pre-2003 events, such as "Bakst's bitter, public dispute with the medical staff in 2002-2003," and public statements by people inside and outside CMH made Bakst "unemployable as a CEO in the healthcare industry since the day he signed the settlement agreement on November 26, 2003."[141] It contends that, as a result, evidence of public statements made prior to 2003 or evidence of publicly known hostility toward Bakst in the medical community, as reflected in the negative videos, is relevant to determine whether Bakst can prove that CMH's actionable statements caused his damage. As the court has noted, it agrees with CMH that such evidence is relevant to its defense.

Bakst also contends that even if the evidence is relevant, it should be excluded under Rule 403 as unfairly prejudicial. He asserts that "parading [before] the jury all the negative history CMH can find will unduly create an emotional bias against Bakst and inflame the jury."[142] Evidence of the basis for the OIG's investigation of Bakst, such as the gifts he allegedly gave to hospital employees, may well cast Bakst in a negative light. Because Bakst has challenged CMH's

---

[140]See Bakst Reply #7 at 6.

[141]CMH Opp. #7 at 5.

[142]Bakst MIL #7 at 8.

1    failure to indemnify him for this conduct, however, the evidence Bakst seeks to exclude is critical

2    to the jury's ability to resolve the issue put before it.  Stated differently, the probative value of the

3    evidence is so great that any prejudicial effect is outweighed.  See *Gross v. Black & Decker*

4    *(U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir. 1983) ("Probative evidence will frequently be prejudicial

5    to a party, but that does not mean that it will cause the factfinder to ground a decision on an

6    emotional basis").  As respects evidence of Bakst's public reputation in the medical community

7    prior to his resignation from CMH, this evidence is unlikely to have "an undue tendency to

8    suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

9    *Haney*, 203 F.3d at 1172.  The fact that Bakst's employees publicly disagreed with his

10   management style is not the kind of evidence that will give rise to an emotional or improper

11   reaction in the mind of the jury; nor does it create a risk that the jury will absolve CMH of

12   liability on this basis.

13        It is important to note, however, that the court's ruling does not permit CMH to offer

14   evidence regarding private dissent or grumblings about Bakst's leadership.  Only evidence of

15   "negative events" that was publicly known is relevant to CMH's attempt to negate Bakst's proof

16   of causation.  To ensure that the evidence CMH seeks to introduce is of this type, therefore, the

17   court directs CMH to file a written offer of proof within seven days of the date of this order,

18   outlining the proof of this type that it seeks to introduce.  Bakst may file a response within seven

19   days of CMH's offer of proof.

20        **Q.    Bakst's Motion *in Limine* to Exclude Evidence and Argument Regarding Any**

21             **Alleged Right to Make Disparaging Statements**

22        Bakst also moves to exclude any evidence or argument regarding CMH's alleged right to

23   make disparaging statements.  Though Bakst's motion is broadly phrased, he clarifies that he

24   makes the motion "because the Court has already ruled on Summary Judgment that the

25   disparaging statements made by Defendant in its third-party lawsuit against its former attorneys

26   and accountants [ ] are not protected under the litigation privilege.  Allowing CMH to make such

27   [an] argument would amount to re-litigation of the issue at trial, which is disfavored in this

28

77

District."[143]   The remainder of the motion focuses on Bakst's "anticipat[ion] that CMH may

attempt to present arguments to the jury that this Court [has] will already resolve[d] prior to trial.

 Specifically, CMH may argue to the jury that its disparaging statements should be protected or

that CMH has a 'right' to make these  statements, whether under a right to pursue its legal claims

or even a right to speak freely."[144]  Because the court cannot render advisory opinions on any and

all rights CMH might assert, it will focus on the issues squarely presented by Bakst's motion:

whether CMH may argue (1) that California's litigation privilege protects statements made in the

state court action against its former accounting firm; or (2) that statements by CMH, either to the

press or in the litigation, are protected by the right to free speech.

For the most part, the court agrees with Bakst that CMH cannot make such arguments.

The court has concluded as a matter of law that the litigation privilege does not bar Bakst's claim

for breach of the non-disparagement clause to the extent it is based on statements made in the state

court litigation.  Therefore, it would be improper to allow CMH to argue a contrary view to the

jury.  Likewise, to the extent the parties had a valid, enforceable contract that included a non-

disparagement clause, CMH waived any right to free speech it might otherwise have had under

the California or federal constitution.  See *A.H.D.C. v. City of Fresno, Cal.*, No. CV-F-97-5498

OWW SMS, 2000 WL 35810723, *7 (E.D. Cal. Aug. 31, 2000) ("It is possible to waive First

Amendment speech rights by contract, if such rights are 'voluntarily, knowingly, and intelligently

waived,'" citing *ITT Telecom Products Corp. v. Dooley*, 214 Cal.App.3d 307, 319 (1989), and

*Leonard v. Clark*, 12 F.3d 885, 887 (9th Cir. 1994)).  Consequently, CMH cannot argue that it

had a free speech right to disparage Bakst in the face of a valid non-disparagement provision in

the Settlement Agreement.

This ruling, however, does not prevent CMH from asserting the affirmative defenses

mentioned in its opposition, many of which are designed to show that the contract is invalid or

unenforceable – i.e., acquiescence, illegality and/or unenforceability of the contract, lack of

---

[143]Bakst MIL #8 at 1.

[144]*Id.* at 6.

mutual consent, fraudulent procurement of the contract, and failure of consideration.[145]  The court will instruct the jury that if it finds the contract invalid or unenforceable, it should find that CMH did not waive its right to free speech or the protection of the litigation privilege.  Likewise, CMH can present evidence that the individual physicians quoted in the Star articles were not speaking on CMH's behalf and were not parties to the Settlement Agreement.  The court will instruct the jury that CMH cannot be held liable for any damages caused by a physician speaking not as a representative or agent of CMH.

It is possible that evidence of CMH's disclosures to the OIG will be presented at trial, as CMH contends that "[e]vidence of these disclosures . . . is highly relevant to causation and damages and thus will almost certainly be presented to the jury."[146]  To the extent evidence of the disclosures is admissible, the court agrees with CMH that the disclosures should be placed in proper context to ensure the jury understands that CMH was legally obligated to make the disclosures and that they are protected by the litigation privilege.  If CMH demonstrates that it is entitled to admit evidence of the substance of its disclosures to the OIG, the court will give an appropriate instruction to the jury regarding the purposes for which it can consider such evidence. The parties are directed to meet and confer to determine if such evidence is admissible and to submit a proposed instruction for the court's consideration if they believe that it is.  The court will make an independent determination regarding the admissibility of the evidence.

Bakst is correct that references by CMH to the existence of a litigation privilege or a right

---

[145]CMH Opp. #8 at 4.

[146]*Id.* at 6.  The court does not necessarily agree with CMH on this point.  It is the court's understanding that the statements made by CMH in its disclosures to the OIG and IRS were never made public.  Thus, it is unclear how they could have caused Bakst's inability to secure employment or his damages.  The *effect* of the disclosures – i.e., the OIG's public investigation of Bakst – is clearly relevant.  It is not as clear, however, that CMH's statements to the agencies have any relevance.  Once again, therefore, the court directs CMH to make a written offer of proof within seven days of the date of this order, outlining the evidence of statements to the OIG it seeks to admit, and describing why such statements are relevant.  Bakst may file a response within seven days after the date the offer of proof is filed.

to free speech has the potential to confuse the jury.[147]  This risk of confusion, however, is not so significant that it justifies the broad relief he requests.  Precluding all reference to a right to make the statements could unfairly prevent CMH from presenting an affirmative defense that the contract was invalid, and thus it had a right to make the statements. Mindful of the risk of confusion, however, the court directs the parties to meet and confer regarding a jury instruction that will address the applicability of the litigation privilege and free speech rights if there is a finding of contract invalidity.

### R.     Bakst's Motion *in Limine* to Exclude Evidence Regarding Certain Lay Opinion Regarding Plaintiff's Employability

Finally, Bakst moves to preclude lay opinion testimony regarding his employability. During his deposition, Bakst testified that certain individuals privy to a confidential OIG investigation of CMH in approximately August 2005 formed the opinion that he would had extreme difficulty finding a comparable job in the healthcare industry.[148] Bakst stated that he approached and spoke with several individuals, including Ken Strople, Dan Smith, Steve Valentine, Conrad Vernon, Richard Reisman, and Denise Paully, and asked for their opinion of his prospects of securing a job. These individuals generally opined that in light of the OIG

---

[147]See Bakst Reply #8 at 2 ("For example, if CMH were to argue that the Hospital has a right to pursue legitimate claims against third-parties, or that the Hospital has a right to have access to the courts, these alleged "rights" are clearly encompassed within the litigation privilege, and therefore will already [have been] decided by this Court by the time of trial.  Thus presenting them – even in argument – to the jury will give the jury the false impression that these rights may be applicable to the statements at issue.  As a result, these arguments will mislead the jury in a manner prejudicial to Bakst, as it provides a basis for the jury to rule against Bakst despite the fact that this right is not relevant to the remaining issues at trial"); *id.* at 3 ("However, allowing CMH to make these arguments will improperly inject into the jury's mind an idea that CMH does in fact have a right to speak freely to the press, despite the existence of a valid non-disparagement and confidentiality clause. It is not uncommon for individual lay persons to misunderstand the applicability of free speech, and thus injecting this well-known and highly publicized concept into the arguments at trial will substantially prejudice Bakst, as it will confuse and mislead the jury as to what the actual issues are at trial, and may lead the jury to absolve CMH of liability on a ground that is irrelevant to the case").

[148]Amir Decl., Exh. 15 (Bakst Depo.) at 284:6-14.

investigation, Bakst would no longer be able to work in the healthcare industry.  Bakst testified,

for example, that Strople, a CMH administrator, told Bakst the OIG investigation had made him

radioactive.[149]  Similarly, Bakst testified that Smith, a healthcare consultant, said that his job

prospects did not look good in light of the OIG investigation.[150]  Bakst further testified that

Valentine, another healthcare consultant Bakst approached for assistance in finding a job, told him

the same.[151]  Bakst stated that Vernon told him he was unemployable "in light of the OIG

investigation."[152]  He testified that Reisman said he believed Bakst was unemployable in light of

CMH's disclosures to the government.[153]  Finally, Bakst testified that Paully, a partner with

---

[149]CMH Opp. #9, Attachment 1 (Bledsoe Opp. Decl. #9), Exh A. (Bakst Depo.) at
286:10-19 ("Q: Tell me about your conversation with Ken Strople where you discussed your job
prospects. . . . A: I recall asking him what he thought my job prospects were and if he knew of
anybody that was looking for a CEO or even a COO, and he indicated that in light of his
involvement with the hospital he felt that I would be radioactive and that nobody would touch me
with a looming OIG inspection"); see also *id.* at 283:20-284:14 ("Well, around that time I recall
speaking to Ken Strople, to other people in the health care industry about their perception of my
ability to get a job in light of a pending OIG investigation, and they basically used the term I was
radioactive, and on that basis they didn't see much hope in me getting a job and thought that that
matter had to be clarified or addressed in some fashion before I could seek gainful employment").

[150]*Id.* at 287:10-23 ("Q: In addition to Ken Strople . . . , who else did you have
conversations with concerning your employability?  A: Dan Smith, Steve Valentine.  Q: Who is
Dan Smith?  A: A consultant in health care.  Q: And what did Dan Smith tell you?  A: That he
didn't see the prospect of me working in light of the investigation going on.  Q: [ ] How did Dan
Smith know about the OIG investigation of CMH?  A: He was at one time a consultant at CMH").

[151]*Id.* at 287:24-288:6 ("Q: And what did Mr. Valentine tell you about your employability?
A: That he didn't see me having any good prospects because of the OIG investigation").

[152]*Id.* at 288:23-289:8 ("Q: What did Conrad Vernon tell you?  A: That in light of the OIG
investigation he didn't see how I could be employable").

[153]*Id.* at 289:16-25 ("Q: What did Dr. Reisman tell you?  A: The impetus for the
conversation was would you be a recommending source for me, and he said he would be happy
to, but he didn't see how I could be employed in light of everything that was being done.  Q: And
when you say 'everything that was being done,' do you know what he was referring to?  A: He
was referring to the State Attorney General Report, to the IRS Report, and to the OIG Report").

1   Deloitte & Touche, LLP, specializing in the hospital industry, offered a similar opinion.[154]

2   Bakst contends that his testimony, which referenced the "personal opinion that plaintiff was

3   unemployable based on a confidential investigation that occurred in August of 2005"[155] should be

4   excluded  (1) as inadmissible hearsay under Rules 801 and 802; (2) as irrelevant under Rule 401;

5   and (3) as improper opinion evidence under Rules 701 and 702.

6   Bakst first asserts that his testimony regarding statements made by his advisors and friends

7   is hearsay because CMH will offer the statements to prove the truth of the matter asserted, i.e.,

8   that he was unemployable in the healthcare industry.[156]  CMH counters that the statements are not

9   hearsay because they constitute adoptive party admissions under Rule 801(d) of the Federal Rules

10  of Evidence.   Where a party has manifested an adoption of or belief in the truth of a statement,

11  it is not hearsay.  See FED.R.EVID. 801(d)(2)(B) ("A statement is not hearsay if . . . the statement

12  is offered against a party and is a statement of which the party has manifested an adoption or belief

13  in its truth").   For a statement to be admitted against a party as an adoptive admission under Rule

14  801(d)(2)(B), there must be evidence that the party's conduct indicated an intent to adopt the

15  statement.  The burden of proof is on the proponent to show that adoption was intended; a mere

16  reference by a party to the statement of a another is insufficient.  See *White Industries, Inc. v.*

17  *Cessna Aircraft Co.*, 611 F.Supp. 1049, 1062 (W.D. Mo. 1985).

18  CMH argues that Bakst adopted the statements made by Strople, Smith, Valentine, Vernon,

19  Reisman, and Paully because he "admits taking action[ ] based on his belief in th[e] statements."[157]

20  In particular, CMH cites Bakst's testimony that "[a]fter the hospital filed the report to the OIG,

21  [he] then had to stop [with his job search] because [he] couldn't go forward until that last specter

22

23  [154]*Id.* at 290:15-25 ("A: Denise Paully. Q: And who is Denise Paully? A: She's the partner
24  in charge of the not-for-profit health systems at Deloitte. . . . Q: Do you recall what Ms. Paully
    told you about your employability in the health care industry in light of the OIG investigation?
25  A: That she doubted that I could be employed in light of the OIG investigation").

26  [155]Bakst MIL #9 at 3.

27  [156]*Id.* at 6.

28  [157]CMH Opp. #9 at 5.

82

of doubt was cleared."[158]  Bakst explained that he stopped his job search based on the statements of his advisors regarding his employability; he said he "recall[ed] speaking to Ken Strople, to other people in the health care industry about their perception of [his] ability to get a job in light of a pending OIG investigation, and they basically used the term [that Bakst] was radioactive, and on that basis they didn't see much hope [of his] getting a job and thought that th[e] matter [of the OIG investigation] had to be clarified or addressed in some fashion before [he] could seek gainful employment."[159]

Bakst contends this evidence is insufficient to demonstrate adoption.  He cites his testimony that his advisors' comments regarding his job prospects "didn't stop [him] from seeking [employment], but added a pallor to the approach in trying to get employment."[160]  Bakst contends that "[c]learly, if [he had] truly adopted the belief that he 'could never work again in health care,' he would not have continued his employment search in health care, would not [have] continue[d] to request job leads and references, and would not [have] continue[d] to seeks other opinions regarding the matter."[161]  The court disagrees.  Bakst's deposition testimony clearly indicates that he believed his advisors were speaking the truth when they told him he was radioactive and his job prospects were low or non-existent.  See *Sea-Land Service, Inc. v. Lozen Intern.*, LLC., 285 F.3d 808, 821 (9th Cir. 2002) ("More importantly, however, Jacques' original e-mail was forwarded to Lozen by Laurie Martinez, a second Sea-Land employee.  She copied the entire body of Jacques' internal memorandum into her e-mail and prefaced it with the statement, 'Yikes, Pls note the rail screwed us up. . . .'  Martinez thereby incorporated and adopted the contents of Jacques' original message, because her remark 'manifested an adoption or belief in [the] truth' of the information contained in the original e-mail"); see also 5 Jack B. Weinstein & Margaret A.

---

[158]CMH Opp. #9 at 3 (citing Bakst Depo. at 278:3-8).

[159]*Id.*

[160]*Id.* at 297:8-16.

[161]Bakst Reply #9, Docket No. 141 (January 31, 2011) at 3.

1    Berger, WEINSTEIN'S FEDERAL EVIDENCE § 801.31 (2d ed. 2002) ("A party may adopt a [ ]

2    statement if the party uses the statement or takes action in compliance [with] the statement").

3    Bakst adopted the statements of his advisors when he repeated them at his deposition, for the

4    purpose of asserting that CMH's disclosures to the OIG caused him to lose employment

5    opportunities, and he manifested a belief in their truth by stopping his job search "until that last

6    specter of doubt was cleared." Even the statement Bakst proffers as evidence that he did not adopt

7    his advisors' views evinces a belief in the correctness of their opinion, as Bakst acknowledges that

8    his advisors' statements "added a pallor to the approach in trying to get employment." The fact

9    that he did not entirely give up his job search does not mean that he did not manifest a belief in

10   the veracity of the advisors' statements or act on them. Rather, he stopped his job search for some

11   period of time and lost faith that it would have positive results. Based on Bakst's testimony, the

12   court concludes that CMH has adduced sufficient evidence to support a finding that Bakst adopted

13   the statements of his advisors and friends. The evidence is therefore not hearsay and is admissible

14   as an adoptive admission.

15        This conclusion does not automatically result in the statements' admission, however. Bakst

16   next contends that the evidence should be excluded because the personal opinions of individuals

17   who were privy to confidential information are "irrelevant [ ] to [his] actual employability . . . [in]

18   the healthcare industry at large."[162]   Bakst asserts that although certain individuals may have

19   formed an opinion regarding his ability to obtain employment as early as August 2005, because

20   they knew of the investigation, that has no bearing whether the healthcare industry at large viewed

21   him as employable since it was not privy to the fact that there was an ongoing investigation.[163]

22   If CMH were offering the statements to show that Bakst was unemployable in 2005 due to the

23   pending OIG investigation, the court would agree with Bakst. Evidence that OIG's investigation

24   of CMH caused Bakst to lose employment opportunities is only relevant if others in the medical

25   community, and particularly prospective employers, knew of the investigation. As neither side

---

[162]Bakst MIL #9 at 6-7.

[163]*Id.* at 7.

84

has proffered evidence suggesting that the information upon which Bakst's advisors based their opinions was public in August 2005, there is no reason to believe that their assessment of his employability was based on information that an average employer would have known.[164]  Evidence of the OIG investigation was eventually made public, however, and the adopted statements of Bakst's advisors have some tendency to show that it was the OIG investigation, rather than CMG's allegedly disparaging statements, that made Bakst "radioactive" or unemployable in the health care industry.  This is relevant to CMH's causation defense.[165]

Bakst also contends that the statements should be excluded because they constitute improper opinion evidence under Rule 701 and 702.  He asserts that the individuals making the statements are not qualified to offer opinions about his employability, the hiring needs of the healthcare industry at the time, or the effect of the investigation on his qualifications.  Rule 701 of the Federal Rules of Evidence states that a lay witness's testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, . . . (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED.R.EVID. 701.  Under Rule 701, lay opinion must be based on the perception of the witness.

Courts have repeatedly held, however, that party admissions are not subject to the personal perception requirement of Rule 701.  See Advisory Committee Notes to FED.R.EVID. 801 ("The

---

[164]Bakst notes "that because the details of the OIG investigation were confidential and FOIA-exempt, . . . the public at large would not be aware of this confidential investigation until the Hospital and the OIG settled their claims in December of 2007."  (Bakst MIL #9 at 5 (citing Amir Decl., Exh. 16 (OIG Settlement) at 1)).  CMH offers no evidence disputing this.

[165]In addition to suggesting that the evidence is relevant to show that the OIG investigation, rather than CMH's statements, caused Bakst's damages, CMH proffers an alternate reason for admitting the statements.  It notes that certain of the individuals whom Bakst consulted regarding the effect of the OIG investigation were prospective employers, such as Vernon, and head-hunters, such as Smith and Valentine, whom Bakst asked to help him mount a job search.  To the extent the statements of these individuals explain their reasons for not hiring Bakst and/or for refusing to assist him with his job search efforts, they are relevant evidence regarding the cause of Bakst's unemployment.

freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, *and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge*, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility"); *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 667-668 (10th Cir. 2006) ("We have expressly held that an admission of a party opponent may be introduced in evidence even though the declarant lacked personal knowledge of the matter asserted. . . .  Thus, any contention that Bishop Brown's letter was inadmissible under Rule 801(d)(2) because his opinions in the letter were not rationally based on his perceptions lacks merit," citing *Smedra v. Stanek*, 187 F.2d 892, 894 (10th Cir.1951) (stating that "[a]dmissions do not come in, on the ground that the party making them, is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are true" (quotation omitted)); *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 96 (3d Cir. 1999) ("Admissions by a party-opponent need not be based on personal knowledge to be admitted under Rule 801(d)(2)."); *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8-9 (1st Cir. 1986) (same).  See also *Washington Public Power Supply Sys. v. Pittsburgh-Des Moines Corp.*, 876 F.2d 690, 696-97 (9th Cir. 1989) (noting in dicta that if the statements "qualified as admissions under FED.R.EVID. 801(d)(2), . . . the 'legal opinion rule' [would] not [be] a bar"); *Owens v. Atchison, T. & S. F. Ry. Co .*, 393 F.2d 77, 79 (5th Cir. 1968) ("[I]t is well settled that the opinion rule does not apply to a party's admissions"). As the court has already concluded that the statements are adoptive party admissions, Bakst's contention they constitute improper lay opinion testimony is unavailing.

In sum, for the reasons stated, the court denies plaintiff's motion *in limine* to preclude CMH from eliciting testimony of lay opinions concerning his employability offered at the time of the confidential OIG investigation in 2005.

## II.  CONCLUSION

For the reasons stated, the court grants CMH's request to exclude: (1) evidence of disparaging statements in a letter from Richard Fleming; (2) evidence that CMH caused Bakst to

86

suffer emotional distress; (3) evidence regarding CMH's purported motive in allegedly breaching the non-disparagement clause; (4) the testimony of plaintiff's expert witness, Robert Wunderlich; (5) evidence of attempts Bakst made to find comparable employment that were not disclosed in his discovery responses; (6) evidence of deposition Exhibit 135; (7) evidence that Bakst received job offers prior to his November 26, 2003 settlement with CMH; and (8) evidence that CMH requested indemnity from its insurer in connection with the OIG investigation. The court grants Bakst's request to exclude: (1) the testimony defendant's rebuttal expert, David Nolte; (2) evidence regarding defendant's internal investigation of plaintiff and defendant's basis for refusing to indemnify plaintiff to the extent such information was not produced during discovery; (3) the testimony of defendant's expert witness, Martin B. Ross, Ph.D.; (4) the testimony of plaintiff's counsel, Michael Amir; and (5) argument regarding any alleged right to make disparaging statements that is inconsistent with the court's summary judgment ruling. The court denies all other motions *in limine*.

DATED: March 7, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE